# EXHIBIT K



Portfolio Media. Inc. | 111 West 19th Street, 5th Floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

## Trial Pros: Bartlit Beck's Chris Lind

*Law360, New York (April 25, 2016, 11:24 AM ET) --*

Chris Lind at Bartlit Beck Herman Palenchar & Scott LLP serves as lead trial counsel before juries, judges and arbitrators throughout the United States. His representations include matters involving antitrust, accountants liability, patent and trademark, fraud and securities litigation, breach of contract and insurance coverage. Lind also served as special trial counsel to the United States in its antitrust enforcement action against Microsoft.


Chris Lind

**Q: What's the most interesting trial you've worked on and why?**

A: I was lead trial counsel for the defendant in an antitrust case in Texas state court. The case, and the trial, were interesting on many levels. For starters, the stakes were huge — both as a practical matter and financially. The case also involved interesting and complex legal issues and the parties were represented by an all-star cast of lawyers, although I was a carpet bagger in a venue where "home town" counts. I recall walking into court the first time and seeing the opposing lawyer with his cowboy boots casually up on counsel table and a cigar in his mouth, chatting with the judge. The judge granted a TRO against us before I could say a word.

During the final pretrial hearing, the plaintiff announced that it wanted to call one of our witnesses adversely on the first day of trial. This came out of left field, as we thought she was a relatively tangential witness, and if she needed to testify we could call her in our case. There was a bigger problem, however. She was halfway around the world, on a long-planned trekking trip in the Himalayas. The judge nevertheless ordered that we produce her to testify within three days. Fortunately, one of our lawyers knew a Nepali Sherpa (seriously). The Sherpa was able to track down our witness and deliver word that she had to immediately return to the U.S.

What happened next was even more unusual. Just days before opening statements, the judge announced that the plaintiff had been making financial contributions to a boys' home where the judge had lived as a child and was currently a director. Less than 48 hours before opening statements, the region's presiding judge concluded that this relationship could lead an objective person to "harbor a reasonable doubt about the impartiality of the judge" and recused our judge.

With no judge and a pile of pretrial motions yet to be ruled on we took the night off to get some much needed rest. There was no way a new judge could be appointed, get up to speed on the case, rule on pending motions and start a trial in less than 48 hours. So we thought. We awoke the next morning to an order requiring us to be in court at 10 a.m. to meet our new judge. Despite knowing nothing about

the case, he ordered the trial to start the following morning.

We opened the next day, and the presentation of evidence began. We were deprived of a verdict, however, because the case ended up settling in the middle of trial. But we were able to talk to the jurors.

It's always enlightening to get the view from the other side of the rail, and this particular discussion did not disappoint. Every seasoned trial lawyer knows that jurors notice everything — the shine on your shoes, how you treat the courtroom staff, whether you are a straight-shooter, etc. But one juror in this trial took such observations to a new level. She remembered how much the plaintiff's lawyer stressed his client's high-tech, modern image while trying to paint my client as a low-tech dinosaur. She then went into a five-minute analysis of how the plaintiffs lawyer's own image didn't support his argument. Like an episode of Fashion Police, she explained in great detail how his suits were single-vent and a boxy cut, how he tied his tie in a Windsor knot, how his shoes looked, etc. His dress looked dated, not modern and cutting edge. She then described how our lawyers' suits had a more modern cut with double vents, how I tied my tie in a four-in-hand, how our shoes looked, etc. Her conclusion from all this: my client came across as the more modern, high-tech company. All this from how the lawyers' dressed.

**Q: What's the most unexpected or amusing thing you've experienced while working on a trial?**

A: I had a four-month trial in which both sides had hired very fancy economists to give expert testimony regarding antitrust and damages issues. My partner was cross-examining the plaintiff's star expert, who charged $900 an hour — an unheard of rate at the time. When asked about his high rate, the expert complained that by testifying that day he was "actually losing money because he had another case in California for which he was charging $950 per hour." The cross then wrapped up with the following: "Q: Life's tough, isn't it sir. A: It certainly is."

The jurors were paid $5 per week for their service. They had no sympathy for the plaintiff's expert. The next day, they all signed over their $5 checks to the expert and handed them to the judge alongside a Farside cartoon mocking the expert.

We didn't put on a single expert witness in our case. We won.

**Q: What does your trial prep routine consist of?**

A: My routine is simple: hunker down and prepare, prepare, prepare. When I am 30-60 days out from a trial, nothing else matters. I learn every fact, every bit of testimony, and every important document. About a week before trial, I move to the trial site where we take over a floor of a local hotel and recreate our offices.

At this point the rehearsal starts — although that's not really the right word, as it is critical not to sound rehearsed. The week before is spent white-boarding arguments, finalizing examination outlines and pacing the room riffing cross-examination points and opening statement bits and getting the team's feedback. All the while guzzling Water Joe and sugar-free Red Bull (because I hate the taste of coffee).

I also nail down exactly how I will present the key evidence — whether to use a hard copy of each key document or project it on the big screen. How I will call out each paragraph of the key documents and what language will I highlight. How I will carry out each key impeachment — with the deposition

transcript or by video. How exactly I will draw or write on the whiteboard to make a critical point or generate a key timeline. I plan and rehearse these logistics so they look effortless when carried out at trial, where anything can go wrong. Not only are your points more persuasive if you aren't fumbling around, but a clean delivery avoids wasting time. Jurors hate wasted time and appreciate the lawyer that didn't waste their time.

**Q: If you could give just one piece of advice to a lawyer on the eve of their first trial, what would it be?**

A: Credibility is everything. Don't overreach.

**Q: Name a trial attorney, outside your own firm, who has impressed you and tell us why.**

A: I tried a case against Bill Slusser in Houston years ago. He was very effective using just a handful of documents over and over again. We saw it as beating a dead horse, but the repetition worked. That said, they were among the worst documents I've ever seen. This was a patent infringement case where the company had written documents that said things like "remember, our intent was to copy."

*The opinions expressed are those of the author(s) and do not necessarily reflect the views of the firm, its clients, or Portfolio Media Inc., or any of its or their respective affiliates. This article is for general information purposes and is not intended to be and should not be taken as legal advice.*

All Content © 2003-2016, Portfolio Media, Inc.