Karma M. Giulianelli (SBN 184175)
**BARTLIT BECK LLP**
1801 Wewatta St., Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140
karma.giulianelli@bartlitbeck.com

Hae Sung Nam (*pro hac vice*)
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7715
hnam@kaplanfox.com

*Interim Co-Lead Counsel for the Proposed Class*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| *In re Google Play Consumer Antitrust Litigation* | CASE NO. 3:20-CV-05761 JD |
| *Related Actions:*<br>*Epic Games, Inc. v. Google, LLC*, 3:20-CV-05671-JD<br>*In re Google Play Developer Antitrust Litigation*, 3:20-CV-5792-JD | **CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

PARTIES ................................................................................................................5

    A.      Plaintiffs .......................................................................................5

    B.      Defendants ....................................................................................7

JURISDICTION & VENUE ...................................................................................8

FACTUAL ALLEGATIONS ..................................................................................9

I.      THE RELEVANT MARKETS..........................................................................9

    A.      The Licensable Mobile Operating System Market ......................9

    B.      The Android App Distribution Market ......................................10

    C.      The Android Payment Processing Market .................................12

II.    GOOGLE HAS MONOPOLY POWER IN THE MARKETS FOR LICENSABLE MOBILE OPERATING SYSTEMS AND ANDROID APP DISTRIBUTION MARKET .......................................................................................................12

    A.      Google's Monopoly Power Over the Market for Licensable Mobile Operating Systems .......................................................12

    B.      Google's Monopoly Power in the Android App Distribution Market ..................14

III.   GOOGLE UNLAWFULLY MAINTAINS A MONOPOLY IN THE ANDROID APP DISTRIBUTION MARKET .....................................................................16

    A.      Google's Anticompetitive Conduct Through the OEM Channel in the Android App Distribution Market .........................................16

    B.      Google's Anticompetitive Conduct Imposed on Developers in the Android App Distribution Market..................................................19

    C.      Anticompetitive Effects in the Android App Distribution Market ......................22

IV.   GOOGLE UNLAWFULLY MAINTAINS A MONOPOLY IN THE ANDROID PAYMENT PROCESSING MARKET .................................................................24

    A.      Google's Monopoly Power in the Android Payment Processing Market.............25

    B.      Google's Anticompetitive Conduct in the Android Payment Processing Market ...............................................................25

    C.      Anticompetitive Effects in the Android Payment Processing Market ..................26

V.      ANTITRUST INJURY ........................................................................................27

VI.     CLASS ALLEGATIONS ....................................................................................28

CLAIMS ........................................................................................................................30

        A.      Claims for a Nationwide Class ...............................................................30

        B.      California Claims for a Nationwide Class and, in the Alternative, a
                Repealer State Class.................................................................................38

PRAYER FOR RELIEF ................................................................................................46

JURY TRIAL DEMAND ..............................................................................................46

1    Plaintiffs Mary Carr, Kondomar Herrera, Daniel Egerter, Francis MacAulay, Paul Kerivan,

2    and Zachary Palmer, on behalf of themselves and all others similarly situated, bring this class

3    action against Defendants Google, LLC, Google Ireland Ltd., Google Commerce Ltd., Google

4    Asia Pacific Pte. Ltd, and Google Payment Corp. (collectively, "Google"), and allege as follows:

5    **INTRODUCTION**

6        1.      Consumers and businesses worldwide rely on smart mobile devices such as

7    smartphones and tablets for work, news, entertainment, and communication. These devices are

8    enhanced through software products known as mobile applications or "apps." Apps allow users to

9    personalize their device according to their specific needs and interests. Consequently, a mobile

10   device that provides seamless access to and use of a wide variety of apps is valuable to consumers

11   across the globe.

12       2.      Like personal computers, smart mobile devices use an operating system or "OS" to

13   provide core device functionality and allow compatible apps to operate. The commercial viability

14   of an OS for mobile devices (a "mobile OS") depends in large part on the availability, number, and

15   variety of compatible apps that cater to users' preferences and needs.

16       3.      Google controls the most pervasive mobile OS available to original equipment

17   manufacturers to license for their mobile devices: the Android OS. Google's Android OS is used

18   by billions around the world and boasts nearly three million compatible apps. For companies that

19   license operating systems for their smart mobile devices, known as original equipment

20   manufacturers ("OEMs"), Android is the only commercially viable OS that is widely available.

21   OEMs have a single mobile OS option: Google's Android OS. Consequently, Google enjoys

22   monopoly power over the market for mobile OS that is available for license by OEMs.

23       4.      Google is not, however, satisfied with controlling the market for licensable mobile

24   operating systems. Through contractual and technological barriers, Google has monopolized the

25   markets for application distribution for licensable operating systems and application payment

26   processing and distribution. Through these unlawful acts, Google forecloses (1) Android users from

27

28

utilizing app distribution platforms other than Google Play Store[1] and (2) Android developers from utilizing alternative payment processing systems for in-application sales. As a result, the Google Play Store accounts for nearly all app downloads from app stores on Android devices, and Google Play's Billing processing software is used for all subsequent in-app purchases. Google thus maintains a monopoly over the market for distributing mobile apps to Android users (hereafter, the "Android Application Distribution Market"), as well as a monopoly in payment processing systems for Android-compatible in-app sales (hereafter, the "Android Payment Processing Market").

5.     First, Google requires OEMs not only to pre-install the Google Play Store on their mobile devices as a condition to distribution of Google's Android operating system, but also to locate the Google Play Store on the home page of each mobile device. Google also requires OEMs to pre-install a whole bundle of other Google apps—such as Gmail, Google Search, Google Maps, and YouTube—on their devices, occupying valuable space that otherwise could be occupied by other competing app stores. These restrictions in Google's OEM agreements therefore interfere with an OEM's ability to make other third-party app stores or apps easily accessible on their devices, effectively foreclosing competing app stores—and even single apps—from a primary distribution channel.

6.     But OEM control is not Google's only avenue of implementing its anticompetitive scheme to monopolize the Android Application Distribution Market. Google also imposes anticompetitive restrictions on app developers. Specifically, Google contractually prohibits app developers from offering an app through the Google Play Store that could be used to download other apps. Additionally, in order for app developers to take advantage of Google-controlled advertising channels that are specially optimized to advertise mobile apps, such as ad placements on Google Search or YouTube, they are required to distribute their apps through the Google Play Store. Because of Google's market power in internet search, app developers must acquiesce to Google's anticompetitive restrictions for the Google Play Store.

---

[1] "Google Play Store" is the online platform provided by Google where app developers make their apps available for download and sale to Android users.

7.    Finally, Google stifles or blocks consumers' ability to download alternative app stores and apps directly from developers' websites. Downloading apps on an Android device outside of the Google Play Store requires multiple steps that require the user to, among other things, change the device's default settings and click through multiple warnings. Even if a tech-savvy user runs this gauntlet and manages to install a competing app store, Google protects the Google Play Store's competitive advantage by blocking the alternative store from offering basic functions, such as automatic "background" updates of the kind seamlessly available for apps downloaded from Google Play Store. Not only does Google erect needless technological hoops to direct downloading, but it has also imposed restrictions on any modification of the operating system code that would facilitate such downloading. These "anti-forking" restrictions, along with Google's needless barriers and warnings, practically foreclose an app developer's ability to distribute its applications through any other source except the Google Play Store.

8.    Through its behavior, Google intends to—and does—eliminate consumer choice, foreclosing competition in the Android App Distribution Market. There is no legitimate procompetitive justification for Google's conduct and restrictions.

9.    Google also imposes anticompetitive restrictions in the separate market relating to payment processing in connection with the purchase of digital content within their applications. Once an application has been downloaded to the user's device, the app developer may offer content, such as accessories for digital game play or advertisement-free app usage, for sale within the app itself. Theoretically, these in-app purchases could use payment processing tools that offer Android users a variety of payment options. For example, an app developer has the ability to create its own payment processing system, or the developer could utilize a payment processing tool offered by third parties, such as Intuit or Stripe.

10.    But Google forecloses this market through its exclusionary practices. It conditions the right to distribute an app through the Google Play Store on a developer's agreement to exclusively use Google's own payment processing tool, Google Play Billing, to process payments for in-app purchases. But for these restrictions, developers could use other payment processing tools, ranging from credit cards and debit cards, to online wallets or digital payment mechanisms

like PayPal, Intuit, or Stripe. Providers of these services compete on the basis of price, range of services, and the extent to which user information is protected, aggregated, or sold (hereafter, the "Android Payment Processing Market").

11.    Because of Google's restrictions, app developers cannot offer users other payment processing options alongside, or instead of, Google Play Billing. This essentially forces app developers to use both Google Play Store and Google Play Billing in perpetuity. Google's use of its monopoly over the Android App Distribution Market to force developers to use Google Play Billing forecloses competition in the Android Payment Processing Market with respect to in-app purchases, preventing alternative payment processing systems from competing by vertically integrating with alternative application distribution stores for app and in-app purchases. Simply put, developers cannot use an alternate payment processing system to offer in-app purchases through alternative, non-Google channels. As a result, Google charges 30% on in-app purchases for years down the road, even where Google Play has nothing to do with the in-app distribution.

12.    Google's decision to tie its market power in the Android App Distribution Market to in-app payment processing means that for every in-app purchase, just as for an initial app purchase, it is Google, not the app developer, that first collects payment from consumers. Google then taxes the transaction at an exorbitant, supra-competitive 30% rate, remitting the remaining 70% to the developer. This 30% commission is up to ten times higher than the toll charged by other payment processing providers. Moreover, this tax can continue for years, for every in-app purchase made. The result: consumers pay more for applications (including in-app purchases) than they would in a competitive market.

13.    Moreover, by conditioning an app's access to the Google Play Store on the use of Google's payment processing tools, Google not only forecloses competition in the Android Payment Processing Market, but gains valuable information for Google's own data information services, advertising services, and mobile app development business. As an integral part of their provision of services, payment processing providers collect information regarding users, including their name, email address, billing address, and purchase history. By interposing itself in every digital content purchase conducted within an Android-distributed app, Google is able to collect

information regarding user purchases and preferences that it would not otherwise receive. And significantly, Google excludes other payment processing providers from having access to this entire universe of Android user information.

14.     But for Google's monopolistic conduct, competitors could offer consumers and developers choices for in-app distribution and payment processing. Entities wishing to distribute apps through a competing app store could offer developers greater innovation and enhanced choices, including in-app payment processing. With other viable options, app developers would not have to pay Google's supra-competitive tax of 30% on all purchases for every distinct product sold within the app itself, which in turn inflated prices paid by Plaintiffs and the Class.

15.     Absent Google's anticompetitive restrictions on OEMs and application developers, the price of distribution and payment processing alike would be set by market forces to the benefit of consumers and developers. Users and developers—not Google—would decide how (or even whether) user data was employed for other purposes.

## PARTIES

### A.     Plaintiffs

16.     Plaintiff Mary Carr is a natural person who resides in the State of Illinois. Ms. Carr purchased one or more apps through the Google Play Store and also purchased in-app digital content through one or more apps offered in the Google Play Store from August 16, 2016, to the present and paid Google directly for these purchases. Ms. Carr is (1) a proposed representative of the national class asserting claims under the federal antitrust laws and (2) a proposed representative of a national class asserting claims under the Cartwright Act or, in the alternative, a proposed representative for Cartwright Act claims for states whose law provides for antitrust recovery for indirect purchasers ("Repealer States").

17.     Plaintiff Kondomar Herrera is a natural person who resides in the State of New York. Ms. Herrera purchased in-app digital content through one or more apps offered in the Google Play Store from August 16, 2016, to the present and paid Google directly for these purchases. Ms. Herrera is (1) a proposed representative of the national class asserting claims under the federal antitrust laws and (2) a proposed representative of a national class asserting claims under the

Cartwright Act or, in the alternative, a proposed representative for Cartwright Act claims for Repealer States.

18.     Plaintiff Daniel Egerter is a natural person who resides in the State of California. Mr. Egerter purchased one or more apps through the Google Play Store and also purchased in-app digital content through one or more apps offered in the Google Play Store from August 16, 2016, to the present and paid Google directly for these purchases. Mr. Egerter is (1) a proposed representative of the national class asserting claims under the federal antitrust laws and (2) a proposed representative of a national class asserting claims under the Cartwright Act or, in the alternative, a proposed representative for Cartwright Act claims for Repealer States.

19.     Plaintiff Francis MacAulay is a natural person who resides in the State of Arizona. Mr. MacAulay purchased one or more apps through the Google Play Store and also purchased in-app digital content through one or more apps offered in the Google Play Store from August 16, 2016, to the present and paid Google directly for these purchases. Mr. McAulay is (1) a proposed representative of the national class asserting claims under the federal antitrust laws and (2) a proposed representative of a national class asserting claims under the Cartwright Act or, in the alternative, a proposed representative for Cartwright Act claims for Repealer States.

20.     Plaintiff Paul Kerivan is a natural person who resides in the State of Maine. Mr. Kerivan purchased one or more apps through the Google Play Store and also purchased in-app digital content through one or more apps offered in the Google Play Store from August 16, 2016, to the present and paid Google directly for these purchases. Mr. Kerivan is (1) a proposed representative of the national class asserting claims under the federal antitrust laws and (2) a proposed representative of a national class asserting claims under the Cartwright Act or, in the alternative, a proposed representative for Cartwright Act claims for Repealer States.

21.     Plaintiff Zachary Palmer is a natural person who resides in the Commonwealth of Massachusetts. Mr. Palmer purchased one or more apps through the Google Play Store and also purchased in-app digital content through one or more apps offered in the Google Play Store from August 16, 2016, to the present and paid Google directly for these purchases. Mr. Palmer is (1) a proposed representative of the national class asserting claims under the federal antitrust laws and

1    (2) a proposed representative of a national class asserting claims under the Cartwright Act or, in the

2    alternative, a proposed representative for Cartwright Act claims for Repealer States.

3         22.    All proposed national class representatives and members of the nationwide Class

4    purchased apps and/or made in-app purchases directly from Google. The proposed nationwide class

5    representatives and members of the nationwide class paid Google directly for these purchases,

6    which means they have federal antitrust claims. *See Apple v. Pepper*, 139 S. Ct. 1514 (2019).

7    Google has judicially admitted in the *Epic Games* case that consumers are direct purchasers and

8    may assert overcharge damages under the federal antitrust laws. *See* Google's Separate

9    Memorandum of Points and Authorities Re: Defendants' Motion To Dismiss Developers' Claim

10   For Damages (ECF No. 91-1). In this case, however, Google has refused to stipulate that Plaintiffs

11   and the Class are direct purchasers.

12        23.    Each of the Plaintiffs named above are proposed national class representatives for

13   federal antitrust claims and proposed representatives of a national class for the Cartwright claims

14   alleged in this Complaint. Alternatively, each of these proposed national class representatives

15   would litigate Cartwright Act claims by representing a class of plaintiffs in Repealer States

16   (*i.e.*, states whose law permits indirect purchaser standing and provides for antitrust recovery for

17   indirect purchasers).

18        **B.    Defendants**

19        24.    Defendant Google, LLC is a Delaware limited liability company with its principal

20   place of business in Mountain View, California. Google, LLC is the primary operating subsidiary

21   of the publicly traded holding company Alphabet Inc. The sole member of Google, LLC is XXVI

22   Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View,

23   California. Since 2005, Google, LLC has owned and developed the Android OS for use in Android-

24   licensed mobile devices. Google, LLC is also the owner of the Google Play Store. Google, LLC

25   contracts with all app developers that distribute their apps to consumers through the Google Play

26   Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

27        25.    Defendant Google Ireland Limited ("Google Ireland") is a limited liability company

28   organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and is a

subsidiary of Google, LLC. Google Ireland contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

26.   Defendant Google Commerce Limited ("Google Commerce") is a limited liability company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and is a subsidiary of Google, LLC. Google Commerce contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

27.   Defendant Google Asia Pacific Pte. Limited ("Google Asia Pacific") is a private limited liability company organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore, and is a subsidiary of Google, LLC. Google Asia Pacific contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

28.   Defendant Google Payment Corp. ("Google Payment") is a Delaware corporation with its principal place of business in Mountain View, California, and is a subsidiary of Google, LLC. Google Payment provides in-app payment processing services to Android app developers and Android users and collects a 30% commission on many types of processed payments, including payments for apps sold through the Google Play Store and in-app purchases made within such apps.

## JURISDICTION & VENUE

29.   This Court has subject-matter jurisdiction over Plaintiffs' federal antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiffs' Cartwright Act claims pursuant to 28 U.S.C. § 1367.

30.   This Court has personal jurisdiction over Defendants. Google, LLC and Google Payment are headquartered in this District. All Defendants have had sufficient minimum contacts with the United States, and purposefully availed themselves of the benefits and protections of United States and California law, such that the exercise of jurisdiction over them comports with due process requirements. Further, Defendants consented to the exercise of personal jurisdiction by this Court.

31.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Google, LLC and Google Payment maintain their principal places of business in the State of California and in this District, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and because, pursuant to 28 U.S.C. § 1391(c)(3), any Defendant not residing in the United States may be sued in any judicial district and their joinder with others shall be disregarded in determining proper venue.

32.     In the alternative, personal jurisdiction and venue are also proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because Defendants may be found in or transact business in this District.

## FACTUAL ALLEGATIONS

## I.     THE RELEVANT MARKETS

33.     Google's anticompetitive conduct affects multiple product markets: (1) the Licensable Mobile Operating System Market; (2) the Android App Distribution Market; and (3) the Android Payment Processing Market.

### A.     The Licensable Mobile Operating System Market

34.     Mobile devices require an OS that enables multi-purpose computing functionality, including, but not limited to: (1) button, touch, and motion commands; (2) a "graphical user interface" made up of icons allowing the user to take action; (3) basic operations such as cellular or WiFi connectivity, GPS positioning, camera and video recording, and speech recognition; and (4) the installation and operation of compatible mobile apps.

35.     Mobile devices cannot be used by purchasers without an OS that controls the device and serves as a platform for other apps and functions.

36.      In addition to providing basic functions for mobile device users, an OS provides a software development platform for app developers. An OS contains code, including application programming interfaces ("APIs"), that allows developers to write apps that run on the OS and are compatible with other apps or platforms an OS developer distributes or bundles with its OS.

37.     An OEM must pre-install an OS on each mobile device prior to its sale so that purchasers immediately have access to basic functions like the ones described above.

38.     Mobile device manufacturers have two options for an OS: (1) they can develop their own OS or (2) they can license an OS. The vast majority of OEMs do not develop their own OS, so they must choose and license an OS for their devices. There is, therefore, a relevant market for licensable mobile operating systems for OEMs to install on their mobile devices.[2]

39.     Historically, this market included the Android OS, developed by Google, the Tizen mobile OS, a partially open-source mobile OS that was developed by the Linux Foundation and Samsung, and the Windows Phone OS developed by Microsoft. Apple's iOS is a broadly-used mobile OS in the United States, but it is not licensed by Apple to other mobile device manufacturers.

40.     The geographic scope of the Licensable Mobile Operating System Market is the United States. The Licensable Mobile Operating System Market operates as described throughout this Complaint.

41.     Google has a monopoly over licensable mobile OS platforms, both globally and in the United States, accounting for over 95% of licensable mobile OSs for mobile devices— smartphones and tablets—in the United States alone.

**B.     The Android App Distribution Market**

42.     There is also a relevant market for the distribution of Android OS compatible apps to mobile device users. This market is made up of all the channels by which Android OS compatible mobile apps and in-app purchases are distributed to the hundreds of millions of mobile Android OS users. The market primarily includes app downloads in Google's dominant Google Play Store, with smaller stores, such as Samsung's Galaxy Store and Aptoide, trailing far behind and in-app purchases made within apps. Nominally only, the direct downloading of apps without using an app store (which Google pejoratively describes as "sideloading") is also part of this market.

43.     Notably, Google tries to deter sideloading through an array of technological hurdles including a complicated multi-step process requiring the user to make changes to the device's default settings and manually granting various permissions, while encountering multiple, unfounded security warnings that suggest sideloading is unsafe. Therefore, while it is theoretically

---

[2] This market does not include any proprietary OS that is not available for licensing, such as Apple's mobile OS, called iOS.

possible to obtain apps through means other than an app store like the Google Play Store, the vast majority of users utilize an app store to purchase and download apps. Users' ability to sideload does not constrain Google's power because Google controls the underlying technology utilized for sideloading.

44.     Upon information and belief, Google imposes restrictions on OEMs requiring them to block sideloading. For example, Epic, which makes the popular game Fortnite, tried to partner with LG, an Android-licensed OEM, to ease restrictions controlling how users could download and play the game. LG ultimately refused because its contract with Google required LG "to block side downloading off Google Play Store this year."

45.     App stores allow consumers to use their mobile device to browse, search for, access reviews on, purchase (if necessary), download, and install mobile apps. It would be commercially unreasonable for an OEM to sell a smart mobile device without an app store since the ability to find, purchase, and download apps is one of the primary benefits of such devices.

46.     App stores are OS-specific and therefore only distribute apps compatible with a specific mobile OS. An Android OS owner will use an Android-compatible app store that distributes only Android-compatible mobile apps. That consumer may not, for example, substitute Apple's App Store because it is not available on Android devices, not compatible with the Android OS, and does not offer Android-compatible apps. Consequently, non-Android mobile app distribution platforms are not part of the Android App Distribution Market.[3]

47.     Even if an app is available for different OS platforms, only the version of that software compatible with a specific OS can run on a specific device, console, or computer. Accordingly, as a commercial reality, any app developer that wishes to distribute apps for Android mobile devices must develop an Android-specific version of the app that is distributed through the Android App Distribution Market.

48.     The geographic scope of the Android App Distribution Market is the United States.

---

[3] These non-Android platforms would include, for example, the Windows Mobile Store used on Microsoft's Windows Mobile OS, the Apple App Store used on Apple iOS devices, and gaming stores for specific consoles like the Sony PlayStation and/or Nintendo.

C.     **The Android Payment Processing Market**

49.     A payment processor handles credit and debit card transactions for merchants. Under normal competitive conditions, developers could create their own payment processing systems or can purchase these services from third-party providers for use with both fees charged for the initial app download and for distinct in-app purchases. Payment processing systems are separate products from application distribution stores, not mere components of a business method, because they can be offered separately and one payment processor could be, absent Google's restrictions, offered instead of another for the same resulting benefits and transactions. There is, therefore, a relevant market for android payment processing tools to use in connection with the sale of in-app digital content on Android devices.

50.     This market includes a range of potential competitors such as Stripe, PayPal, and Square.

51.     The geographic scope of the Android Payment Processing Market is the United States. The Android Payment Processing Market operates as described throughout this Complaint.

II.     **GOOGLE HAS MONOPOLY POWER IN THE MARKETS FOR LICENSABLE MOBILE OPERATING SYSTEMS AND ANDROID APP DISTRIBUTION MARKET**

A.     **Google's Monopoly Power Over the Market for Licensable Mobile Operating Systems**

52.     Google enjoys monopoly power in the Licensable Mobile Operating System Market through Android OS.

53.     OEMs design mobile devices to ensure compatibility with whatever OS was selected for that device. For OEMs, the process of implementing a mobile OS requires significant time and investment, making switching to another mobile OS difficult, expensive, and time-consuming. OEMs that developed their devices around the Android OS would face substantial costs to switch to another OS, a reality that furthers Google's monopoly power in the Licensable Mobile Operating System Market.

54.     A mobile ecosystem of products like apps, devices, and accessories typically develops around one or more mobile OSs, such as the Android OS. The "Android ecosystem" is, therefore, a system of mobile products that are inter-dependent and compatible with each other.

55.     Google restricts OEMs from developing or distributing their own version of Android. But for this restriction, anyone can access the Android source code and create a modified OS, known as a fork. Yet Google enters into anti-forking agreements with mobile-device OEMs—Anti-Fragmentation Agreements or Android Compatibility Commitments—that forbid them from developing or distributing their own versions of Android and prohibit OEMs from doing anything that may cause or result in the fragmentation of Android. Anti-forking agreements are a pre-condition to receiving a license to distribute Google apps and APIs—the set of technical specifications that enable software applications to communicate with each other, OSs, and hardware. These anti-forking agreements allow Google to maintain its stranglehold over OSs for Android devices.

56.     Moreover, and as evidence of its market power over OEMs, Google uses the Android OS to restrict which apps and app stores OEMs pre-install on their devices and to deter the direct distribution of competing app stores and apps to Android users, all at the expense of competition in the Android ecosystem.

57.     OEMs have no commercially viable choice but to license Google's Android OS, and, in turn, developers must create apps that are compatible with that OS. OEMs such as ZTE and Nokia have acknowledged that other, non-proprietary OSs are poor substitutes for and not a reasonable alternative to the Android OS, not least because other mobile OSs do not presently support many high-quality and successful mobile apps deemed essential or valuable by consumers. Google, therefore, has constructed a market that biases consumers against devices with non-proprietary mobile OSs other than the Android OS, while putting OEMs at Google's mercy because their devices must offer a popular mobile OS and corresponding ecosystem to consumers.

58.     To attract app developers and users, Google has represented that Android is an "open" ecosystem where any participant may create Android-compatible products without unnecessary restrictions.

59.     In fact, Google has used the Android OS to keep its ecosystem closed to competition. As the dominant mobile OS licensor, Google recognizes that participation on its platform is a "must-

have" market for developers. Google only unlocks the door to its ecosystem for participants willing to play by Google's rules and anticompetitive restrictions.

**B.     Google's Monopoly Power in the Android App Distribution Market**

60.     Google also has monopoly power in the Android App Distribution Market through the Google Play Store.

61.     Other existing Android mobile app stores cannot thwart Google's monopoly power in the Android App Distribution Market because no other app store reaches nearly as many Android users as the Google Play Store. No other Android app store comes close to that number of pre-installed users. Setting aside app stores designed by a particular OEM for installation in the mobile device sold by that OEM (for example, Samsung Galaxy Apps and the LG Electronics App Store), no other Android app store except the Google Play Store is pre-installed on more than 10% of Android mobile devices, and many have no appreciable market penetration at all. Aptoide, for example, is an Android app store that claims to be the largest "independent" app store outside China, but it comes pre-installed on no more than 5% of Android mobile devices.

62.     Google's monopoly power is demonstrated by its massive market share in terms of apps downloaded.

63.     Because there is no economically viable substitute to the Google Play Store for distribution of Android apps, Google has a monopoly over the Android App Distribution Market. The Google Play Store offers over three million apps, including all the most popular Android apps, compared to just 700,000 apps offered by Aptoide, the Android app store with the next largest listing. The Google Play Store benefits from the large number of participating app developers and users. The ever-growing variety of apps attracts more and more users, and, in turn, the audience attracts app developers who wish to access those users. The system feeds itself. Consequently, Android OEMs find it commercially unreasonable to make and sell smartphones or tablets without Google Play Store.

64.     As further proof of its monopoly power, Google imposes a supra-competitive commission of 30% on the price of apps purchased through the Google Play Store and in-apps processed through Google Play Billing, the use of which is mandated by Google's restrictions on

app developers whose apps are distributed through the Google Play Store, which is a far higher commission than would exist under competitive conditions.

65.     Google's market power over in-app distribution is not constrained by competition at the smart mobile-device level.

66.     First, consumers are deterred from leaving the Android ecosystem due to the difficulty and costs of switching. Consumers choose a smartphone or tablet based in part on the pre-installed OS and its ecosystem. Once a consumer selects a smartphone or tablet, the consumer cannot replace the pre-installed mobile OS with an alternative. If they want to switch OSs, consumers must purchase a new mobile device. In addition, mobile OSs have different designs, controls, and functions that consumers learn to navigate over time. The cost of learning to use a different mobile OS is part of consumers' switching costs.

67.     Second, switching from Android devices may result in a significant loss of personal and financial investment that consumers put into the Android ecosystem. Because apps, in-app content, and many other products are designed for or are only compatible with a particular mobile OS, switching to a new mobile OS may mean losing access to such products or data, even if such apps and products are available within the new ecosystem. Consumers switching from the Android OS would, consequently, lose their investment in the Android-specific apps previously purchased or used.

68.     Consumers are also unable to determine the "lifecycle price" of devices—*i.e.*, to accurately assess at the point of purchase how much they will ultimately spend (including on the device and all apps and in-app purchases) for the duration of their device ownership. Consumers cannot predict all of the apps or in-app content they may eventually purchase. Because they cannot know or predict all such factors when purchasing mobile devices, consumers are unable to calculate lifecycle prices for the devices. This prevents consumers from effectively taking Google's anticompetitive conduct into account when making mobile device purchasing decisions.

69.     Given consumers' essentially unavoidable "lock-in" to the Android OS, developers must participate in the Android ecosystem. The alternative is losing access to millions of Android users.

III.    **GOOGLE UNLAWFULLY MAINTAINS A MONOPOLY IN THE ANDROID APP DISTRIBUTION MARKET**

70.    Mobile apps make mobile devices more useful and valuable because they add user-specific functionality like working, video chatting, banking, shopping, job hunting, photo editing, reading digital news sources, editing documents, or playing a game like Hearthstone or Pokémon Go. Many consumers own only a mobile device and, even if they could perform the same or similar functions on a personal computer, the ability to access apps "on the go" using a handheld, portable device remains valuable and important.

71.    Consequently, mobile devices must provide an avenue for downloading or buying apps post-purchase. On Android devices, this is primarily done through the Google Play Store. Through this store, mobile apps can be browsed, purchased (if necessary), and downloaded by a consumer. App stores such as Google Play Store, alongside other distribution platforms available to the hundreds of millions of Android-based mobile device users, comprise the Android App Distribution Market.

A.    **Google's Anticompetitive Conduct Through the OEM Channel in the Android App Distribution Market**

72.    Through various anticompetitive acts and unlawful restraints on competition, Google maintains a monopoly in the Android App Distribution Market, causing ongoing harm to competition and to app developers and consumers. Google's restraints of trade undermine its representations that, "as an open platform, Android is about choice," and that app developers "can distribute [their] Android apps to users in any way [they] want, using any distribution approach or combination of approaches that meets [their] needs," including by allowing users to directly download apps "from a website" or even by "emailing them directly to consumers." These representations are false, and Google uses anticompetitive means to ensure that they remain that way.

73.    Google willfully and unlawfully maintains its monopoly in the Android App Distribution Market through a series of related anticompetitive acts designed to foreclose alternative and competing Android app distribution channels.

74.     First, Google imposes anticompetitive restrictions on OEMs. Google conditions licensing of Google Play Store, other essential Google services, and the Android OS and trademark on an OEM's agreement to give Google Play Store preferential treatment. Google requires pre-installation and prominent placement for the Google Play Store. These actions are crucial because, as Google explains, "most users just use what comes on the device. People rarely change defaults."

75.     Specifically, Android OEMs (which, as noted above, comprise virtually all OEMs that obtain an OS in the licensable market) must sign a Mobile Application Distribution Agreement ("MADA") with Google. A MADA confers a license to a bundle of proprietary Google apps (such as Google Chrome, Gmail, Google Search, Google Maps, and YouTube), Google-supplied services necessary for mobile app functionality ("Google Play Services"), and the Android trademark. The MADA *requires* OEMs to locate Google Play Store on the "home screen" of each mobile device. Android OEMs must further pre-install up to thirty mandatory Google apps and locate these apps on the home screen or on the next screen, occupying valuable space on each user's mobile device that otherwise could be occupied by competing app stores and other services.

76.     These requirements ensure that the Google Play Store is the most visible app store any user encounters and, therefore the app store that most consumers will simply use by default. The prominence of the Google Play Store permits Google to place restrictions on app developers with respect to in-app purchases. All other app stores are purposely placed at a significant disadvantage. Prominent placement is critical to an app store's success and adoption.

77.     Absent this restraint, OEMs could pre-install and prominently display alternative app stores. This would allow competing app stores to vie for prominent placement on Android devices, which would increase exposure to consumers and, as a result, increase their ability to attract app developers to their store. An app distributor could and would negotiate with OEMs to provide their app stores the prominent placement that Google currently forbids. Google's contracts, covering over 95% of mobile devices using a licensable OS globally, therefore substantially foreclose competition by relegating would-be competitors to the bottom of the pile. Google prohibits any OEM that licenses the Android OS—which is the overwhelming majority—

from installing *and* featuring any rival app distribution platform more prominently than Google Play Store.

78.     Second, Google interferes with OEMs' ability to distribute Android app stores and apps, and consequently, in-app purchases, directly to consumers outside of the Google Play Store. Some OEMs might compete for buyers by offering mobile devices with easy access to additional mobile app stores and apps through, for instance, pre-installed or prominently placed icons. Even when an OEM wants to make mobile apps available to consumers in this way, Google imposes unjustified and pretextual warnings about the security of installing an app outside of the Google Play Store. This is done even though the consumer installing the app is fully aware of its source. This conduct dissuades users from downloading apps outside the Google Play Store.

79.     Third, Google interferes with OEMs' ability to license, distribute, and prominently display competing Android app stores by forcing any OEM who wishes to license even *one* of the applications included in Google's arbitrarily designated Google Mobile Services ("GMS")—a suite of applications including Google Search, Google Chrome, YouTube, Google Maps, and the Google Play Store—to enter a MADA that requires that OEM to license and prominently display *every* GMS application. Accordingly, if an OEM only wants to pre-install Google Chrome, it cannot do so without pre-installing all applications in GMS, and must display all apps in GMS prominently. As a consequence, there is no prominent space for the display of competing play stores.

80.     Fourth, as discussed above, Google prohibits OEMs from modifying the Android source code through anti-forking agreements with mobile-device OEMs. Google's anti-forking agreements prevent OEMs from modifying the Android OS to facilitate preloaded or side-loaded app stores and eliminate the technical hurdles for competing app stores.

81.     OEMs must agree and have agreed to Google's anticompetitive, restrictive terms and conditions or risk losing access to the Android OS and Google Play Services, including the APIs that many mobile-app developers need for their apps to work properly, at least without expensive and time-consuming reprogramming.

1

2

**B.    Google's Anticompetitive Conduct Imposed on Developers in the Android App Distribution Market**

3

82.    Google also imposes anticompetitive restrictions on app developers, restricting their

4

ability to provide competing mobile app stores within an app. This further entrenches Google's

5

monopoly in the Android App Distribution Market.

6

83.    First, Google prevents developers who go through the Google Play Store

7

from providing an app that would allow for the downloading of competitive application

8

distribution stores within that app. In other words, Google prevents the distribution of a

9

competing mobile storefront for other app purchases, even though Google has no legitimate

10

procompetitive justification for preventing application developers from distributing alternative

11

application delivery stores.

12

84.    Google imposes this restraint through provisions of the Google Play Developer

13

Distribution Agreement ("DDA"), which all app developers must sign before they can distribute

14

their apps through the Google Play Store. Each of the Defendants, except Google Payment, is a

15

party to the DDA.

16

85.    Section 4.5 of the DDA provides that developers "may not use Google Play to

17

distribute or make available any Product that has a purpose that facilitates the distribution of

18

software applications and games for use on Android devices outside of Google Play." The DDA in

19

Section 8.3 further reserves to Google the right to remove and disable any Android app that it

20

determines violates this requirement. The DDA is non-negotiable, so developers seeking access to

21

Android users through the Google Play Store must accept Google's standardized contract of

22

adhesion. Through this restraint, Google has exercised its monopoly power by refusing to allow any

23

rival app stores to be accessed through the Google Play Store.

24

86.    In the absence of these unlawful restraints, app developers could direct users to

25

competing app distributors through the app which would allow users to replace or supplement the

26

consumers by offering lower prices and innovative app store models, such as app stores that are

27

curated to specific consumers' interests—*e.g.*, an app store that specializes in games. Without

28

Google's unlawful restraints, app developers could give users an opportunity to use other app stores

providing additional platforms on which more apps could be featured, and thereby, discovered by consumers.

87.     Second, Google conditions app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store. Specifically, Google markets an App Campaigns program that, as Google says, allows app developers to "get your app into the hands of more paying users" by "streamlin[ing] the process for you, making it easy to promote your apps across Google's largest properties." This includes certain ad placements on Google Search, YouTube, Discover on Google Search, and the Google Display Network, and with Google's "search partners," which are specially optimized for the advertising of mobile apps. However, to access the App Campaigns program, Google requires that app developers list their app in either the Google Play Store (to reach Android users) or in the Apple App Store (to reach Apple iOS users). This conduct further entrenches Google's monopoly in the Android App Distribution Market by coercing Android app developers to list their apps in the Google Play Store or risk losing access to a great many Android users they could otherwise advertise to, including through Google's search engine, but for Google's restrictions.

88.     But for Google's anticompetitive acts, Android users could freely download apps, without the technological and practical hurdles placed by Google, from developers' websites, rather than through an app store, just as they might do on a personal computer. There is no reason that downloading and installing an app, or making in-app purchases, on a mobile device should be different. Millions of personal computer users easily and safely download and install software directly every day, such as Google's own Chrome browser or Adobe's Acrobat Reader.

89.     Google denies directly downloaded or sideloaded apps the permissions necessary to be seamlessly updated in the background—a benefit reserved solely for apps downloaded via Google Play Store. Instead, users must manually trigger updates, which may even require revisiting the original download process, complete with its hurdles and warnings. This imposes onerous obstacles on consumers who wish to keep the most current version of an app on their mobile device and further drives consumers away from direct downloading or sideloading and toward the Google Play Store. For instance, Amazon's website explains that updating an app on Amazon's Android

app store requires a user to follow a multi-step process: "1. Open the app store you used to install the app on your device. 2. Search for the app and open the app's detail page. 3. If an update is available, an Update option displays." By making the app update process difficult, Google further discourages users from seeking out rival app stores and the apps offered therein.

90.   Google further restricts direct downloading under the guise of offering protection from malware. When Google deems an app "harmful," Google may prevent the installation of, prompt a consumer to uninstall, or forcibly remove the app from a consumer's device. Direct downloading is entirely prevented on Android devices that are part of Google's so-called Advanced Protection Program ("APP"). Consumers who enroll in APP cannot directly download apps; their Android device can only download apps distributed in the Google Play Store or in another pre-installed app store that Google pre-approved an OEM to offer on its devices. App developers therefore cannot reach APP users unless they first agree to distribute their apps through the Google Play Store or through a separate Google-approved, OEM-offered app store, where available. Any claimed benefits resulting from Google's Advanced Protection Program can be achieved through less restrictive means, allowing for alternative application distribution mechanisms while still protecting users from malware and other security issues.

91.   Google's invocation of security is an excuse to further limit the apps available to Android users, as shown by a comparison to personal computers, where users can securely purchase and download new software without being limited to a single software store owned or approved by the user's anti-virus software vendor. This comparison shows that Google's multiple technical barriers to direct downloading from alternative sources go far beyond what is necessary to achieve any legitimate security objectives. Put differently, Google has not adopted the least restrictive means necessary for achieving any legitimate security objectives.

92.   Direct downloading by consumers of competing app distributors who seek to distribute competing Android app stores directly to consumers is also nominally available. However, the same restrictions Google imposes on the direct downloading of apps apply to the direct downloading of app stores. Indeed, Google Play Protect, a default program that Google has created to periodically scan Android devices and delete or disable potentially harmful apps, has

flagged at least one competing Android app store, Aptoide, as "harmful," further hindering consumers' ability to access a competing app store.

93.     Thus, neither direct downloading nor sideloading are a viable way for non-Google Play Store app stores to reach Android users, any more than they are a viable alternative for single apps. Google's barriers erected against competing app distributors also are not the least restrictive means necessary to achieve any legitimate security objectives.

94.     But for Google's restrictions on direct downloading, app distributors and developers could try to distribute their stores and apps directly to consumers. As explained above, Google makes direct downloading substantially and unnecessarily difficult, and in some cases prevents it entirely, further narrowing this already narrow alternative distribution channel.

95.     There is no legitimate reason for Google's conduct, and even if there were, Google has not adopted the least restrictive means for achieving it. For decades, PC users have installed software acquired from various sources without being deterred by anything like the obstacles erected by Google. A PC user can navigate to an internet webpage, click to download and install an application, and be up and running, often in a matter of minutes. Security screening is conducted by a neutral security software operating in the background, allowing users to download software from any source they choose (unlike Android).

96.     Through these anticompetitive acts, including contractual provisions and exclusionary obstacles, Google has willfully obtained a near-absolute monopoly over the Android App Distribution Market. Google Play Store downloads have accounted for more than 90% of downloads through Android app stores, dwarfing other available distribution channels.

C.     **Anticompetitive Effects in the Android App Distribution Market**

97.     Google's anticompetitive conduct has foreclosed competition in the Android App Distribution Market, affected a substantial volume of commerce in this market, and caused anticompetitive harms to consumers.

98.     As described above, Google's anticompetitive conduct forces OEMs to dedicate valuable "home screen" real estate to the Google Play Store and other mandatory Google applications, regardless of the OEM's preferences, which might include allowing other app stores

or developers to place an icon there. Individually and together, these requirements limit OEMs' ability to differentiate themselves and compete with each other by offering innovative and more appealing (in terms of price and quality) distribution platforms for mobile apps. Google's restrictions also interfere with OEMs' ability to compete with each other by offering Android devices with tailored combinations of pre-installed apps that would appeal to particular subsets of mobile device consumers.

99.     Google's anticompetitive conduct harms consumers because would-be competitor app distributors are foreclosed from innovating new models of app distribution.

100.     Google's anticompetitive conduct harms app developers, who must agree to Google's anticompetitive terms and conditions to reach many Android users through downloads or Google's advertising platforms. Google's restrictions prevent developers from experimenting with alternative app distribution models, such as providing apps directly to consumers, selling apps through curated app stores, creating their own competing app stores, or forming business relationships with OEMs who can pre-install apps. By restricting developers, Google ensures that the developer's apps will be distributed on the Google Play Store, which empowers Google to monitor the apps' usage. Consumers are harmed by Google's supra-competitive taxes of 30% on the purchase price of apps and in-app purchases distributed directly or indirectly through the Google Play Store, which is a much higher transaction fee than would exist in a competitive market unimpaired by Google's anticompetitive conduct. Google's supra-competitive tax raises prices for consumers and reduces the output of mobile apps and related content. By depriving app developers of a market price for their apps, the tax reduces developers' incentive and capital to develop new apps and content and harms consumers.

101.     Consumers are further harmed because Google's control of app distribution reduces developers' ability and incentive to distribute apps in different and innovative ways—for example, through genre-specific app stores. Google, by restraining the distribution market and eliminating the ability and incentive for competing app stores, also limits consumers' ability to discover new apps of interest to them. More competing app stores would permit additional platforms to feature diverse collections of apps. Instead, consumers are left to sift through millions of apps in one

monopolized app store, where Google controls which apps are featured, identified, or prioritized in user searches.

## IV.   GOOGLE UNLAWFULLY MAINTAINS A MONOPOLY IN THE ANDROID PAYMENT PROCESSING MARKET

102.   By selling digital content within a mobile app rather than charging for the app itself, app developers can make an app widely accessible and then generate revenue based on use. By allowing users to use apps without up-front costs, developers permit more users to try the app "risk free" and only pay for what they want to access. Many apps are free to download and use but make additional content available for in-app purchasing on an à la carte basis or via a subscription-based service. App developers who sell digital content rely on in-app payment processing tools to process consumers' purchases in a seamless and efficient manner.

103.   Google has engaged in anticompetitive conduct to ensure that Android app developers are not free to utilize any one of the multitude of electronic payment processing solutions available to process in-app purchases and other transactions. Google conditions developers' access to the dominant Google Play Store on an agreement to use Google Play Billing to process app and in-app purchases of digital content. Google thus ties its own proprietary payment processing tool to its Google Play Store and uses that tie to maintain its monopoly over the Android Payment Processing Market, as defined below.

104.   Absent Google's unlawful conduct, app developers could integrate compatible payment processors into their apps to facilitate in-app digital content purchases or develop such functionality themselves. Developers could restrict the number of payment options, choosing to minimize costs by offering only PayPal as an option, for example. Or, developers could choose to offer a wide range of payment options, either through their own infrastructure or through a third-party payment processing provider. More importantly, without Google's requirement that developers use Google Play Billing, its payment processing software, developers could offer an efficient alternative to Google for the distribution and frictionless payment of in-app purchases. This would, in turn, result in lower prices for consumers and reduce developers' costs for receiving payment.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**A.    Google's Monopoly Power in the Android Payment Processing Market**

105.    There is a relevant antitrust market for processing payment for digital content within Android apps. The Android Payment Processing Market comprises the payment processing solutions that Android developers could integrate into their Android apps to process the purchase of in-app digital content.

106.    App developers selling in-app digital content must offer transactions that are seamless, engrossing, and quick.

107.    The geographic scope of the Android Payment Processing Market is the United States. The Android Payment Processing Market operates as described throughout this Complaint.

108.    Google has monopoly power in the Android Payment Processing Market.

**B.    Google's Anticompetitive Conduct in the Android Payment Processing Market**

109.    For apps distributed through the Google Play Store, Google requires use of Google Play Billing to process in-app purchases of digital content and for all in-app purchases. Because 90% or more of Android-compatible mobile app downloads through an app store are conducted in the Google Play Store, Google has a monopoly in these markets.

110.    Google charges a 30% commission for Google Play Billing. This rate reflects Google's market power, which allows it to charge supra-competitive prices for payment processing within the markets. Indeed, the cost of alternative electronic payment processing tools, which are prohibited by Google for apps purchased through the Google Play Store, can be one-tenth of the 30% cost of Google Play Billing.

111.    Through provisions of Google's DDA imposed on all developers seeking access to Android users, Google unlawfully ties its Google Play Store, through which it has a monopoly in the Android App Distribution Market, to its own in-app payment processing tool, Google Play Billing. Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Google Payment, to receive payment for and from apps and in-app digital content.

112.    Further, Section 4.1 of the DDA makes compliance with Google's Developer Program Policies mandatory, and those Policies require in relevant part that app developers

(1) offering products within an app downloaded through the Google Play Store, (2) providing access to app content, or (3) offering products within another category of app downloaded through the Google Play Store must use Google Play In-App Billing as the method of payment, except when the payment is solely for physical products or is for digital content that may be consumed outside of the app itself (*e.g.*, songs that can be played on other music players).

113.    Google's unlawful restraints in the DDA prevent app developers from integrating alternative, even multiple, payment processing solutions into their mobile apps, depriving app developers and consumers alike of a choice of competing payment processors. This, in turn, stifles the development of efficient alternative application delivery stores for in-app purchases. Since developers are required to use Google's payment processing system, alternative distribution mechanisms cannot compete by offering seamless and frictionless sales of in-app purchases through alternative billing systems.

114.    Google has no legitimate justifications for its tie-in. If it were concerned, for example, about the security of its users' payment information, then it would not permit alternative payment processing for certain transactions made on Android smartphones and tablets for physical products or digital content consumed outside an app. But Google does allow alternative payment processing tools in that context, with no diminution in security.

C.    **Anticompetitive Effects in the Android Payment Processing Market**

115.    Google's conduct harms competition in the Android Payment Processing Market and injures consumers.

116.    Google's conduct harms consumers because would-be competitor in-app payment processors are not free to innovate and offer Android consumers alternative payment processing tools with better functionality, lower prices, tighter security, and the protection of user data, including purchase history. Absent Google's Developer Program Policies, for example, app designers could offer consumers a choice of in-app payment processors for each purchase made by the consumer, including payment processors at a lower cost and with better customer service.

117.    Google harms consumers by inserting itself as a mandatory middleman in every in-app transaction. This prevents app developers from providing users comprehensive customer

service relating to in-app payments without Google's involvement. Google has little incentive to compete through improved customer service because it faces no competition. Google does, however, have an incentive to obtain information concerning developers' transactions with their customers, which Google can use to give its ads and search businesses an anticompetitive edge. This is true regardless of whether the developer or the app's users would prefer not to share their information with Google. In these ways and others, Google directly harms users.

118.    Google also raises consumers' prices through its supra-competitive 30% tax on in-app purchases, a price it could not maintain in a competitive payment processing market. The resulting increase in prices for in-app content likely deters some consumers from making purchases. The supra-competitive tax rate also reduces developers' incentive to invest in and create additional apps and related in-app content for consumers.

## V.    ANTITRUST INJURY

119.    Plaintiffs and Class members have suffered antitrust injury as a direct result of Google's unlawful conduct. Google Play Store commissions and fees generated more than $21.5 billion in revenue for Google in 2018. If Google had operated the Google Play Store in a competitive market, free of Google's anticompetitive restraints, then the fees and commissions that Google could have collected from Plaintiffs and Class members would be significantly lower.

120.    By impairing competition in the Android App Distribution Market, Google's unlawful conduct has enabled it to charge supra-competitive prices for Android apps and in-app purchases.

121.    In addition, by impairing competition in the Android Payment Processing Market, Google's unlawful conduct has enabled it to charge supra-competitive prices for in-app digital content.

122.    Plaintiffs and the Class are the direct purchasers of Android apps and make in-app purchases directly from Google. When Plaintiffs and the Class purchased Android apps, they did so directly from Google and paid Google directly through Google Payment, using their credit card or other payment sources. When Plaintiffs and the Class purchased in-app digital content, they did so through the Google Play Store, using the pre-established payment streams set up when

purchasing that app or other apps using Google Payment. When Plaintiffs and the Class made app and in-app purchases, they paid Google directly.

**VI.   CLASS ALLEGATIONS**

123.   Plaintiffs bring this action for themselves and as a class action under Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following classes (the "Class"):

> **THE NATIONWIDE CLASS:**
>
> **All persons in the United States who paid for an app through the Google Play Store, or paid for in-app digital content (including subscriptions) on an app that was offered in the Google Play Store from August 16, 2016, to the present (the "Class Period").**
>
> **Plaintiffs and the Nationwide Class are claiming damages and seeking injunctive relief for violations of Sections 1 and 2 of the Sherman Act and for violations of the Cartwright Act during the Class Period.**
>
> **THE ALTERNATIVE REPEALER-STATE CLASS:**
>
> **All persons in the those states whose laws permit indirect purchaser standing and provide for antitrust recovery to indirect purchasers, who paid for an app through the Google Play Store, or paid for in-app digital content (including subscriptions) on an app that was offered in the Google Play Store from August 16, 2016, to the present (the "Class Period").**
>
> **Plaintiffs and the Repealer-State Class are claiming damages and seeking injunctive relief for violations of the Cartwright Act during the Class Period.**

124.   Specifically excluded from each Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant and any person acting on their behalf. Also excluded from the Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

125.   Each Class is readily ascertainable and the records for the Class should exist, including, specifically, within Defendants' own records and transaction data.

126.    Due to the nature of the trade and commerce involved, there are tens of millions of geographically dispersed members in the Class, the exact number and their identities being known to Defendants.

127.    Plaintiffs' claims are typical of the claims of the members of each Class. Plaintiffs and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of the laws alleged herein. The damages and injuries of each member of the Class were directly caused by Defendants' wrongful conduct.

128.    There are questions of law and fact common to the Class, and those questions predominate over any questions affecting only individual members of the Class. These common questions of law and fact include, but are not limited to:

- whether Google has monopoly power in the Android App Distribution Market;
- whether Google has monopoly power in the Android Payment Processing Market;
- whether Google's contractual restrictions on OEMs and developers furthered Google's monopolization of the Android App Distribution Market;
- whether Google's contractual restrictions on OEMs and developers were an unreasonable restraint of trade;
- whether Google's tie of Google Payment to its Google Play Store furthered Google's monopolization of the Android Payment Processing Market;
- whether Google's contractual restrictions limiting payment for in-app digital content to Google Payment was an unreasonable restraint of trade;
- whether Google's conduct resulted in supra-competitive prices paid by consumers of Android apps and for in-app purchases of Android apps;
- whether Google's conduct has harmed consumers;
- the appropriate Class-wide measures of damages; and
- whether the Class is entitled to the injunctive relief sought herein.

129.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the

Class would impose heavy burdens on the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of the Class members to seek redress for the violations of law alleged herein.

## CLAIMS

### A.    Claims for a Nationwide Class

130.    Plaintiffs, as direct purchasers under *Apple v. Pepper*, allege violations of the federal antitrust laws as set forth below.

### COUNT 1: Sherman Act § 2 Unlawful Monopolization in the Android App Distribution Market
### (Against all Defendants except Google Payment)

131.    Plaintiffs restate, reallege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

132.    Google's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

133.    The Android App Distribution Market is a valid antitrust market.

134.    Google holds monopoly power in the Android App Distribution Market.

135.    Google has unlawfully maintained monopoly power in the Android App Distribution Market through the anticompetitive acts described herein, including, but not limited to: (1) leveraging its Android OS and Google suite of products to impose anticompetitive contractual restrictions in its agreements with OEMs and app developers; (2) conditioning licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on OEMs' agreement give the Google Play Store preferential placement and treatment; (3) imposing technical restrictions and obstacles on both OEMs and developers that prevent the distribution of Android apps through means other than the Google Play Store; and (4) conditioning app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store.

136.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

137.    Google's conduct has substantial anticompetitive effects, including increased prices to consumers and costs to developers, reduced innovation and quality of service, and lowered output to consumers.

138.    Plaintiffs and the Class were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. They paid more for Android apps and in-app purchases than they would have paid in a competitive market. Plaintiffs and the Class were also injured because Google's unlawful monopolization of the Android apps and in-app purchases extinguished Plaintiffs' and the Class's freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not monopolized the market. Additionally, Plaintiffs and the Class were injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.

139.    Plaintiffs and the Class have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction issues ending Google's anticompetitive conduct.

**COUNT 2: Sherman Act § 1 Unreasonable Restraints of Trade Concerning the Android App Distribution Market: OEMs**

**(Against all Defendants except Google Payment)**

140.    Plaintiffs restate, reallege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

141.    Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

142.    Google entered into agreements with OEMs that unreasonably restrict competition in the Android App Distribution Market. These include anti-forking agreements and MADAs with OEMs that condition their access to the Google Play Store and other "must have" Google services

on the OEM offering the Google Play Store as the primary (and often the only) viable app store on Android mobile devices.

143.    These agreements serve no legitimate or procompetitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain competition in the Android App Distribution Market.

144.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

145.    Google's conduct has substantial anticompetitive effects, including increased prices to consumers and costs to developers, reduced innovation and quality of service, and lowered output.

146.    Plaintiffs and the Class were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. They paid more for Android apps and in-app purchases than they would have paid in a competitive market. Plaintiffs and the Class were also injured because Google's unlawful restraints of trade extinguished Plaintiffs' and the Class's freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained competition. Plaintiffs and the Class were further injured because Google's establishment and maintenance of supra-competitive pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.

147.    Plaintiffs and the Class have suffered and will continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction issues ending Google's anticompetitive conduct.

**COUNT 3: Sherman Act § 1 Unreasonable Restraints of Trade Concerning the Android App Distribution Market: DDA (Against all Defendants except Google Payment)**

148.    Plaintiffs restate, reallege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

149.   Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

150.   Google forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of their apps being distributed through the Google Play Store. The relevant provisions of these agreements unreasonably restrain competition in the Android App Distribution Market.

151.   Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies. Under the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the app on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

152.   These agreements serve no legitimate or procompetitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain competition in the Android App Distribution Market.

153.   Google's conduct affects a substantial volume of interstate as well as foreign commerce.

154.   Google's conduct has substantial anticompetitive effects, including increased prices to consumers and costs to developers, reduced innovation and quality of service, and lowered output.

155.     Plaintiffs and the Class were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. They paid more for Android apps and in-app purchases than they would have paid in a competitive market. Plaintiffs and the Class were also injured because Google's unlawful restraints of trade extinguished Plaintiffs' and the Class's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not restrained competition. Plaintiffs and the Class were further injured because Google's establishment and maintenance of supra-competitive pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.

156.     Plaintiffs and the Class have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction issues ending Google's anticompetitive conduct.

### COUNT 4: Sherman Act § 2 Unlawful Monopolization in the Android Payment Processing Market
### (Against all Defendants)

157.     Plaintiffs restate, reallege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

158.     Google's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

159.     The Android Payment Processing Market is a valid antitrust market.

160.     Google holds monopoly power in the Android Payment Processing Market.

161.     Google has unlawfully maintained its monopoly power in the Android Payment Processing Market, including through the anticompetitive acts described herein. For apps distributed through the Google Play Store, Google in its DDA with app developers requires the use of Google Play Billing for payments for apps and to process in-app purchases of digital content.

162.     Google's conduct affects a substantial volume of interstate as well as foreign commerce.

163.    Google's conduct has substantial anticompetitive effects, including increased prices to consumers and costs to app developers, reduced innovation and quality of service, and lowered output.

164.    Plaintiffs and the Class were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. They paid more for Android in-app purchases than they would have paid in a competitive market. Plaintiffs and the Class were also injured because Google's unlawful monopolization of the Android apps and in-app purchases has extinguished Plaintiffs' and the Class's freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not monopolized the market. Plaintiffs and the Class were further injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.

165.    Plaintiffs and the Class have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction issues ending Google's anticompetitive conduct.

## COUNT 5: Sherman Act § 1 Unreasonable Restraints of Trade Concerning the Android Payment Processing Market
### (Against all Defendants)

166.    Plaintiffs restate, reallege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

167.    Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

168.    Google forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of having their apps distributed through the Google Play Store. The relevant provisions of these agreements unreasonably restrain competition in the Android Payment Processing Market.

169.    Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Google Payment, in order to receive payment for apps

and content distributed through the Google Play Store. This includes payments related to in-app purchases of digital content. Further, compliance with Google's Developer Program Policies, which Section 4.1 of the DDA makes obligatory, requires that apps distributed through the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for such in-app purchases. Google's Policies exclude only certain, limited types of transactions from this requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself."

170.    The challenged provisions serve no sufficient legitimate or procompetitive purpose and unreasonably restrain competition in the Android Payment Processing Market.

171.    Defendants' conduct affects a substantial volume of interstate as well as foreign commerce.

172.    Defendants' conduct has substantial anticompetitive effects, including increased prices to consumers and costs to developers, reduced innovation and quality of service, and lowered output.

173.    Plaintiffs and the Class were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. They paid more for Android apps and in-app purchases than they would have paid in a competitive market. Plaintiffs and the Class were also injured because Google's unlawful restraints of trade extinguished Plaintiffs' and the Class's freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained trade. Plaintiffs and the Class were further injured because Google's establishment and maintenance of supra-competitive pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.

174.    Plaintiffs and the Class have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction issues ending Google's anticompetitive conduct.

## COUNT 6: Sherman Act § 1 Tying Google Play Billing to the Google Play Store
### (Against all Defendants)

175.     Plaintiffs restate, reallege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

176.     Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

177.     Google has unlawfully tied its app and in-app payment processor, Google Play Billing, to the Google Play Store through its DDAs with app developers and its Developer Program Policies.

178.     Google wields significant economic power in the tying market, the Android App Distribution Market. With Google Play Store installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed by the Google Play Store, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supra-competitive taxes on the sale of apps through the Google Play Store.

179.     Google makes the Google Play Store available only to those app developers who agree to exclusively process all app-related payments (including in-app purchases) through Google Play Billing. This tie is especially powerful and effective because Google simultaneously forecloses a developer's ability to use alternative app distribution channels, as described above. Taken together, Google's conduct effectively forces developers to use Google Play Billing.

180.     The tying product, Android app distribution, is distinct from the tied product, Android payment processing, because app developers have alternative in-app payment processing options and would prefer to choose among them independently of distribution. Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

181.     Google's conduct forecloses competition in the Android Payment Processing Market, affecting a substantial volume of commerce in these markets.

182.     Google has thus engaged in a *per se* illegal tying arrangement, and the Court does not need to engage in a detailed assessment of the anticompetitive effects of Google's conduct or its purported justifications.

183.     In the alternative only, even if Google's conduct does not constitute a *per se* illegal tie, a detailed analysis of Google's tying arrangement would demonstrate that this arrangement violates the rule of reason and is illegal.

184.     Plaintiffs and the Class were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. They paid more for Android apps and in-app purchases than they would have paid in a competitive market. Plaintiffs and the Class were also injured because Google's unlawful restraints of trade extinguished Plaintiffs' and the Class's freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not engaged in a tying arrangement. Plaintiffs and the Class were further injured because Google's establishment and maintenance of supra-competitive pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.

185.     Plaintiffs and the Class have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction issues ending Google's anticompetitive conduct.

### B.     California Claims for a Nationwide Class and, in the Alternative, a Repealer State Class

186.     Plaintiffs allege a nationwide class for Defendants' violation of California law, as set forth in Counts 7-10. Google, LLC is a California corporation with its principal place of business in California. Notably, Google, LLC's terms of service provides the following:

> California law will govern all disputes arising out of or relating to these terms, service-specific additional terms, or any related services, regardless of conflict of laws rules.

The Google Play Store incorporates Google, LLC's terms of service.

187.     In the alternative, Plaintiffs allege a Repealer State Class as set forth in Paragraph 123 above for violations of California law as set forth in Counts 7-10.

1

2

**COUNT 7: California Cartwright Act Unreasonable Restraints of Trade in the Android App Distribution Market**
**(Against all Defendants except Google Payment)**

3

4

188.    Plaintiffs restate, reallege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

5

6

7

189.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See id.* §§ 16720, 16726.

8

9

10

190.    Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

11

191.    The Android App Distribution Market is a valid antitrust market.

12

13

14

15

16

17

192.    Google has executed agreements with OEMs that unreasonably restrict competition in the Android App Distribution Market. Namely, Google entered into anti-forking agreements and MADAs with OEMs that require OEMs to offer the Google Play Store as the primary—and practically the only—app store on Android mobile devices. These agreements further prevent OEMs from offering alternative app stores on Android mobile devices in any prominent visual positioning.

18

19

20

193.    Google's conduct and practices have substantial anticompetitive effects, including increased prices to consumers and costs to developers, reduced innovation, poorer customer service, and lowered output.

21

22

23

24

194.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anticompetitive scheme took place in California.

25

26

27

28

195.    Plaintiffs and the Class were harmed by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. They paid more for Android apps and in-app purchases than they would have paid in a competitive market. Plaintiffs and the Class have also been injured because Google's unlawful restraints of trade extinguished Plaintiffs' and the Class's

freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained trade. Plaintiffs and the Class were also injured because Google's establishment and maintenance of supra-competitive pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.

196.     Plaintiffs and the Class have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 8: California Cartwright Act Unreasonable Restraints of Trade in the Android App Distribution Market**
**(Against all Defendants except Google Payment)**

197.     Plaintiffs restate, reallege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

198.     Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq*., which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See id.* §§ 16720, 16726.

199.     Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

200.     The Android App Distribution Market is a valid antitrust market.

201.     Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein. Through certain provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Android App Distribution Market.

202.     Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies. Under the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from

distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store. In addition, the anti-forking agreements Google entered into with OEMs forbid OEMs from developing or distributing their own versions of Android to eliminate the technical hurdles Google has imposed on competing app stores.

203.    These provisions have no legitimate or procompetitive purpose or effect, and unreasonably restrain competition in the Android App Distribution Market.

204.    Google's conduct and practices have substantial anticompetitive effects, including increased prices to consumers and costs to developers, reduced innovation, poorer customer service, and lowered output.

205.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anticompetitive scheme took place in California.

206.    Plaintiffs and the Class have been harmed by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. They paid more for Android apps and in-app purchases than they would have paid in a competitive market. Plaintiffs and the Class have also been injured because Google's unlawful restraints of trade extinguished Plaintiffs' and the Class's freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained trade. Plaintiffs and the Class have also been injured because Google's establishment and maintenance of supra-competitive pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.

207. Plaintiffs and the Class have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

### COUNT 9: California Cartwright Act Unreasonable Restraints of Trade in the Android Payment Processing Market
### (Against all Defendants)

208. Plaintiffs restate, reallege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

209. Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See id.* §§ 16720, 16726.

210. Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

211. The Android App Distribution Market and Android Payment Processing Market are valid antitrust markets.

212. Google has monopoly power in the Android Payment Processing Market.

213. Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein. Through certain provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Android Payment Processing Market.

214. Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Google Payment, to receive payment for apps and content distributed through the Google Play Store. This includes payments related to in-app purchases. Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require that apps distributed through the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for in-app purchases. Google's Policies exclude only certain, limited types of transactions from this

requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself."

215.    These provisions have no legitimate or procompetitive purpose or effect, and unreasonably restrain competition in the Android Payment Processing Market.

216.    Google's conduct and practices have substantial anticompetitive effects, including increased prices to consumers and costs to developers, reduced innovation, poorer customer service, and lowered output.

217.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anticompetitive scheme took place in California.

218.    Plaintiffs and the Class have been harmed by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. They paid more for Android apps and in-app purchases than they would have paid in a competitive market. Plaintiffs and the Class have also been injured because Google's unlawful restraints of trade extinguished Plaintiffs' and the Class's freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained trade. Plaintiffs and the Class have also been injured because Google's establishment and maintenance of supra-competitive pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.

219.    Plaintiffs and the Class have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

### COUNT 10: California Cartwright Act Tying Google Play Store to Google Play Billing (Against all Defendants)

220.    Plaintiffs restate, reallege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

221.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq*., which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce, or to prevent market competition. *See id.* §§ 16720, 16726.

222.    Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

223.    The Cartwright Act also makes it:

> [U]nlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State.

*Id.* § 16727.

224.    As detailed above, Google has unlawfully tied its app and in-app payment processor, Google Play Billing, to the Google Play Store through its DDAs with app developers and its Developer Program Policies.

225.    Google has sufficient economic power in the tying market, the Android App Distribution Market, to affect competition in the tied market, the Android Payment Processing Market. With Google Play Store installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed by the Google Play Store, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supra-competitive taxes on the sale of apps through the Google Play Store.

226.    The availability of the Google Play Store for app distribution is conditioned on the app developer accepting a second product, Google's in-app payment processing services. Google's foreclosure of alternative app distribution channels forces developers to use Google's in-app payment processing services, which Google has expressly made a condition of reaching Android users through its dominant Google Play Store.

227.    The tying product, Android app distribution, is separate and distinct from the tied product, Android in-app payment processing, because app developers have alternative in-app payment processing options and would prefer to choose among them independently of how an Android app is distributed. Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

228.    Google's conduct forecloses competition in the Android Payment Processing Market, affecting a substantial volume of commerce in these markets.

229.    Google has thus engaged in a *per se* illegal tying arrangement, and the Court does not need to engage in a detailed assessment of the anticompetitive effects of Google's conduct or its purported justifications.

230.    Even if Google's conduct does not form a *per se* illegal tie, an assessment of the tying arrangement would demonstrate that it is unreasonable under the Cartwright Act, and therefore, illegal.

231.    Google's acts and practices detailed above unreasonably restrained competition in the Android Payment Processing Market.

232.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anticompetitive scheme took place in California.

233.    Plaintiffs and the Class have been harmed by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. They paid more for Android apps and in-app purchases than they would have paid in a competitive market. Plaintiffs and the Class have also been injured because Google's unlawful restraints of trade extinguished Plaintiffs' and the Class's freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained trade. Plaintiffs and the Class have also been injured because Google's establishment and maintenance of supra-competitive pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.

234.    Plaintiffs and the Class have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendants:

A.    Permanently enjoining Defendants from monopolizing the Android applications market;

B.    Permanently enjoining Defendants from engaging in anticompetitive conduct in connection with their agreements with OEMs and app developers;

C.    Awarding Plaintiffs and the Class treble damages for injuries caused by Defendants' violations of the federal antitrust laws and California's Cartwright Act;

D.    Awarding Plaintiffs and the Class reasonable attorneys' fees and costs; and

E.    Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial of all issues so triable.


Dated: December 28, 2020

Respectfully submitted,

By: */s/ Karma M. Giulianelli*

**BARTLIT BECK LLP**
Karma M. Giulianelli (SBN 184175)
Glen E. Summers (SBN 176402)
Jameson R. Jones (*pro hac vice*)
1801 Wewatta St., Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140
karma.giulianelli@bartlitbeck.com
glen.summers@bartlitbeck.com
jameson.jones@bartlitbeck.com

**KOREIN TILLERY, LLC**
George A. Zelcs (*pro hac vice*)
Robert E. Litan (*pro hac vice*)
Randall Ewing, Jr. (*pro hac vice*)
Jonathon D. Byrer (*pro hac vice*)
205 North Michigan, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751
gzelcs@koreintillery.com
rlitan@koreintillery.com
rewing@koreintillery.com
jbyrer@koreintillery.com

Stephen M. Tillery (*pro hac vice*)
Jamie Boyer (*pro hac vice*)
Michael E. Klenov (SBN 277028)
Carol O'Keefe (*pro hac vice*)
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525
stillery@koreintillery.com
jboyer@koreintillery.com
mklenov@koreintillery.com
cokeefe@koreintillery.com

By: */s/ Hae Sung Nam*

**KAPLAN FOX & KILSHEIMER LLP**
Hae Sung Nam (*pro hac vice*)
Robert N. Kaplan (*pro hac vice*)
Frederic S. Fox (*pro hac vice to be sought*)
Donald R. Hall (*pro hac vice*)
Aaron L. Schwartz (*pro hac vice*)
850 Third Avenue
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7715
hnam@kaplanfox.com
rkaplan@kaplanfox.com
ffox@kaplanfox.com
dhall@kaplanfox.com
aschwartz@kaplanfox.com

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: (415) 772-4700
Facsimile: (415) 772-4707
lking@kaplanfox.com
mchoi@kaplanfox.com

**PRITZKER LEVINE, LLP**
Elizabeth C. Pritzker (SBN 146267)
Bethany Caracuzzo (SBN 190687)
Caroline Corbitt (SBN 305492)
1900 Powell Street, Suite 450
Emeryville, CA 94608
Telephone: (415) 805-8532
Facsimile: (415) 366-6110
ecp@pritzkerlevine.com
bc@pritzkerlevine.com
ccc@pritzkerlevine.com

**COTCHETT, PITRE & MCCARTHY, LLP**
Nanci E. Nishimura (SBN 152621)
Adam J. Zapala (SBN 245748)
Elizabeth T. Castillo (SBN 280502)
Tamarah P. Prevost (SBN 313422)
Noorjahan Rahman (SBN 330572)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
nnishimura@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com
tprevost@cpmlegal.com
nrahman@cpmlegal.com

**MILBERG PHILLIPS GROSSMAN LLP**
Peggy J. Wedgworth (*pro hac vice*)
Robert A. Wallner (*pro hac vice*)
Elizabeth McKenna (*pro hac vice*)
Blake Yagman (*pro hac vice*)
Michael Acciavatti (*pro hac vice*)
100 Garden City Plaza, Suite 500
Garden City, NY 11530
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
pwedgworth@milberg.com
rwallner@milberg.com
emckenna@milberg.com
byagman@milberg.com
macciavatti@milberg.com

1

## **CERTIFICATE OF SERVICE**

2      The undersigned certifies that a true and correct copy of the foregoing was served on

3   December 28, 2020 upon all counsel of record via the Court's electronic notification system.

4

5                                          */s/ Karma M. Giulianelli*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28