Pages 1 - 38

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY CONSUMER          )
ANTITRUST LITIGATION.               )
                                    )    **NO. C 20-05761 JD**
                                    )
_____     )
                                    )    **NO. C 20-07379 JD**
AND RELATED CASES.                  )         **C 20-07824 JD**
_____     )         **C 20-07984 JD**

                              San Francisco, California
                              Tuesday, December 15, 2020

               **TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**


**APPEARANCES BY ZOOM WEBINAR:**

For Plaintiffs in Carr/In Re Google Play Consumer Antitrust
Litigation, C 20-05761 JD:
                         KOREIN TILLERY LLC
                         505 N. 7th Street - Suite 3600
                         St. Louis, Missouri  63101
                    BY:  **JAMIE L. BOYER, ATTORNEY AT LAW**

                         KOREIN TILLERY LLC
                         205 N. Michigan Plaza - Suite 1950
                         Chicago, Illinois  60654
                    BY:  **GREGORY A. ZELCS, ATTORNEY AT LAW**

                         BARTLIT BECK LLP
                         1801 Wewatta Street - Suite 1200
                         Denver, Colorado  80202
                    BY:  **GLEN E. SUMMERS, ATTORNEY AT LAW**
                         **KARMA M. GIULIANELLI, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

**APPEARANCES BY ZOOM WEBINAR**:   (CONTINUED)

For Plaintiffs in Bentley, et al./In Re Google Play Consumer
Antitrust Litigation, C 20-07079 JD:
                         MILBERG PHILLIPS GROSSMAN LLP
                         100 Garden City Plaza - Suite 500
                         Garden City, New York  11530
              BY:  **PEGGY WEDGWORTH, ATTORNEY AT LAW**

For Plaintiff McNamara/In Re Google Play Consumer Antitrust
Litigation, C 20-07361 JD:
                         COTCHETT, PITRE & MCCARTHY LLP
                         San Francisco Airport Office Center
                         840 Malcolm Road
                         Burlingame, California  94010
              BY:  **ADAM J. ZAPALA, ATTORNEY AT LAW**
                   **ELIZABETH T. CASTILLO, ATTORNEY AT LAW**
                   **NANCI E. NISHIMURA, ATTORNEY AT LAW**

For Plaintiff Herrera, C 20-07365 JD:
                         KAPLAN, FOX & KILSHEIMER LLP
                         850 Third Avenue - 14th Floor
                         New York, New York  10022
              BY:  **ROBERT N. KAPLAN, ATTORNEY AT LAW**
                   **HAE SUNG NAM, ATTORNEY AT LAW**

For Plaintiffs in Carroll/In Re Google Play Consumer Antitrust
Litigation, C 20-07379 SK:
                         PRITZKER LEVINE LLP
                         1900 Powell Street - Suite 450
                         Emeryville, California  94608
              BY:  **ELIZABETH C. PRITZKER, ATTORNEY AT LAW**

For Plaintiffs in Gamble, C 20-07984 JD:
                         GIBBS LAW GROUP LLP
                         505 14th Street - Suite 1110
                         Oakland, California  94612
              BY:  **ANDRE M. MURA, ATTORNEY AT LAW**

For Plaintiff Amos Kober:
                         BOTTINI & BOTTINI, INC.
                         7817 Ivanhoe Avenue - Suite 102
                         La Jolla, California  92037
              BY:  **ALBERT Y. CHANG, ATTORNEY AT LAW**

**APPEARANCES BY ZOOM WEBINAR**:   (CONTINUED)

For Plaintiff Ashly Esquivel and the Plaintiff Class:
                              BROWNE, GEORGE, ROSS, O'BRIEN, ANNAGUEY
                                 & ELLIS LLP
                              2121 Avenue of the Stars - Suite 2800
                              Los Angeles, California  90067
                    BY:   **MARIBETH ANNAGUEY, ATTORNEY AT LAW**

For Plaintiff Jared Stark, C 20-08309 JD:
                              KELLER ROHRBACK LLP
                              1201 Third Avenue - Suite 3200
                              Seattle, Washington  98101
                    BY:   **KARIN B. SWOPE, ATTORNEY AT LAW**

For Plaintiff Smith Roberts:
                              SAVERI & SAVERI, INC.
                              706 Sansome Street
                              San Francisco, California  94111
                    BY:   **RICHARD A. SAVERI, ATTORNEY AT LAW**
                          **SARAH J. VAN CULIN, ATTORNEY AT LAW**

For Defendants:
                              MORGAN, LEWIS & BOCKIUS LLP
                              One Market - Spear Street Tower
                              San Francisco, California  94105
                    BY:   **BRIAN C. ROCCA, ATTORNEY AT LAW**
                          **SUJAL J. SHAH, ATTORNEY AT LAW**

1   <u>**Tuesday - December 15, 2020**</u>                    <u>**11:00 a.m.**</u>

2                        P R O C E E D I N G S

3                          ---oOo---

4        **THE CLERK:**  Calling Civil 20-5761, In Re Google Play

5   Consumer Antitrust Litigation; Civil 20-7379, Carroll vs.

6   Google LLC; Civil 20-7824, Roberts vs. Google LLC; and Civil

7   20-7984, Gamble, et al., vs. Google LLC.

8        Counsel for the defendant, please state your appearance.

9        **MR. ROCCA:**  Good morning, Ms. Clark.  Hello,

10   Your Honor.  Brian Rocca of Morgan Lewis representing Google

11   defendants.

12        **THE COURT:**  Okay.  Mr. Rocca, I'm expecting you will

13   be a silent participant for most of the day, but thank you for

14   being here.

15        **THE CLERK:**  Counsel for the plaintiff, Albert Chang.

16                     (Pause in proceedings.)

17        **THE CLERK:**  You need to unmute yourself.

18        **MR. CHANG:**  Good morning, Your Honor.  I'm Albert

19   Chang with the law firm of Bottini & Bottini in San Diego

20   appearing on behalf of plaintiff Amos Kober.

21        **THE CLERK:**  Peggy Wedgworth.

22        **MS. WEDGWORTH:**  Good morning, Your Honor.  Peggy

23   Wedgworth from Milberg Phillips Grossman on behalf of plaintiff

24   consumer Bentley and the consumer class.

25        **THE COURT:**  Hae Sung Nam.

1          **MS. NAM:**  Good morning, Your Honor.  Hae Sung Nam with

2    Kaplan Fox for the Herrera plaintiffs.

3          **THE COURT:**  Robert Kaplan.

4          **MR. KAPLAN:**  Robert Kaplan, Kaplan Fox & Kilsheimer

5    LLP, for the Herrera plaintiffs.

6          **THE CLERK:**  Elizabeth Pritzker.

7          **MS. PRITZKER:**  Good morning, Your Honor.  Elizabeth

8    Pritzker, Pritzker Levine, on behalf of the plaintiffs in the

9    Carroll vs. Google litigation.

10          **THE CLERK:**  Andre Mura.

11          **MR. MURA:**  Good morning, Your Honor.  Andre Mura from

12    Gibbs Law Group on behalf of the Gamble plaintiffs.

13          **THE CLERK:**  Jamie Boyer.

14          **MS. BOYER:**  Good morning, Your Honor.  Jamie Boyer

15    from Korein Tillery on behalf of plaintiff Mary Carr.

16          **THE CLERK:**  Glen Summers.

17          **MR. SUMMERS:**  Good morning, Your Honor.  Glen Summers

18    on behalf of Bartlit Beck on behalf of plaintiff Carr.

19          **THE CLERK:**  Nanci Nishimura.

20          **MS. NISHIMURA:**  Good morning, Your Honor.

21    Nanci Nishimura, Cotchett, Pitre & McCarthy, on behalf of

22    plaintiff Brian McNamara.

23          **THE CLERK:**  Adam Zapala.

24          **MR. ZAPALA:**  Good morning, Your Honor.  Adam Zapala,

25    Cotchett Pitre & McCarthy, on behalf of plaintiff McNamara.

1        **THE CLERK:**  Maribeth Annaguey.

2                          (No response.)

3        **THE CLERK:**  Maribeth Annaguey.

4        **MS. ANNAGUEY:**  Good morning, Your Honor.

5  Maribeth Annaguey on behalf of Ashly Esquivel and the plaintiff

6  class.

7        **THE CLERK:**  Karin Swope.

8        **MS. SWOPE:**  Good morning, Your Honor.  This is

9  Karin Swope from Keller Rohrback representing the plaintiff

10  Jared Stark.

11        **THE CLERK:**  Rick Saveri.

12        **MR. SAVERI:**  Good morning, Your Honor.  May it please

13  the Court, Rick Saveri from Saveri & Saveri on behalf of the

14  Roberts complaint.

15        **THE CLERK:**  And Sarah Van Culin.

16        **MS. VAN CULIN:**  Good morning, Your Honor.  Sarah

17  Van Culin of Saveri & Saveri on behalf of the Roberts

18  plaintiff.

19        **THE CLERK:**  That's everyone, Your Honor.

20        **THE COURT:**  Okay.  Well, I was looking for

21  Ms. Giulianelli.  Is she not joining us today?

22        **THE CLERK:**  What's her name?

23        **THE COURT:**  Giulianelli.

24        **MR. SUMMERS:**  Your Honor, I'm her partner, Glen

25  Summers here, and I'll be handling the argument for

```
 1   Bartlit Beck.
 2            THE COURT:  Okay.  Well, that's not going to really be
 3   working for me.  I'm appointing lawyers, not law firms.  So is
 4   Ms. Giulianelli here?
 5            THE CLERK:  What's her first name, Judge?  Is it --
 6            THE COURT:  Karma.  I think it's --
 7            THE CLERK:  Okay.  I see her.  I'll move her over.
 8            THE COURT:  Okay.
 9            MR. SUMMERS:  Thank you, Your Honor.
10            THE COURT:  And also Mr. Zelcs.
11            THE CLERK:  I don't see Mr. Zelcs.
12            THE COURT:  I do.
13            THE CLERK:  Do you?
14            THE COURT:  Yeah.
15            THE CLERK:  Okay.
16            THE COURT:  And Elizabeth Castillo from the Cotchett
17   firm, is she on the line?
18            MR. ZAPALA:  She's not, Your Honor.  She's in a
19   deposition today.  This is Adam Zapala.
20            THE COURT:  Oh, okay.  Hmm.
21       All right.  Well, this is an unexpected development.  You
22   know, I'm not appointing law firms.  I'm appointing lawyers.
23   This is lead counsel, not lead law firms.  So, you know, the
24   people who have been presented in the papers I wanted to have a
25   word with so I'm a little unclear about the status of some of
```

1   the individuals who put themselves forward in the papers who

2   are interested in leadership roles who are not here today, and

3   that puts a little bit of crimp in the program.

4        Also, let me just do one last call on seeing if you are

5   interested in trying to work this out.  I normally defer to the

6   counsel.  You know the case better than I do at this point and,

7   you know, I'd like to have you arrange things in the way you

8   think is good; and as long as the proposal to me looks fair and

9   in the best interest of the putative class, I usually don't

10  have a problem with it.

11       Now, I gather there's been a little bit of friction.  It's

12  not uncommon.  It's not out of control by any means, but I

13  usually in a typical case don't have to do this.  So before I

14  go any further, let me just ask.  Is there any groundswell --

15  and I shouldn't say "any."  Is there a groundswell of interest

16  in having you-all take one last run at trying to organize this

17  privately?  Anybody?

18                      (No response.)

19       **THE COURT:**  Okay.  Not only is there not a

20  groundswell, there's not a single lawyer in support.

21       Okay.  All right.

22       **MR. KAPLAN:**  Yes, Robert Kaplan, Your Honor.

23       I think if you gave us till the end of the week, let us

24  see if we can reach some kind of agreement, I'd like to try

25  again.  We have had conversations and Ms. Nishimura could also

1    address it.

2              **THE COURT:**  Okay.  Ms. Nishimura?

3              **MS. NISHIMURA:**  Your Honor, good morning.

4    Nanci Nishimura of Cotchett, Pitre & McCarthy.  I'm part of the

5    Cotchett-Kaplan team.  We've made many efforts to create a

6    co-lead relationship, but sadly the Korein-Bartlit group wants

7    sole control.

8         To the extent we could work it out in a couple of days, we

9    would do our best because we are here, Your Honor, to recognize

10   that we must engage in professionalism in a cooperative spirit.

11   We need to do what's fair and reasonable and in the best

12   interest of the putative class, and that's what we're

13   endeavoring to do.

14        To the extent we could encourage other counsel to do so,

15   we will do that; but I've got three points to make that we've

16   never -- to try to accomplish here.  There's plenty of work.

17   There's no need to try to seek sole control of this case.  We

18   need to work together because Google is who we're working

19   together against.

20        Our complaints are different.  The reason why the

21   Cotchett-Kaplan group wants to be part of this leadership team

22   is because we only have three claims.  They have 35 claims

23   under the laws of 25 states so we need to ensure that our

24   voices are heard and that we don't get lost.

25             **THE COURT:**  Oh, no one is going to get lost.  So

```
1    really the only issue at this point is:  Is there a majority

2    interest shading to super majority?  Because I'm willing just

3    to go ahead and make all the calls right now but if there is a

4    super majority interest in having you-all take one last shot at

5    privately ordering it, I'd be open to that.

6        Mr. Kaplan has proposed doing that.  Is there anybody else

7    who is supportive of that?  Maybe in the other law firms.

8                         (No response.)

9              THE COURT:  No?  Okay.  All right.

10             MR. SAVERI:  Your Honor, I apologize.  Rick Saveri for

11   Roberts.

12             THE COURT:  Yes.

13             MR. SAVERI:  I think some time together -- you know,

14   we're asking to be on a steering committee.  I thought that the

15   conversations that I took part in, which were very recent, were

16   very fruitful and I thought some movement was made, and I think

17   it could be useful on that.  So I would say a little time

18   unless others have thoughts.

19             THE COURT:  All right.  Well, let me --

20             MS. SWOPE:  Karin Swope.

21             THE COURT:  Let me just pick somebody.

22   Ms. Giulianelli, what do you think?  Do you want to have more

23   conversations, or do you think you're at a decision point for

24   me?

25             MS. GIULIANELLI:  Yes.  I mean, I think, Your Honor,
```

1    we have -- and I'm glad I'm on video now so I apologize for not

2    having been on video.

3        I think that we might have reached already the point -- we

4    can have more conversations, but we have not been able to reach

5    an agreement so far.  There are actually four of us working

6    together -- the Korein Tillery, Bartlit Beck, Elizabeth

7    Pritzker and her firm, and Peggy Wedgworth and her firm -- and

8    we've already had quite a bit of substantial dealings and work

9    with the developers and Epic.

10        And so I think that we've been -- there are -- we are

11   happy to work cooperatively and we are planning to work

12   cooperatively with the other group so that we can all have a

13   role in getting the substantial work done, but we don't think

14   that a huge committee structure with three different leads

15   makes sense at this point for this case because of all the work

16   we've already been doing efficiently.

17            **THE COURT:**  All right.

18            **MS. GIULIANELLI:**  And we'll work with everybody, of

19   course, in a way that makes sense for the case.

20            **THE COURT:**  Yes.  Okay.

21        All right.  Well, let's just get it done.  Time to move

22   this thing on.  Your amended complaint is due in a couple weeks

23   anyway, isn't it?

24            **MS. GIULIANELLI:**  Correct.

25            **THE COURT:**  Yeah.

1          **MS. GIULIANELLI:**  Correct.

2          **THE COURT:**  So the developers are all set and with

3    their plaintiff-side structure we're going to -- I'm going to

4    just tell you at the end of this call who I selected.  I want

5    to hear from a couple of people.  I have everybody's papers.

6    They were very detailed.  I appreciate all that, and I do want

7    to ask just a couple of individuals a couple of questions, and

8    then I will tell you what the structure will be.

9          Now, before I do that, though, just a couple of guiding

10   principles.  One, this is about you, your strengths, your

11   experience, what you're going to bring to the case.  When I

12   talk to you individually, it is not about why the other person

13   is not to be trusted with a burnt match.  Okay?  So we're not

14   engaging in a comparative winner-loser dialogue.  You just talk

15   to me about you and your team and your experience, and we're

16   all going to keep it positive.  We're not going to have anybody

17   undercutting each other or slinging mud.  I don't need that.

18   It's not productive and it does not reflect well on the people

19   who bring that to the table.  So please keep that in mind.

20         The second thing is there is going to be a role for more

21   than three law firms.  People are going to have various things

22   to do.  You are going to have to work together.  I'm confident

23   you can.  You're all experienced.  I think once we get past

24   today, you'll be able to, you know, link arms and move your

25   side of the case forward.  So that is my expectation.

1    Now, I also, as you know, if you've looked at my -- and

2    I'm sure you have -- you've looked at my prior orders in this

3    area, I do not favor -- no judge does -- I do not favor

4    complicated committee structures whose primary goal is just to

5    give everybody a little slice of engagement.  There will be

6    plenty of work to do.  That doesn't necessarily mean that the

7    leadership team, which is what we're going to appoint today,

8    needs to be sliced into 16 pieces.  That usually is not

9    efficient.

10    So I am going to appoint today lead counsel, probably two,

11    co-lead counsel; and a liaison counsel who, in my view, is

12    going to have a very important role in making sure that the

13    trains leave the station on time, among other tasks; and I'm

14    also going to appoint a steering committee of additional

15    members that will supplement the liaison counsel and the two

16    co-lead counsel, and I'll probably do three other steering

17    committee members.  And I'm going to let you know all that

18    today as soon as we get through the first questions.

19    Let me start with Ms. Giulianelli.  Am I saying your name

20    correctly?

21    **MS. GIULIANELLI:**  You are.  That's very good.  It's

22    like two girls' names, Julie and Ellie.  So that's perfect.

23    **THE COURT:**  My name also ends in a vowel so I have

24    some experience --

25    **MS. GIULIANELLI:**  Yes.

1          **THE COURT:**  -- with your name structure.

2     Okay.  Tell me a little bit about what else you have done

3     on the plaintiffs' side in situations like this where you have

4     worked with a variety of different plaintiffs' firms.

5          **MS. GIULIANELLI:**  On the plaintiffs' side, we have

6     worked -- we've never been, Your Honor, in a class action on

7     the plaintiffs' side, but we've had plenty of cases where we

8     have been plaintiffs working with other firms in commercial and

9     other disputes, and including plaintiffs' side class actions as

10    opt-outs -- excuse me -- plaintiffs' side antitrust actions,

11    and we have worked as opt-outs with multiple firms in such

12    antitrust actions.  And of course we've had various plaintiffs'

13    side cases.

14         **THE COURT:**  Let me just jump in.  I'm talking about

15    you, not "we."  You, Ms. Giulianelli, not the firm.  Okay?  We

16    are hiring lawyers.  We are not hiring a firm.

17         **MS. GIULIANELLI:**  I have --

18         **THE COURT:**  So I'm going to talk about you personally

19    so take it from the top.  What experience have you had

20    personally?  And don't make me say this every time to

21    everybody.  I'm talking about you now.  So we're just putting a

22    marker on the table.  What experience have you personally had

23    with this type of arrangement being interim counsel or class

24    counsel and working with, you know, steering committees and

25    liaison counsel, and so on, on the plaintiffs' side?

1      **MS. GIULIANELLI:**  On the plaintiffs' side I have not

2  had experience in class action cases, but I have worked on the

3  plaintiffs' side in class action cases as an opt-out.  So not

4  representing a class but representing Hewlett Packard in

5  multiple class action cases, the ODD cases, and the LCD cases

6  as an opt-out; and that has entailed working, of course, with

7  other counsel that we worked with as an opt-out and

8  coordinating with the class to some extent.  So that's on the

9  plaintiffs' side.

10     **THE COURT:**  What about just cases where you've been

11 with a large group of other lawyers outside of your firm?  What

12 kind of experience have you had with that where you've had to

13 work with people that aren't necessarily in your building and

14 on your letterhead?

15     **MS. GIULIANELLI:**  I've done that.  Most of my cases

16 have been with other firms because that's what we do at

17 Bartlit Beck.  So on the defense side, I have worked with

18 multiple other firms in a class action case defending Sabre,

19 and that was a case in the Southern District of New York, and

20 we had co -- Well, we had co-counsel and we had co-defendants

21 in that case.  So there were numerous firms in that case with

22 which we worked.

23     And I have also represented companies, Sabre, in cases

24 where we have paired with defense -- with other firms because

25 we do that all of the time.

1          And in the last case that went to trial, antitrust case in

2    which I participated, we had three law firms involved.  We were

3    one of them trying that case.  So we have a lot of experience

4    working with numerous firms in cases of that nature.

5          THE COURT:  All right.  And what do you think -- if

6    there is one secret to success in teaming with people and

7    lawyers outside of your own firm in service to a common

8    interest of either joint client or shared clients, what do you

9    think is the one secret for success --

10         MS. GIULIANELLI:  Well, I think communicating --

11         THE COURT:  -- in making that work?

12         MS. GIULIANELLI:  I think communication and using

13   everybody's strengths accordingly.  So communicating about one

14   another's strengths, figuring out who plays which role in the

15   best way possible depending on what their respective strengths

16   are and our respective strengths are.

17         THE COURT:  And what would you do if one of your

18   outside colleagues just felt very strongly against something

19   that you wanted to do, say, in discovery or in argument?  How

20   would you handle that?

21         MS. GIULIANELLI:  Well, we'd communicate about it a

22   lot and we'd basically have a debate -- and by that I mean a

23   friendly debate -- to figure out what the pros and cons are of

24   each side, and we would get as many people involved as

25   efficient but into the decision to make sure that we have a

1  diversity of points of view and that we've considered all of

2  the arguments.

3      And so I think it would be, again, communication,

4  Your Honor, to try to figure out the best outcome.  And, in

5  fact, this is -- we do this a lot because we often work with

6  co-counsel and Bartlit Beck and me.  We're very good at trying

7  to figure out -- you know, these cases are hard cases, and so

8  we do what we can to try to hear all sides.  And, you know,

9  usually we come to a resolution, and it's the best resolution

10 for the client.  Once we talk everything out, we usually end up

11 agreeing on the best substantive path forward, and it's usually

12 a good combination of people's thoughts.

13      THE COURT:  Okay.  And last question for you.  Just

14 tell me about your antitrust experience, please.

15      MS. GIULIANELLI:  So I started at the Department of

16 Justice in the San Francisco Field Division, and I was one of

17 the four or five people investigating Microsoft's

18 Internet-related conduct starting in 1996.  We brought a

19 consent decree case in '97.  Then we brought the monopolization

20 case out of the San Francisco Field Office, and I was one of

21 the core people who drafted the complaint in '98 and brought

22 the case.  That case went to trial in the spring of '98, and I

23 spent a full year in D.C. on -- 10 months, it seemed like a

24 year -- on the trial team in Washington, D. C.

25      THE COURT:  That was judge --

1          **MS. GIULIANELLI:**  That was Judge Jackson.

2          **THE COURT:**  Judge Jackson, yes.  Yeah.  Go ahead.

3          **MS. GIULIANELLI:**  Penfield Jackson.

4      And so I was part of the core trial team in that case.

5      And then after that case in 1999, I moved to Bartlit Beck

6  where I've done a substantial amount of antitrust work both on

7  the plaintiffs' side representing Hewlett Packard in various

8  cases and of course on the defense side.  So on the defense

9  side in the last 10 -- well, in the last 10 years, I've

10  represented Sabre in four separate antitrust cases.  I've

11  represented OtterBox in an antitrust case in Colorado and I got

12  all the antitrust claims dismissed.

13      But I've tried two cases for Sabre.  One of them settled

14  during trial and the other one went to a jury verdict in *Sabre*

15  *vs. U.S. Airways*.  So I've tried multiple antitrust cases.

16          **THE COURT:**  Okay.  Thank you.

17      All right.  Let me move to Mr. Zelcs.  Am I saying that

18  correctly?  You need to unmute yourself.

19          **MR. ZELCS:**  My apologies, Your Honor.  Good morning.

20  You are saying it correctly.

21          **THE COURT:**  Good morning.

22      Okay.  All right.  Were you not planning on making a court

23  appearance today?  You look rather casually dressed.

24          **MR. ZELCS:**  I apologize for that.  I was not planning

25  on speaking today.  I expected that to be handled by

1    Mr. Summers and Mrs. Giulianelli.

2         **THE COURT:**  Well, as I said, I'm looking for lawyers

3    and not for firms so it's fine for right now.

4         Okay.  Mr. Zelcs, you've heard what I asked

5    Ms. Giulianelli so let me just recap that.  So what has your

6    experience been working on plaintiffs' side structures like

7    this with lead counsel, liaison counsel, steering committees?

8         **MR. ZELCS:**  My first experience would have been

9    appointed co-lead in an MDL involving Motor Fuel Temperature

10   Litigation back in 2008 in front of Judge Vratil in Kansas,

11   three-way co-lead steering committee of about eight people; and

12   there were -- I believe there were 58 lawsuits filed.

13   Essentially most of them were copycats after we filed the

14   initial case there.

15        Second, an additional experience is working in the Foreign

16   Exchange Antitrust Litigation that's still pending in front of

17   Judge Schofield.  Fifteen defendants have settled.  One is

18   still pending, Credit Suisse.  We have been working with

19   co-leads, Hausfeld and Scott & Scott, and we've been the third

20   firm that's been involved in both doing substantial work and

21   also providing financing for the case.

22        I've also been involved -- I am currently involved in

23   another antitrust case involving the bond market that's pending

24   in front of Judge Liman in New York.  We also just completed

25   the GSE case in front of Judge Rakoff in New York.  That

settled a couple of month ago.  The co-leads there were Lowey

Dannenberg and Scott & Scott, and we worked with them as well.

An additional case that I've spent a long time working on,

not in the class context but with another law firm that was

also selected by the NCA, a government agency, where we

litigated mortgage-backed security cases in 16 different cases

for them, recovered about 5.5 billion to date.

Those are probably the best examples of working in class

actions with other law firms or with other law firms in large

direct actions.

**THE COURT:**  I'm glad you mentioned financings.  I

forgot to ask Ms. Giulianelli this, but let me ask you this

first.

So we now have the Northern District -- we have a local

rule, Local Rule 3-15, which requires the disclosure of parties

interested or who may have a financial interest in the outcome

of a case, and we now have a standing order -- I think we were

the first district court in the country to do this -- where

litigation funding does have to be disclosed as part of the

Rule 3-15 disclosures.

So, Mr. Zelcs, are you anticipating that you'll be making

a litigation funding disclosure?

**MR. ZELCS:**  Your Honor, we will not.  We self-fund all

of our cases.

**THE COURT:**  Okay.  And, Ms. Giulianelli, what about

1   you?  Do you think you'll be making a litigation funding

2   disclosure?

3          **MS. GIULIANELLI:**  The same, Your Honor.  We will not

4   be.

5          **THE COURT:**  Okay.  All right.

6      And, Mr. Zelcs, you've had a lot of experience in

7   situations like this.  What do you think the secret is for

8   making it work?

9          **MR. ZELCS:**  Identifying which lawyers are best at

10  doing specific things and communicating with everybody.

11         **THE COURT:**  Okay.  And when you've had problems and

12  differences of opinion and strategy and tactics, how have you

13  worked that out?

14         **MR. ZELCS:**  If it's a difference of views between two

15  people, you involve a larger group, try to get a consensus.

16  That usually works.

17         **THE COURT:**  Okay.  Thank you.

18      All right.  Let me -- I was hoping to talk to Ms. Castillo

19  because I have an interest in a role for her in this case, but

20  I guess she's not available.

21      Let me --

22         **MR. ZAPALA:**  Your Honor, actually -- this is Adam

23  Zapala -- she's on a break so she did join the Webinar.  I

24  don't know if she can be promoted to --

25         **THE COURT:**  Oh.  I see a hand.  I see a blue hand.

```
 1   Let me see if I can bring her up.

 2         Oh, yes, there she is.   Okay.

 3             MR. ZAPALA:   I moved over, Judge.

 4             THE COURT:   Okay.   Great.

 5             MS. CASTILLO:   Good morning, Your Honor.

 6             THE COURT:   How are you?   So I take it you're video

 7   free right now, Ms. Castillo?

 8             MS. CASTILLO:   I just joined the video.

 9             THE COURT:   Ah, there you are.   Good.   Okay.

10         Are you doing a deposition?

11             MS. CASTILLO:   I am, but I'm on a break so I just

12   chose to join.

13             THE COURT:   All right.   Well, I know I moved this up

14   so I know that might have created some scheduling issues, but

15   your background caught my eye.   I wanted to ask you a little

16   bit.   Just tell me a little bit more about your antitrust

17   background on the plaintiffs' side.

18             MS. CASTILLO:   Sure.   I've been practicing antitrust

19   law for the past nine years.   I have worked on the In Re

20   Automotive Parts Antitrust Litigation.   It's a sprawling MDL

21   based in the Eastern District of Michigan.   It encompasses 41

22   cases.

23         I have also worked on other MDLs, the Domestic Airline

24   case based in D.C., In Re Transpacific Passenger Air in the

25   Northern District, also Capacitors/Resistors.   I know
```

```
 1   Capacitors -- well, Resistors isn't an MDL, but these were all
 2   complex antitrust cases involving multiple parties on each
 3   side.
 4        THE COURT:  Have you ever had, you know, a so-called
 5   leadership position, like on a steering committee or liaison
 6   counsel or anything like that?
 7        MS. CASTILLO:  Not me personally, but all the cases I
 8   mentioned my firm was either lead or co-lead in those cases.
 9        THE COURT:  Okay.  And if you had, say, a steering
10   committee position or liaison counsel position, what do you
11   think you would like to do in that role to make things work for
12   the plaintiffs?
13        MS. CASTILLO:  You know, I have a lot of experience
14   settling cases, especially in auto parts.  My firm and
15   specifically me was really involved with settling with at least
16   half of the 73 defendants in that case.  So we're really strong
17   there.  We have really, really solid discovery experience.
18        THE COURT:  I'm talking about you now.  I'm talking
19   about Ms. Castillo, not your firm.
20        MS. CASTILLO:  Yes.  Me.
21        THE COURT:  What would you like to do?  You've had
22   about 10 years' worth of experience.  You've seen how
23   committees in antitrust cases go, and probably have some ideas
24   on how things worked out well and maybe how they didn't work
25   out well.  I'm just trying to get a sense of if you were in a
```

```
 1   leadership position, what do you think you might be interested
 2   in accomplishing on behalf of the plaintiffs with the group?
 3           MS. CASTILLO:  You know, I've personally had a lot of
 4   experience taking depositions and doing offensive discovery.
 5   So those would be my strong suits and whether it's PSC or
 6   liaison counsel, it doesn't matter that much to me.
 7           THE COURT:  Okay.
 8       All right.  Ms. Nam, let's start.
 9           MS. NAM:  Good afternoon, Your Honor.
10           THE COURT:  Good afternoon.
11       Oh, before I forget, I mean, are you anticipating filing a
12   litigation funding third-party disclosure of any sort?
13           MS. NAM:  No.
14           THE COURT:  Okay.  So Kaplan would just chip in on its
15   own; is that right?
16           MS. NAM:  That's right.  Kaplan Fox self-funds.
17           THE COURT:  All right.  It looks from your papers that
18   you've had a substantial amount of antitrust background.  Can
19   you tell me a little bit more about that?
20           MS. NAM:  Sure.  I started at Kaplan Fox in 1999, and
21   one of my first cases was a class action plaintiffs' side
22   antitrust case.  It was Flat Glass.  It was a price fixing
23   case.  I worked on that case for a few years.
24       I've also worked -- throughout my career at Kaplan Fox I
25   have worked on various antitrust matters for the plaintiffs'
```

```
 1  side -- for class action on the plaintiffs' side, including
 2  high fructose.  I've done some work in that case.  I
 3  recently -- I was recently working on a case in Keurig.  That
 4  case recently settled and that was for indirect purchasers.
 5            THE COURT:  Oh, the little coffee things?
 6            MS. NAM:  Yeah, the little coffee things.  It was a
 7  monopoly tying case.  So it wasn't -- it was a Sherman Act 2
 8  case.
 9            THE COURT:  Oh.
10            MS. NAM:  And it was --
11            THE COURT:  Sherman Act 2 case against the little
12  coffee things.  Wow.
13            MS. NAM:  Right.
14            THE COURT:  Interesting.
15            MS. NAM:  It was.  It was basically they had a patent
16  and that patent expired, and then they tried to redesign their
17  lid so the Keurig machines would only read the Keurig cups.  It
18  was an interesting case.
19       So I've had a great deal of antitrust experience on the
20  plaintiffs' side through my work at Kaplan Fox.
21            THE COURT:  And what about committee structures,
22  committee roles, lead counsel roles?
23            MS. NAM:  You know, I have never been individually
24  selected for a role, a committee role or a lead role.  You
25  know, it's kind of been a new thing.
```

1          I've done a lot of securities work, and in securities

2     class actions the firms are generally selected as the lead.

3     And I know that in antitrust actions individual -- some judges

4     in some courts select individuals to lead, and I haven't had

5     the opportunity to do that.

6          THE COURT:  All right.  But you're interested in doing

7     that?

8          MS. NAM:  Yes, I am, sir.

9          THE COURT:  What do you think -- just looking back in

10    your experience, what do you think your -- what would be the

11    one thing that you think would make a multioffice team work

12    well?

13         MS. NAM:  I think the one thing is probably respect.

14    We're all there to work on behalf of a class.  We're all

15    capable attorneys.  We all have something to contribute, and I

16    think acknowledging that and working with each other with that

17    in mind, I think that helps.  I think that makes it an easier

18    work environment for everyone involved.

19         THE COURT:  Okay.  All right.  Thank you.

20         Ms. Nishimura, let me have a couple of words with you.

21    Can you tell me a bit more about your antitrust background?

22         MS. NISHIMURA:  I started with the Cotchett firm in

23    2002.  Prior to that, I did work on securities and antitrust

24    cases with the Cotchett firm.  I was involved with the Natural

25    Gas Antitrust Litigation involving I think 20 public entities

1    and private companies that went on for a number of years.

2        I handled -- I was -- I ran the Bond Insurance Antitrust

3    Litigation.  That involved 26 public entities against bond

4    insurance companies and the credit rating agencies.

5        I also was in charge of, if you recall, the municipal

6    derivative litigation that was MDL'd in New York.  I

7    represented more than two dozen entities in New York and

8    California.  We were the individual actions that were

9    consolidated with dozens of class actions so we had a seat at

10   the table with the class counsel, and we coordinated everything

11   that we did, including working with our individual plaintiffs

12   because they were also class members; and in the event there

13   was a settlement, we had to coordinate all of that.  So I was

14   always communicating with class counsel.  We had an equal role

15   in court.

16       Similarly, I'm currently running the London InterBank

17   Offered Rate, the LIBOR litigation, if you recall the global

18   debacle of the benchmark interest rate-rigging case in the

19   United States.  I currently represent 14 public entities.  We

20   are individual actions, but we're also consolidated with dozens

21   and dozens of class actions in the MDL in New York.  Those are

22   also antitrust cases, and in those cases I have to coordinate

23   everything that my individual plaintiffs do with the I think

24   there's more than three dozen class cases because my clients

25   are also members of various classes or subclasses.

1      In addition, I'm working with the Attorneys General --

2    there are a couple dozen Attorneys General who started to

3    investigate -- and the Department of Justice.

4      So it's dealing with a multilevel chess game sometimes

5    with your eyes shut or your hands in the black box and learning

6    to work with all these various entities, law firms, different

7    courts, and making it move for the client.

8          **THE COURT:**  Okay.  I appreciate that.

9      And what do you think -- if you had to pick one thing that

10   makes that a happy relationship and productive for the

11   plaintiffs, what do you think that would be?

12         **MS. NISHIMURA:**  I think it's what everybody here has

13   said.  One, it's respect, we all respect each other; two, it's

14   communication; three, it's consensus, like Mr. Zelcs says.  If

15   there's two of us talking, we get the larger group.  And

16   currently in one of my cases we're communicating across the

17   country with, oh, more than a dozen law firms just to get an

18   idea of how to take the next steps.

19     Like Ms. Castillo said, in discovery some of the

20   plaintiffs' groups have been allowed to do discovery with the

21   Department of Justice or with a certain group or subgroup of

22   defendants and in coordinating that, how do you do that?  You

23   have to communicate.

24     One thing I will say is the difference between the class

25   cases and the individual actions in these antitrust cases is

1   that in the individual actions, I'm duty bound to communicate

2   with my clients all of the time.  So I also have that where I

3   write reports to them every month, and I let them know what's

4   going on with their case.  And I keep good records.  And it's

5   like you said in your order, keeping hours.  Even though some

6   of these are -- most of these are all contingency cases, we

7   maintain very careful records of our time and our costs every

8   day, every week, every month so that if or when there's an

9   audit, we're ready to go.

10          **THE COURT:**  Okay.  Thank you.

11      And Ms. Pritzker.  Where is Ms. Pritzker?  Ah, yes.

12      Okay.  So it looks like you were involved in the NCAA

13   cases.  Was that here in this district?

14          **MS. PRITZKER:**  That's correct.  That was in front of

15   Judge Wilken.

16          **THE COURT:**  Okay.  And what did you do in those cases?

17          **MS. PRITZKER:**  So I came into the case as additional

18   class counsel in part because, although the case was proceeding

19   on behalf of college athletes, Division I athletes, in

20   basketball -- women's basketball, men's basketball, and

21   football, there weren't actually any women basketball players

22   in the case; and so I worked hard to develop client

23   relationships with former college basketball players, brought

24   them into the case, and then worked the case through discovery.

25      My biggest role I think in that case was developing the

1    economic modeling -- working with the experts in developing the

2    economic modeling for the damages class, which required us

3    subpoenaing -- you know, issuing subpoenas to 132 Division I

4    schools across the nation and enforcing those subpoenas and

5    collecting that data and then digesting it and working with the

6    experts to provide damages models.

7        I litigated the case through class certification.  I

8    participated in the injunctive relief trial, although I will

9    admit in the trial area I had a very modest role, although my

10   client did testify as part of injunctive relief trial in front

11   of Judge Wilken and I did attend every day of that trial and

12   worked with the trial team on strategy and trial-related

13   matters.

14       THE COURT:  Okay.  And are you anticipating filing any

15   kind of a litigation or third-party funding disclosure?

16       MS. PRITZKER:  We do not use litigation funding.  We

17   have never done it in our firm and we have no intention to do

18   so.  We also self-fund.

19       THE COURT:  Ms. Nishimura, I forgot to ask you that.

20   Are you planning on filing anything like that?

21       MS. NISHIMURA:  No, Your Honor.  We are self-funded.

22       THE COURT:  Okay.  And, Ms. Pritzker, what other

23   antitrust background have you had?

24       MS. PRITZKER:  Well, you know, I've been a member of

25   the bar for 30 years.  More than 20 of those years have been in

1    the area of complex litigation.  Some of the matters in the

2    Northern District in which I've participated in antitrust cases

3    are the *Il Fornaio* case, which was a mesquite charcoal price

4    fixing case that was in front of Judge Alsup that resolved

5    short of trial.  Judge Alsup appointed me as sole class counsel

6    in that case.

7         I was liaison counsel in this district in the LCDs case,

8    which was part of a larger role than a liaison title actually

9    suggests.  I participated very actively in that case through

10   discovery, through motion practice, and even a little bit at

11   trial at the end of the day.

12        Again, there's the NCAA case that you referenced.  That's

13   in this district.

14        Outside of this district I've been active in a lot of

15   antitrust matters.  I'm currently co-lead counsel in a case in

16   the Middle District of Pennsylvania involving price fixing and

17   tying arrangements of specialty copper press fittings.  That

18   case is set for final approval hearing on Thursday.

19        I'm also co-lead counsel in the EpiPen antitrust

20   litigation, which is pending in front of Judge Crabtree in the

21   District of Kansas.

22             **THE COURT:**  Oh.

23             **MS. PRITZKER:**  It's slated to go to trial in April of

24   this year --

25             **THE COURT:**  Okay.

1            **MS. PRITZKER:**  -- or April of next year I should say.

2            **THE COURT:**  Which courthouse is that in Kansas?

3            **MS. PRITZKER:**  It is in the Kansas City courthouse.

4            **THE COURT:**  Kansas City, okay.

5            **MS. PRITZKER:**  Yes.

6            **THE COURT:**  Okay.  I know Judge Crabtree.

7        Okay.  And then let me -- this is the last person I need

8    to -- or I'd like to direct questions to.  Ms. Wedgworth.

9            **MS. WEDGWORTH:**  Good morning, Your Honor.

10           **THE COURT:**  Good morning.  Tell me a little bit more

11   about your antitrust background.

12           **MS. WEDGWORTH:**  So I currently serve as lead counsel

13   in a case in the Northern District of Illinois in front of

14   Judge Dow, and in that case I represent a nationwide class of

15   automobile dealerships who were suing the two software

16   companies who provide data management services to auto

17   dealerships.  And in that case we have settled on behalf of the

18   dealers with one of the defendants leaving one remaining

19   defendant.

20       The case has been going for two and a half years.  We have

21   done over 90 depositions.  There are also co-counsel involved

22   concerning competitors who have also sued.  So I have -- I am

23   lead counsel, but I have a PSC, a steering committee, that I

24   work with and I have certain assignments for them, and we've

25   worked together well for the past over two and a half years.

1          In addition, the co-counsel who represents competitors,

2     I've had to work with them in order -- somewhat like Cravath's

3     role in this case for Epic.  You have very similar interests.

4     Discovery can be completely coordinated.  You can eliminate

5     duplication.  All sorts of efficiencies occur when you work

6     together even though your interests will diverge at some point

7     and, in fact, there may be some conflict but you have mutual

8     interests that can facilitate efficiently going forward in the

9     case.

10          In addition, I'm currently working on some HDD, hard disk

11     drive, in the district in front of Judge Chesney.

12          I've worked on contact lens in Florida in front of

13     Judge Schlesinger, and actually Magistrate Klindt has handled

14     all of our discovery disputes there.

15          I've worked on other antitrust cases.  CRT, took a lot of

16     depositions there in that case.

17          Several other cases in the past.  I've also worked on a

18     lot of Commodity Exchange Act cases through the years, which

19     are class actions on behalf of those who invest in the futures

20     market; and many times when we have brought a Commodity

21     Exchange Act case, we also include antitrust claims as well

22     even though the Exchange Act claims predominate ultimately in

23     those cases.

24          **THE COURT:**  Now, in that Illinois case where I think

25     you're lead counsel --

1        **MS. WEDGWORTH:**  Yes.

2        **THE COURT:**  -- how have you -- what do you think the

3   secret has been to running a productive and happy steering

4   committee in relationship with co-counsel?

5        **MS. WEDGWORTH:**  I'd say first off hard work.  I'd

6   certainly echo everyone who has said the communication angle;

7   but I think the strongest point is to identify everyone's

8   strength, give them the room to develop their strength.  If

9   your thing is depositions, you need to be on the deposition

10  team; and if your specialty is experts, you need to be on the

11  expert team.  If you are an economist by heart though you

12  practice law for a day job, you can work with the economists

13  and really develop that.

14       In this case where I'm lead we've had a real great --

15  we've had a strong team both internally within the firm and

16  working with other firms where in that case they were appointed

17  somewhat like what you're anticipating here.  Not that we chose

18  them but the Court chose them and we've worked together well

19  over a long period of time.  The word "synergy" comes to mind

20  every project we do from the first deposition to summary

21  judgment that Judge Dow has said is the largest summary

22  judgment filing he's ever encountered in his career.

23       **THE COURT:**  Okay.  Well, I don't want to have to say

24  that here.

25       **MS. WEDGWORTH:**  And hopefully you won't.  I've read

1   your standing order that you're not in favor of --

2           THE COURT:  You can also read my order in *FTC v.*

3   *D-Link*, D-L-I-N-K, that will give you good guidance on summary

4   judgment.

5       Ms. Wedgworth, are you planning or anticipating that there

6   will be a litigation funding disclosure on your behalf?

7           MS. WEDGWORTH:  Not at this time, Your Honor, no.

8           THE COURT:  All right.  Great.

9       Okay.  We're going to take a five-minute break, and I will

10  be back in five minutes.  Thank you.

11                  (Recess taken at 11:46 a.m.)

12              (Proceedings resumed at 11:54 a.m.)

13          THE CLERK:  Okay.  We're back on the record in

14  Civil 20-5761, In Re Google Play Consumer Antitrust Litigation;

15  Civil 20-7379, Carroll vs. Google LLC; Civil 20-7824, Roberts

16  vs. Google LLC; and Civil 20-7984, Gamble, et al., vs.

17  Google LLC.

18          THE COURT:  All right.  Well, thank you, everyone,

19  both for all the details in the papers, from all the

20  submissions I have reviewed.  It's very useful in our

21  discussion this morning.  It's made things easier for me.

22      Here is how we're going to organize the management end of

23  the plaintiffs' side.  I am appointing Ms. Nam and

24  Ms. Giulianelli as co-lead counsel.  They are the co-lead

25  counsel for the case as a whole and will be responsible for

1    running it.

2         I'm appointing lawyers, as I said many times today.  Of

3    course they come with law firms, but it is the lawyers who are

4    going to be running the case; namely, Ms. Nam and

5    Ms. Giulianelli.

6         I'm going to appoint Ms. Pritzker -- Ms. Pritzker, you're

7    in Oakland, aren't you?

8         **MS. PRITZKER:**  I'm actually in Emeryville but close

9    enough.

10        **THE COURT:**  Emeryville.  Okay.  You are going to take

11   on the task of being liaison counsel, which I actually think is

12   a critical role in the case.

13        And, by the way, I'll do a written order confirming all

14   this and I'll describe in slightly greater detail what the

15   expectations will be in terms of performance for the co-lead

16   counsel, the liaison counsel, and the steering committee; but

17   it's going to be open-ended.  Okay?  I'm just setting the

18   table.  You-all are going to take it from here and make this

19   thing work, and I don't want to put a straitjacket on you.  So

20   this is an architecture.  You're going to do the interior and

21   exterior detail work and build the building.

22        Now, so those three members of the plaintiffs' side will

23   also be on the steering committee in addition to the following

24   other members:  Ms. Nishimura, Ms. Wedgworth, and Mr. Zelcs.

25   All right?  That will be the steering committee additional

 1   members.

 2       And you-all are perfectly free to -- as I said, if you

 3   want to develop the committee, do other things, that's fine.

 4   You are at this point aware and you will be even more aware

 5   when I issue my order of appointment explaining all of the

 6   expectations I have for a lean-and-mean efficient litigation.

 7   So you do what you want, but at the end of the day if there are

 8   too many people doing too many things or overlapping with each

 9   other, you won't get paid, just to put it bluntly, if you get

10   to that point.  So that's how that's going to work out.

11       And I also would encourage everybody, since you're all

12   here, particularly the lawyers that I have just appointed to

13   management positions for the plaintiffs' side, make sure you

14   get your less-experienced colleagues into significant

15   opportunities.

16       I'm just going to use a couple of examples.  It's not

17   meant to be binding in any way or in any way exclusive of

18   others, but Mr. Jameson Jones, Jamie Boyer, and Elizabeth

19   Castillo, they all caught my eye with their background.  They

20   may not quite be at the point to have leadership positions, but

21   I would hope, I'll leave it up to you, it's for you to decide,

22   but I would hope to see lawyers of that vintage and experience

23   level and others like them have the opportunity to spread their

24   wings and fly so that someday they too may be a lead counsel,

25   liaison counsel, or steering committee member.

1       Okay.  That is the disposition.  Please get your amended

2   complaints in on time, and I think that's it.

3       Anything else for today from anyone?

4           **MS. NISHIMURA:**  Thank you, Your Honor.  Stay safe and

5   well.

6           **MR. ROCCA:**  Happy holidays, everybody.

7           **THE COURT:**  Thank you very much.

8           **MS. BOYER:**  We look forward to working on this.

9           **ALL:**  Thank you, Your Honor.

10          (Proceedings adjourned at 11:59 a.m.)

11                 ---oOo---

12

13               **CERTIFICATE OF REPORTER**

14      I certify that the foregoing is a correct transcript

15  from the record of proceedings in the above-entitled matter.

16

17  DATE:   Tuesday, January 5, 2021

18

19

20

21             _____

22        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

23

24

25