# EXHIBIT B

2021 WL 2643724
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

State of NEW YORK, et al., Plaintiffs,

v.

FACEBOOK, INC., Defendant.

Civil Action No. 20-3589 (JEB)
|
Signed 06/28/2021

**MEMORANDUM OPINION**

JAMES E. BOASBERG, United States District Judge

**\*1**  As the pillars of our national economy have shifted from the concrete to the virtual, so too have the targets of government antitrust actions. Where railroads and oil companies were alleged to be early violators, over the past decades, providers of telecommunications (AT&T) and computer operating systems (Microsoft) have been the defendants. In the internet age, not surprisingly, Facebook finds itself in the spotlight, as both federal and state regulators contend, in two separate actions before this Court, that it is now the one violating the antitrust laws. The company, they allege, has long had a monopoly in the market for what they call "Personal Social Networking Services." And it has allegedly maintained that monopoly, in violation of Section 2 of the Sherman Act, through two different kinds of actions: first, by acquiring firms that it believed were well positioned to erode its dominance — most notably, Instagram and WhatsApp; and second, by adopting policies preventing interoperability between Facebook and certain other apps that it saw as threats, thereby impeding their growth into viable competitors. The State Plaintiffs in this action further contend that Facebook's purchases of Instagram and WhatsApp violated Section 7 of the Clayton Act, which prohibits acquisitions "the effect of [which] may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Both suits seek equitable remedies for these alleged antitrust violations, including forced "divestiture or reconstruction of illegally acquired businesses and/or divestiture of Facebook assets or business lines." ECF No. 4 (Redacted Compl.) at 75. (The Court cites a version of the States' Complaint that has minor redactions to protect confidential business information, and it mentions certain redacted facts only with the parties' permission.)

Facebook now separately moves to dismiss both actions. This Opinion resolves its Motion as to the States' Complaint, and the Court analyzes the Federal Trade Commission's largely parallel claims in its separate Opinion in No. 20-3590. Although the Court does not agree with all of Defendant's contentions here, it ultimately concurs with Facebook's bottom-line conclusion: none of the States' claims may go forward. That is so for two main reasons.

First, the States' Section 2 and Section 7 attacks on Facebook's acquisitions are barred by the doctrine of laches, which precludes relief for those who sleep on their rights. Although Defendant purchased Instagram in 2012 and WhatsApp in 2014, Plaintiffs' suit — which seeks, in the main, to have Facebook divest one or both companies — was not filed until December 2020. The Court is aware of no case, and Plaintiffs provide none, where such a long delay in seeking such a consequential remedy has been countenanced in a case brought by a plaintiff other than the federal government, against which laches does not apply and to which the federal antitrust laws grant unique authority as sovereign law enforcer. If laches is to mean anything, it must apply on these facts, even in a suit brought by states.

**\*2**  Second, the States' Section 2 challenge to Facebook's <u>policy</u> of preventing interoperability with competing apps fails to state a claim under current antitrust law, as there is nothing unlawful about having such a policy. While it is possible that Facebook's <u>implementation</u> of that policy as to certain specific competitor apps may have violated Section 2, the Court does

not reach that question because all such revocations of access occurred over five years before the filing of the Complaint. Such long-past violations cannot furnish a basis for the injunctive relief that Plaintiffs seek here.

The Court, consequently, will grant Facebook's Motion and dismiss the case.

## Table of Contents

I. Background...——
A. Social Networking...——

B. Facebook Blue...——

C. Alleged Monopoly Maintenance...——

   1. Acquisitions...——

   2. Interoperability Permissions...——

     a. Facebook Platform...——

     b. Conditioning Access...——

D. Procedural History...——


II. Legal Standard...——

III. Analysis...——
A. Standing...——

B. Platform Policies...——

   1. Refusal to Deal...——

     a. Legal Framework...——

     b. Application...——

       i. Facebook Policies...——

       ii. Specific Refusals...——

   2. Conditional Dealing...——

C. Acquisitions...——

   1. Legal Framework...——

   2. Application...——

   3. Counterarguments...——

a. Applicability of Laches...——

b. Ongoing Violation...——

c. Prospective Relief...——

d. Course of Conduct...——

e. Procedural Posture...——


IV. Conclusion...——

## I. Background

### A. Social Networking

At the dawn of our century, in the much earlier days of the internet, a number of websites began to offer services that, in hindsight, were precursors to the sort that Facebook provides. Those websites provided users a platform for creating a unique webpage, personalized with photos and messages, that could then be used to interact with the pages of other "friends." See Redacted Compl., ¶ 58. Interactions were initially limited to email, using services such as America Online (AOL). Id., ¶¶ 58–59. Eventually, new online services emerged that allowed users to organize their profiles into a specific network and communicate with that network, such as Classmates.com and SixDegrees.com. Id., ¶ 59. Friendster and Myspace, both launched in 2002, built further on this trend, offering the first of what came to be known as "social networking" services. Id., ¶ 60. Although the precise definition of a "Personal Social Networking Service" (the main market in which Facebook allegedly operates) is disputed, it can be summarized here as one that enables users to virtually connect with others in their network and to digitally share their views and experiences by posting about them in a shared, virtual social space. Id., ¶¶ 1, 28, 70. For example, users might view and interact with a letter-to-the-editor-style post on politics by a neighbor, pictures from a friend's recent party, or a birth announcement for a newborn cousin. Id., ¶¶ 1, 70.

Perhaps because humans are naturally social, this new way of interacting became hugely popular. In 2006, Myspace, at one point the leading social network, "overtook Google as the most-visited website in the world." Id., ¶ 60. By 2008, however, it had been surpassed by a new competitor: Facebook. Id., ¶ 66. Launched in 2004 by then-undergraduate Mark Zuckerberg from his Harvard dorm room, "The Facebook," as it was initially called, was a social-networking service initially limited to Harvard students. Id., ¶ 61. Encouraged by its success on campus, Zuckerberg and some fellow students expanded the product to other universities, where it proved similarly popular. Id., ¶¶ 62–63. That growth led Facebook to expand beyond colleges, first to high schools and then to the larger adult population. Id., ¶¶ 64–66. By 2008, it had 120 million active users globally. Id., ¶ 66. Three years later, it had 156 million active users in the United States alone, with each user averaging over seven hours per month. Id. The following details of Facebook's conduct are drawn from the States' Complaint, as the Court must consider its allegations true at this stage. The allegations are quite similar, though not identical, to those made by the FTC in the parallel case and recounted in the Court's companion Opinion.

### B. Facebook Blue

**\*3** Facebook's "core" social-network product is known as "Facebook Blue." Id., ¶ 71. This is what its millions of users think of when they think of "Facebook." Generally speaking, using Facebook Blue entails interacting with "user-created content," — i.e., content created or shared by one's Facebook "friends," id., ¶ 30 — or creating content oneself by posting. That is not all that users see or do, however. Users, for instance, also encounter "publisher-created content like news articles ... and advertisements," id., "interspers[ed]" in their "news feed." Id., ¶¶ 30, 49, 54. Such content can come in text, photo, or video form. Id., ¶ 49. In addition, Facebook users can play games or use other applications built either by Facebook or by third parties. Id., ¶¶ 80, 152, 190. Facebook also offers other services beyond Facebook Blue to its users, such as Facebook Messenger, a free mobile-messaging and voice-calling service. Id., ¶¶ 71, 159, 209.

Unlike most businesses, Facebook charges users no fee; instead, it makes money by selling advertising. Id., ¶¶ 2–3. By leveraging the "vast trove of data it has collected on users, their friends, and their interests," the company is able to offer advertisers a "highly targeted" set of potential customers distilled from its "massive network of users." Id., ¶¶ 3, 51. Under this business model, as the States' Complaint puts it, "Users do not pay a cash price to use Facebook"; instead, "they exchange their time, attention, and personal data for access to Facebook's services." Id., ¶¶ 2, 46. That approach has been highly profitable: in 2019, for instance, advertisers paid Facebook nearly $30 billion. Id., ¶ 48. To be clear, although Facebook's data-collection and -use practices have been subject to increasing scrutiny, they are not the subject of this action.

### C. Alleged Monopoly Maintenance

Instead, this suit alleges that Facebook has violated and is violating the antitrust laws, the focus of which, generally speaking, is to promote and ensure competition. According to Plaintiffs, Facebook Blue's meteoric rise was a positive example of what happens when firms compete to provide the best product to consumers. Because its social-networking service provided more "innovative features," "a higher-quality user experience, and better privacy protections" than anyone else, id., ¶ 73, at least as early as 2011, it had become the dominant personal social networking service" in this country, giving Facebook "monopoly power" in that market. Id., ¶¶ 4, 11, 68.

Around that time, however, Facebook allegedly made a fateful pivot: rather than continuing to focus on providing the best product, it became concerned with protecting its monopoly by leveraging its dominance to foreclose and forestall the rise of new competitors. Id., ¶¶ 98–99. In particular, the company's executives saw a "unique threat[ ] to Facebook's dominance" in the advent of mobile devices — first and foremost, smartphones — capable of accessing the internet. Id., ¶¶ 100–01. Although Facebook had mobile functionality, it had been built with websites and desktop or laptop computers in mind. Other firms' offerings, by contrast, were "built to look and function well on a mobile device in the first instance." Id., ¶ 100. Zuckerberg and other Facebook executives fretted over the possibility that other apps might create attractive mobile-native features and then leverage those features into exponential user growth, end-running Facebook's established position. Id., ¶¶ 101–02. Even if such an app was not already providing social-network-like functionality, once it had a big enough base of users, it would still pose a potential threat to Facebook Blue. Id. Facebook executives feared fast-growing mobile-messaging services in particular, nervous that such apps could rather easily "morph[ ]" into direct competitors by adding social features. Id., ¶ 103.

What Facebook did in response to these perceived threats is the basis for these antitrust suits against it. The company allegedly used its monopoly power to eliminate or destroy competitors in order to maintain its market dominance. Id., ¶ 104. Plaintiffs allege that, beginning around 2011, "Facebook used two primary tactics to achieve" that result. Id. First, it reached deep into its very deep pockets to acquire competitors and potential competitors, preventing their emergence as serious rivals. Id. Second, it adopted and then enforced policies that blocked rival apps from interconnecting their product with Facebook Blue, thereby both (i) blunting the growth of apps that had previously depended on that interoperability to attract new users, and (ii) warning all other developers not to compete with Facebook, lest they lose access as well. Id.; see also id., ¶¶ 186–87.

### 1. Acquisitions

**\*4** On the acquisitions front, "Facebook acquired dozens of companies" from 2012 to 2020, and it "pursued many more acquisitions that did not come to fruition." Id., ¶ 105. Among those "dozens" were many minor companies; the Complaint briefly mentions Glancee and EyeGroove, firms Facebook purchased in 2012 and 2016, respectively. Id., ¶ 184. Rather than catalog each acquisition (some of which, presumably, posed no threat to competition), Plaintiffs focus almost exclusively on several key examples that purportedly illustrate Facebook's allegedly anticompetitive approach: its purchases of Instagram (2012) and WhatsApp (2014), and its ultimately unsuccessful attempts to buy Snapchat (2012–13). Id., ¶¶ 107–80.

Begin with Insta, as those in the know — *viz.*, our children — refer to it. Launched in late 2010, Instagram was an innovative photo-editing and -sharing app designed for the era of smartphones with built-in cameras. Id., ¶¶ 107, 109. The company grew explosively, eventually attracting the attention of Facebook executives who feared that their own photo-sharing features paled in comparison. Id., ¶¶ 111, 113. That disparity gave Instagram a chance to grow to a large enough scale to be threatening, making it a "powerful competitive threat to Facebook's ... monopoly." Id., ¶ 128. Aiming to "neutralize" that competition, and to "integrate" the "mechanics" of Instagram's popular photo-sharing features with Facebook Blue in order to forestall the growth of future Instagrams, id., ¶ 115, Zuckerberg offered to buy the company for $1 billion in April 2012. Id., ¶ 119. Instagram agreed.

As required by the Hart-Scott-Rodino Act, 15 U.S.C. § 18a, the FTC reviewed the acquisition prior to closing to assess whether it posed anticompetitive concerns. Whereas most mergers are cleared quickly, in this instance the review took over four months. During that scrutiny, the agency took the rare step of "requir[ing] the submission [by the parties] of additional information or documentary material relevant to the proposed acquisition." 15 U.S.C. § 18a(e)(1)(A). Eventually, however, Facebook and Instagram satisfied the agency's concerns, and in August (over four months after the merger was announced), the Commission voted 5–0 to allow it to proceed without any challenge or conditions. See FTC, FTC Closes Its Investigation into Facebook's Proposed Acquisition of Instagram Photo Sharing Program (Aug. 22, 2012), https://bit.ly/3bDa2mp. Although Plaintiffs do not mention that prolonged FTC review in their Complaint, the Court may take judicial notice of that agency action. SeePharm. Rsch. & Manufacturers of Am. v. U.S. Dep't of Health & Hum. Servs., 43 F. Supp. 3d 28, 33 (D.D.C. 2014); Herron v. Fannie Mae, No. 10-943, 2012 WL 13042852, at *1 (D.D.C. Mar. 28, 2012).

Zuckerberg, Plaintiffs allege, had similar designs in offering to buy Snapchat in October 2013. Id., ¶¶ 131, 134. That app also involved photo-sharing, with the twist that images would usually be sent one-to-one or one-to-small-group, rather than to a user's entire network, and would automatically delete after being viewed for only a few seconds. Id., ¶ 130. Impressed by the app's engagement and user growth, Facebook offered to purchase it for $4 billion — mainly, allege Plaintiffs, to "keep[ ] [it] out of the hands of any firm with the resources to transform [it] into a major competitive threat." Id., ¶ 134. Snapchat's founder, however, steadfastly refused the overtures. Id., ¶ 135.

Facebook had better luck the next year with WhatsApp. As noted above, the company's executives saw mobile-messaging apps like WhatsApp as their "biggest competitive threat," even though they did not directly compete with Facebook Blue in the Personal Social Networking Services market. Id., ¶ 153. The fear instead was that such apps might well "morph" into competitors in the future; given the ubiquity of text messaging in modern life, a widely adopted messaging app could leverage its network effects to transition into a highly competitive "mobile-first social network" by adding functions such as "gaming platforms, profiles, and news feeds." Id., ¶¶ 152–53, 160. WhatsApp was the most potent threat, according to Facebook executives, because it was the "category leader" among mobile messengers, with over 400 million active users and a superior product. Id., ¶¶ 154–55. Zuckerberg in particular "believe[d] that WhatsApp had the potential to enter Facebook's core market and erode its monopoly power," and he thus resolved to try to buy it to prevent that from happening. Id., ¶ 161. In February 2014, after negotiating specific terms regarding WhatsApp's continued independence, user privacy, and freedom from ads, he succeeded, as the two companies agreed on a purchase price of around $19 billion. Id., ¶¶ 165–66. That transaction was also subject to Hart-Scott-Rodino Act pre-merger review, see 15 U.S.C. § 18a, but the FTC, once again, did not block it.

### 2. *Interoperability Permissions*

#### a. Facebook Platform

 **\*5**  Shortly after expanding beyond colleges and high schools, Facebook developed Facebook Platform, a set of tools designed to enable developers of other mobile or web apps to interoperate with Facebook's site and data. See Redacted Compl., ¶ 80. The goal was to make Facebook the "platform" for all social interactions on the internet, thereby creating a better, more engaging product and driving even more users to its site. Id. The first iteration of Facebook Platform, circa 2007, allowed developers to build what Facebook called "canvas" apps displayed within the Facebook website itself. Id., ¶ 190. As an example, a user

scrolling through Facebook could come upon a personality-test app, take the test, and then share her results and invite Facebook friends to take the test as well, all without ever navigating off the Facebook site. Id. Facebook made these third-party apps available to users "on a level playing field with applications built by Facebook." Id., ¶ 189. App developers took advantage, scrambling to create these canvas apps in order to gain access to its growing network of users. Id., ¶¶ 80, 189–94. Such apps would make money by allowing users to purchase virtual goods or items within the app on a "freemium" model or via ad sales.

Facebook soon expanded Platform, deploying a suite of tools that expanded its reach off the Facebook site itself. These tools — called application programming interfaces or APIs — created mechanisms for sharing data between Facebook and other services. Id., ¶ 80. The States provide several examples of APIs that Facebook opened to developers. One is the "Find Friends" API, id., ¶ 190, which enabled freestanding apps to allow Facebook account holders to find and connect with Facebook friends within that separate app, or to invite Facebook friends to join that app. Id., ¶¶ 207, 210, 214–15, 217. For instance, when first starting to use an independent chess app — i.e., an app used separately as opposed to on the Facebook site itself — a user with a Facebook account could nonetheless search within the app for other Facebook friends already using it, or invite them to join via Facebook, all without leaving the app. Another API Facebook created was Facebook Connect, which allowed Facebook users to sign into third-party websites or apps using their Facebook log-in credentials. Id., ¶ 81.

Facebook went even further in that direction in 2010 when it launched its Open Graph API. Open Graph allowed third-party apps and websites to essentially integrate pieces of Facebook within their own service; for instance, apps could install the famous "Like" button, which, if clicked, would share a user's "like" on the user's Facebook profile. Id., ¶ 82. Users could do this without even navigating away from the third-party service. Id., ¶¶ 191–93. "[A] user reading an article on ESPN.com," for instance, "could now like an article on ESPN's site, and choose to post a link of the article to the user's Facebook profile directly from the ESPN.com website." Id., ¶ 193. App developers could also host Facebook comment sections, facilitating further engagement with their content. Id., ¶ 194. This was, unsurprisingly, a massively popular tool among app developers. By May 2013, over 10 million apps and websites had used the Open Graph API to integrate with Facebook, and Facebook "integrations quickly became common across the internet." Id.

According to Plaintiffs, Facebook benefited significantly from its Platform program and open APIs. The company garnered goodwill and positive media coverage, continued to increase its growth and user engagement, and earned substantial sums from its requirement that partner third-party apps share revenues from in-app purchases. Id., ¶¶ 195–96. Third-party app developers likewise gained, improving the quality of users' experience by integrating social functionality and benefiting from Facebook's sizeable network of highly engaged users. Id., ¶ 197. Users, too, enjoyed the increased efficiency and convenience. Id., ¶ 198.

### b. Conditioning Access

Nonetheless, the States allege, Facebook eventually "turned to Platform as a tool to monitor, leverage," and — most crucially here — "harm (via rescinding API access [to]) apps that Facebook viewed as actual or potential competitive threats." Id., ¶ 200. In 2011, it announced a company policy that allegedly "aimed at forbidding 'competing social platforms,' and any apps that linked or integrated with competing social platforms, from accessing its APIs." Id., ¶ 199. In 2013, Facebook announced an even broader policy of withholding API access from apps that competed by "replicat[ing] [Facebook's] core functionality," even if they were not full social networks. Id., ¶ 201.

**\*6** To the extent the States allege that Facebook's 2011 policy actually prohibited — as opposed to merely "aim[ed] at" prohibiting, as is the precise wording of the allegation — freestanding third-party apps from accessing its APIs merely because those apps also "linked to or integrated with" other social-networking services, the Court does not accept that characterization because it is inconsistent with the text of the 2011 policy, which the FTC quotes in its simultaneously filed Complaint in the related case. See Vanover v. Hantman, 77 F. Supp. 2d 91, 98 (D.D.C. 1999) (court may consider material outside the pleadings where it is "referred to in the complaint and is central to plaintiff's claim"). As set out in the FTC's Complaint, the 2011 policy covered only "Apps on Facebook" — i.e., the sort of "canvas apps" described above — rather than freestanding third-party

apps or sites such as ESPN.com. See No. 20-3590, ECF No. 3 (Redacted FTC Compl.), ¶ 139 (quoting 2011 policy as stating that "Apps on Facebook may not integrate, link to, promote, distribute, or redirect to any app on any other competing social platform"). The 2011 policy, then, limited what apps hosted and used on Facebook's own site could do; it did not purport to restrict freestanding apps and sites from linking to or integrating with other social networks.

At any rate, armed with its policies, Facebook "began to selectively enforce" them "to cut off API access to companies Facebook worried might one day threaten its monopoly." Redacted Compl., ¶ 202. Plaintiffs allege that in cutting off access, Facebook intended to, and did, "devastat[e]" the targeted apps by suddenly depriving them of a "critical piece of infrastructure" on which they had relied for growth and engagement — namely, Facebook's user data and network. Id. The Complaint provides seven discrete examples of competitive or potentially competitive apps that Facebook targeted for API revocation from 2013 to 2015. Each, after promising early growth, faltered shortly after losing its access. Id., ¶¶ 207–12 (Voxer), 213–14 (Vine), 215–16 (MessageMe), 217–18 (Path), 219–21 (Circle), 222–24 (Tsū), 225–29 (Phhhoto). Around the same time, Facebook announced yet another new policy, requiring all developers to seek permission before being granted API access, even if they previously had it. Id., ¶ 203. Facebook then denied such requests from "apps it classified as competitors or potential competitors." Id.

According to the States, Facebook's policies and enforcement decisions helped "ensur[e] that would-be competitors could not gain or maintain a foothold in the Personal Social Networking Services market." Id., ¶ 230. What is more, Plaintiffs allege, Facebook's actions deterred other firms (and their venture-capital backers) from even thinking about challenging Facebook Blue. Id. The effect was to "maintain and enhance Facebook's monopoly power." Id., ¶ 231.

Although the story laid out in the Complaint ends there, the States' brief in opposition to the present Motion to Dismiss provides an important coda. According to that brief, and a Facebook press release the States append as an exhibit to their Opposition, see ECF No. 121-7, in 2018, Facebook terminated all of its policies regarding competitor API access. See ECF No. 122 (States Opp.) at 13. Facebook does not dispute that contention, see ECF No. 123 (Reply States) at 24, and the FTC's Complaint in the parallel action makes the same allegation. See Redacted FTC Compl., ¶¶ 148–49. The Court accordingly takes judicial notice of the fact that Facebook retracted its API policies in 2018. See Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997) (considering "the pleadings and undisputed documents in the record" while considering motion to dismiss); Webster v. Spencer, No. 17-1472, 2020 WL 2104231, at *5 (D.D.C. May 1, 2020) (citing similar cases). That revocation holds legal relevance, as readers with sufficient stamina will discover.

   D. Procedural History

Plaintiffs — 46 States, the District of Columbia, and the Territory of Guam — filed this action on December 9, 2020. See Redacted Compl. at 5 n.1. Their Complaint alleges three counts. First, they claim, Facebook has violated, and is violating, Section 2 of the Sherman Act's prohibition on monopoly maintenance via the two forms of exclusionary conduct described above: acquiring nascent and potential competitors, and anticompetitively conditioning access to its APIs. Id., ¶¶ 256–62. Second, Facebook violated Section 7 of the Clayton Act by acquiring Instagram, thereby "substantially ... lessen[ing] competition [and] tend[ing] to create a monopoly," 15 U.S.C. § 18, and it continues to violate that statute by holding and using Instagram assets. Id., ¶¶ 263–67. Third and finally, Facebook similarly violated and continues to violate Section 7 by acquiring and holding WhatsApp. Id., ¶¶ 268–72. Plaintiffs seek equitable relief for these violations, including an injunction prohibiting similar conduct in the future and the divestiture of unlawfully held assets, id., ¶¶ 277(2), (8), pursuant to Section 16 of the Clayton Act. See 15 U.S.C. § 26 (authorizing suits by "[a]ny person ... for injunctive relief ... against threatened loss or damage by a violation of the antitrust laws").

  **\*7**  As noted, the Federal Trade Commission filed a very similar suit against Facebook on the same day as the State Plaintiffs, pursuing similar injunctive relief. That action was assigned to Judge Christopher R. Cooper of this district. Pursuant to Local Rule 40.5(c)(2), which governs related cases, he was required to reassign the FTC action to this Court, which presides over the earlier-filed State case. See No. 20-3590, Minute Order of Jan. 12, 2021.

Facebook has now moved to dismiss both actions. See ECF No. 114 (MTD States); No. 20-3590, ECF No. 56-1 (MTD FTC). While the cases could be consolidated, the Court believes that clarity will be enhanced by resolving the two Motions to Dismiss in separate, contemporaneously issued Opinions. As noted above and explained hereafter, it will grant the Motion to Dismiss the States' case. By contrast, the Court will dismiss only the Complaint, not the case, in the FTC action, thus permitting the Government leave to amend. An explanation of why may be found in the companion Opinion. See Mem. Op., No. 20-3590.

## II. Legal Standard

Facebook moves to dismiss this action under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. See MTD States at 1. In evaluating such Motion to Dismiss, the Court must "treat the complaint's factual allegations as true ... and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.' " Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955) — that is, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555, 127 S.Ct. 1955. The Court need not accept as true, then, "a legal conclusion couched as a factual allegation," Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)), nor "inferences ... unsupported by the facts set out in the complaint." Id. (quoting Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)). And it may consider not only "the facts alleged in the complaint," but also "any documents either attached to or incorporated in the complaint[,] and matters of which [courts] may take judicial notice." Equal Emp't Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

## III. Analysis

Facebook proffers multiple bases for dismissal here, both jurisdictional and on the merits. The Court begins by considering its argument that Plaintiffs here lack Article III standing to sue. Such position gains no purchase. But that is the only place the States prevail, for the Court concurs with Facebook that their Section 2 challenges to its API dealings fail as a matter of law. It also concludes that their Section 2 and Section 7 claims as to Facebook's acquisitions, which took place at least six years prior to the filing of the Complaint, are barred by the doctrine of laches. Dismissal of the entire case is thus warranted.

### A. Standing

Plaintiffs bring this action under Section 16 of the Clayton Act, which provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. In order to meet Article III's requirement that they articulate an injury-in-fact that they have suffered, Plaintiffs sue in their "capacity as *parens patriae.*" Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 594, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982); see States Opp. at 5.

**\*8** "The doctrine of *parens patriae* standing allows [a] state[ ] to bring suit on behalf of [its] citizens." New York v. Microsoft Corp., 209 F. Supp. 2d 132, 149 (D.D.C. 2002). To do so, a state must "assert an injury to what has been characterized as a 'quasi-sovereign interest,' " Alfred L. Snapp, 458 U.S. at 601, 102 S.Ct. 3260, which refers to an "interest[ ] the State has in the well-being of its populace" that is "sufficiently concrete to create an actual controversy between the State and the defendant."Id. at 602, 102 S.Ct. 3260. Although the concept of a "quasi-sovereign interest" is fairly "vague[ ]," id., it includes a state's "interest in the continuing prosperity of [its] econom[y]," such that states have "standing to challenge actions whose clear and direct effects would be the substantial disruption of the[ir] internal econom[ies]." Pennsylvania v. Kleppe, 533 F.2d 668, 674 (D.C. Cir. 1976) (citing cases); Alfred L. Snapp, 458 U.S. at 607, 102 S.Ct. 3260 ("[A] State has a quasi-sovereign interest in the health and well-being — both physical and economic — of its residents in general."). To ensure that such "[i]njury to the state's economy is ... sufficiently severe and generalized," Kleppe, 533 F.2d at 675, it must stand "apart from the interests of particular private

parties," <u>Alfred L. Snapp</u>, 458 U.S. at 607, 102 S.Ct. 3260 — in other words, "the controversy must in substance implicate the state's interest in economic supervision, and not merely affect the fortunes of a limited class of her citizens." <u>Kleppe</u>, 533 F.2d at 674. To ensure the requisite breadth of injury, some "substantial" "proportion of the population of the State ... must be adversely affected by the challenged behavior." <u>Alfred L. Snapp</u>, 458 U.S. at 607, 102 S.Ct. 3260; <u>see also</u>New York v. Microsoft, 209 F. Supp. 2d at 152 (asking whether "the direct impact of the alleged wrong [is] felt by a substantial majority ... of the state's citizens, so that the suit can be said to be for the benefit of the public").

Applying these principles in the antitrust context, the Supreme Court long ago held that a State had *parens patriae* standing to seek an injunction against a price-fixing conspiracy under Section 16 of the Clayton Act. <u>Georgia v. Penn. R. Co.</u>, 324 U.S. 439, 451, 65 S.Ct. 716, 89 L.Ed. 1051 (1945). In that case, the State of Georgia alleged that its "economy ... and the welfare of [its] citizens [had] seriously suffered as the result of this alleged conspiracy," <u>id.</u> at 450, 65 S.Ct. 716, and the Court agreed that antitrust violations "may affect the prosperity and welfare of a State as profoundly as [the] diversion of waters from the rivers." <u>Id.</u>; <u>see also</u>id. at 451, 65 S.Ct. 716 (State suffered injury to "interest apart from that of particular individuals who may be affected" because the conspiracy, if proven, "limit[ed] the opportunities of her people, shackle[d] her industries, retard[ed] her development, and relegate[d] her to an inferior economic position"). Citing that decision, the lower courts have consistently held that states have *parens patriae* standing to seek injunctions under Section 16 against antitrust violations the effects of which are widely felt within their borders. <u>See, e.g.</u>, <u>New York v. Microsoft Corp.</u>, 209 F. Supp. 2d at 150–52 ("significant[ ] hamper[ing] [of] competition" by a monopolist is enough); <u>In re Ins. Antitrust Litig.</u>, 938 F.2d 919, 927 (9th Cir. 1991) ("The state's interest in preventing harm to its citizens by antitrust violations is, indeed, a prime instance of the interest that the *parens patriae* can vindicate by obtaining ... an injunction."); <u>Pennsylvania v. Russell Stover Candies, Inc.</u>, No. 93-1972, 1993 WL 145264, at *8 (E.D. Pa. May 6, 1993) ("[A] state may ... seek injunctive relief for harm to its general economy that is caused by a violation of federal antitrust law.").

Under these cases, Plaintiffs here have properly pleaded sufficient injury to their quasi-sovereign interests in the economic well-being of their states. Their Complaint alleges that Facebook has prevented, through anticompetitive means, the emergence of viable competitors to its monopoly in Personal Social Networking Services. As a result, millions of Plaintiffs' citizens have experienced "reductions in the quality and variety of privacy options and content available to them" in that market, <u>see</u> Redacted Compl., ¶¶ 8, 247–50 — which is to say that, on the States' theory, millions have experienced a rise in the effective price of using Facebook. <u>Id.</u>, ¶ 46 (users "exchange their time, attention, and personal data for access to Facebook's services"). In addition, small and medium businesses reliant on "Social Advertising" have lacked lower-priced and higher-quality alternatives to Facebook, <u>id.</u>, ¶¶ 52, 252, and the States' economies in general have suffered from suppressed innovation and investment in the social-networking space. <u>Id.</u>, ¶¶ 8, 230, 246. Although these allegations are a shade vague, the Court finds them enough to at least satisfy the pleading requirements for *parens patriae* standing in the context of asserted antitrust violations.

 **\*9** Facebook attempts to distinguish <u>Georgia v. Pennsylvania Railroad</u> and <u>New York v. Microsoft</u> based on the size of the harms caused by the antitrust violations in those cases: a price-fixing conspiracy amongst twenty railroads and unlawful maintenance of Microsoft's monopoly in personal-computer operating systems, respectively. <u>See</u> MTD States at 5. Rather than undermining Plaintiffs' position, <u>New York v. Microsoft</u> supports their standing to bring this action. There, the court held that Microsoft's conduct had caused the requisite "significant adverse effect on competition within the [plaintiff] state[s]," such that "the suit c[ould] be said to be for the benefit of the public" because "millions of citizens of, and hundreds, if not thousands, of enterprises in each of the [states] utilize[d] PCs running on Microsoft software." 209 F. Supp. 2d at 151–52 (citation omitted and cleaned up). Here, the State Plaintiffs have similarly alleged that tens, if not hundreds, of millions of their citizens consistently use Facebook Blue, and that U.S. advertisers paid over $30 billion to access those users in 2019 alone. <u>See</u> Redacted Compl., ¶¶ 1, 48, 68–70. The Court thus fails to see how, at this stage especially, it could find that Facebook's alleged squelching of competition lacked "sufficiently severe and generalized" consequences for Plaintiffs' economies; the damage to their quasi-sovereign "interest[s] in economic supervision" would seem, at the very least, comparable to the harm caused by Microsoft. <u>Kleppe</u>, 533 F.2d at 674. To the extent Defendant rejoins that social-networking services are essentially whimsical enterprises, such that suppressed competition in that market cannot <u>as a matter of law</u> have a sizeable effect on the overall economic well-being of a state, <u>see</u> Reply States at 5–6, the sheer size of the related advertising market alone plausibly suggests otherwise.

Plaintiffs, accordingly, have established their standing to sue *parens patriae* at this stage.

### B. Platform Policies

Moving now to the merits, the Court starts with the States' challenges to Facebook's Platform-related conduct under Section 2 of the Sherman Act. That Section prohibits monopoly maintenance, an offense that "has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful ... maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Microsoft Corp., 253 F.3d 34, 50 (D.C. Cir. 2001) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). This second element of a Section 2 violation is usually referred to by the shorthand of "anticompetitive" or "exclusionary conduct." Id. at 58.

By way of refresher, Plaintiffs allege that Facebook adopted and enforced a number of anticompetitive policies governing the use of its APIs. Most prominently, in 2013 it announced a policy of refusing to allow third-party, freestanding apps (like the chess app or the ESPN app discussed above) to access those APIs if they "replicate[d] [Facebook's] core functionality" — *i.e.*, if they competed with Facebook Blue. See Redacted Compl., ¶ 201. The States allege that, from 2013 to 2015, Facebook enforced that policy against a number of freestanding apps to which it had previously offered API access. See id., ¶¶ 207–12 (Voxer), 215–16 (MessageMe), 217–18 (Path), 219–21 (Circle), 222–24 (Tsū), 225–29 (Phhhoto). Facebook also allegedly enforced the policies "proactively" against newly launched apps that it feared could become a threat, id., ¶ 203, such as Vine. Id., ¶¶ 213–14. The States contend that these actions represent unlawful "conditional dealing" or unlawful "refusal[s] to deal" with apps that had their API access revoked or blocked. See States Opp. at 34–35.

This Court, however, agrees with Facebook that both theories hold no water as a matter of law. That result follows from three conclusions. First, under current antitrust doctrine, Facebook's general policy of refusing to provide API access to its competitors does not itself violate Section 2. Second, although specific instances in which Facebook revoked a competitor's API permissions (after previously providing it access) might have violated Section 2, the last alleged instance occurred in 2015, and there is therefore no current or impending violation of law for the Court to enjoin here. Third, and more prosaically, Plaintiffs have failed to plead facts to support a "conditional dealing" theory. The Court looks at the first two together and then moves to the third.

For those who will consider this Opinion alongside the Court's companion Opinion in the FTC case, the following "legal framework" section is the same in both. The analysis that follows diverges somewhat given the different legal regimes governing suits by States and suits by the FTC, although the outcome is similar.

#### 1. *Refusal to Deal*

##### a. Legal Framework

**\*10**  The central principle that governs refusal-to-deal claims is that, as a general matter, a monopolist has "the right to refuse to deal with other firms," which includes the right to "refus[e] to cooperate with rivals." Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP, 540 U.S. 398, 408, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004) (citing Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 601, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985)). That is because "[m]onopolists are both expected and permitted to compete like any other firm," and "[p]art of competing like everyone else is the ability to make decisions about with whom and on what terms one will deal." Viamedia, Inc. v. Comcast Corp., 951 F.3d 429, 454 (7th Cir. 2020) (citations omitted). This general no-duty-to-deal rule holds even where a monopolist refuses to deal with its competitor merely "in order to limit entry," Trinko, 540 U.S. at 407, 124 S.Ct. 872 — in other words, because it wants to prevent that rival from competing with it. See, e.g., Olympia Equip. Leasing Co. v. W. Union Tel. Co., 797 F.2d 370, 375–76 (7th Cir. 1986) ("Today it is clear that a firm with lawful monopoly power has no general duty to help its competitors" and thus no duty "to extend a helping hand to new

entrants ... [or] help [rivals] ... survive or expand ...."); Novell, Inc. v. Microsoft Corp., 731 F.3d 1064, 1074 (10th Cir. 2013) ("Even a monopolist generally has no duty to share ... its intellectual or physical property with a rival."); Fed. Trade Comm'n v. Qualcomm Inc., 969 F.3d 974, 993 (9th Cir. 2020) ("As the Supreme Court has repeatedly emphasized, there is no duty to deal under the terms and conditions preferred by a competitor's rivals.") (quoting Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc., 555 U.S. 438, 457, 129 S.Ct. 1109, 172 L.Ed.2d 836 (2009)); Aerotec Int'l, Inc. v. Honeywell Int'l, Inc., 836 F.3d 1171, 1184 (9th Cir. 2016) (rejecting argument that refusal to deal is unlawful because it was motivated by "intent to foreclose competition").

These decisions, to be clear, "are not premised on the view that [monopolist refusals to deal] are incapable of harming competition"; obviously, "refusals to aid new entrants can indeed" have that effect. See Daniel A. Crane, Does Monopoly Broth Make Bad Soup?, 76 Antitrust L.J. 663, 669 (2010). Rather, the rule declaring unilateral refusals to deal essentially "per se lawful," id. at 666, or "presumptive[ly] legal[ ]," Novell, 731 F.3d at 1073, rests on three overriding considerations of antitrust policy. First, and most importantly, "[f]irms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." Trinko, 540 U.S. at 407–08, 124 S.Ct. 872. Put another way, already large and successful firms "might be deterred from investing, innovating, or expanding ... with the knowledge [that] anything [they] creat[e] [they] could be forced to share," while "smaller [competitors] might be [similarly] deterred, knowing [they] could just demand the right to piggyback on [their] larger rival." Novell, 731 F.3d at 1073. That equilibrium would hinder, rather than advance, consumer welfare. SeeOlympia Equip. Leasing, 797 F.2d at 379 ("Consumers would be worse off if a firm with monopoly power had a duty to extend positive assistance to new entrants, or having extended it voluntarily a duty to continue it indefinitely."). Second, "compelled sharing puts federal courts in the role of central planners," requiring them to pick and choose the applicable terms and conditions of the forced sharing they would order "despite their being ill-equipped to assume this role." Aerotec, 836 F.3d at 1183. Finally, "compelled sharing may actually provide opportunities for collusion" between the monopolist and its rival or rivals. Id. Collusion is "the supreme evil of antitrust," Trinko, 540 U.S. at 408, 124 S.Ct. 872, and itself quite "injuri[ous] to consumers and the competitive process alike." Novell, 731 F.3d at 1073.

Nevertheless, the general no-duty-to-deal rule does have a "narrow-eyed needle" of an exception, id. at 1074, traceable to the Supreme Court's decision in Aspen Skiing. In that case, the defendant owned three of the four ski resorts in the Aspen, Colorado, market (making it a monopolist), and it had long operated a joint venture with the fourth (a rival mountain) that provided a ticket good for all four. See472 U.S. at 588–92, 105 S.Ct. 2847. That joint ticket was profitable for both parties and made customers happy. Id. at 610, 105 S.Ct. 2847. The defendant Aspen Skiing, however, eventually terminated the joint ticket. Plaintiff Highlands "tried a variety of increasingly desperate measures to re-create the joint ticket," including eventually "offering to buy the defendant's tickets at retail price." Trinko, 540 U.S. at 408–09, 124 S.Ct. 872. Aspen Skiing refused to even accept those tickets at its resorts. According to the Court, based on these facts, the jury (which had found liability) could have reasonably concluded that Aspen Skiing "was not motivated by efficiency concerns and ... was [instead] willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." 472 U.S. at 610–11, 105 S.Ct. 2847. That, the Court held, was sufficient for Section 2 liability.

 **\*11**  As the case has come to be understood, Aspen Skiing ran afoul of the Sherman Act — despite the general no-duty-to-deal rule — because it acted in a predatory fashion, which is to say it deliberately harmed itself (and consumers) in order to harm its competitor more. Consider the analogy of a predatory pricing scheme, in which a firm prices its goods below its costs and below its rivals' costs with the goal of driving those rivals out of the market and leaving it standing alone; such a scheme works where the predatory firm takes advantage of its greater ability to withstand the losses caused by its below-cost pricing. SeeNovell, 731 F.3d at 1075 (drawing this comparison); Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) (explaining predatory-pricing doctrine). Aspen Skiing was doing something very similar. By terminating a profitable and customer-pleasing joint venture, and refusing to even recreate it by accepting vouchers bought at retail price, it was enduring short-term pain with the exclusive goal of driving its rival (which could not stand that pain) out of the market. The defendant thus lost the usual protection of the general no-duty-to-deal rule, since it had used its general right to choose with whom it deals "as part of a larger anticompetitive enterprise" — i.e., an enterprise aimed at "harming competition,"

and therefore consumers, "by entrenching a dominant firm and enabling it to extract monopoly rents once the competitor is killed off." Viamedia, 951 F.3d at 462 (quoting Novell, 731 F.3d at 1075) (cleaned up); see also Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law vol. IIIB, ¶ 772d3, at 235 (4th ed. 2014).

The "larger anticompetitive enterprise" that characterizes an Aspen Skiing violation, crucially, cannot simply be an intent to harm — or, the flip side of the same coin, to avoid helping — a rival or rivals. "In concentrated markets the intent to maintain or improve one's own market position always entails the knowledge that rivals must suffer," and if antitrust law were to condemn every action taken by a monopolist with the "effect or purpose of limiting competition with itself," there would be little left to the rule that monopolists have no duty to aid their competitors. See Areeda & Hovenkamp, ¶ 772c2, at 220–21. That is why the Supreme Court has described Aspen Skiing as "at or near the outer boundary of § 2 liability," Trinko, 540 U.S. at 409, 124 S.Ct. 872, and "refused to extend liability to various other refusal to deal scenarios."Novell, 731 F.3d at 1074; but seeSteward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island, 311 F. Supp. 3d 468, 483 (D.R.I. 2018) (arguing that Trinko should not be read as "pull[ing] back the reins on refusal-to-deal claims"). And that is why the touchstone for liability is the sort of predatory design described above: "where the only conceivable rationale or purpose" for the refusal to deal is "to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition." Aerotec, 836 F.3d at 1184 (citation omitted).

Courts have accordingly coalesced around a three-part test for unlawful refusals to deal, drawn from Aspen Skiing's particular facts and aimed at sniffing out predation while avoiding over-inclusiveness. First, "there must be a preexisting voluntary and presumably profitable course of dealing between the monopolist and rival" with which the monopolist later refuses to deal. Novell, 731 F.3d at 1074; Qualcomm, 969 F.3d at 993. It was the absence of this preexisting relationship that doomed the plaintiffs in Trinko, as the Court upheld the dismissal of their Aspen Skiing claim at the pleading stage on that basis, despite their allegations that Verizon's refusal to deal with rivals was intended to, and did, blunt their growth. See540 U.S. at 404–05, 407, 409, 124 S.Ct. 872. Second, "the refusal to deal [must] involve[ ] products that the defendant already sells in the existing market to other similarly situated customers." Qualcomm, 969 F.3d at 994; see Areeda & Hovenkamp, ¶ 773d3, at 233 (defendant must be "selling [the] particular product or service to others but refu[sing] to sell that same product or service to" the rival) (citing Trinko, 540 U.S. at 410, 124 S.Ct. 872). Third, and most importantly, "[t]he monopolist's discontinuation of the preexisting course of dealing must suggest a willingness to forsake short-term profits to achieve an anti-competitive end," Novell, 731 F.3d at 1075 (citation omitted); seeQualcomm, 969 F.3d at 993, rather than to advance a valid business purpose. See alsoCovad Commc'ns Co. v. Bell Atl. Corp., 398 F.3d 666, 675 (D.C. Cir. 2005) (to prevail on refusal-to-deal claim, plaintiff "will have to prove [that defendant's] refusal to deal caused [defendant] short-term economic loss"). The cases, and the leading treatise, offer a demanding gloss on this prong of the test: Qualcomm requires the predatory motivation to be "the only conceivable rationale or purpose" for the otherwise inexplicable profit sacrifice, see969 F.3d at 993; Novell asks whether the cessation of dealing was "irrational but for its tendency to harm competition," 731 F.3d at 1076; and Areeda & Hovenkamp look for "an unexplained, apparently irrational change in an established course of dealing." Areeda & Hovenkamp, ¶ 772d3, at 233.

### b. Application

### i. Facebook Policies

 **\*12**  Applying these principles, it is clear off the bat that Facebook's adoption of a policy of not offering API access to competitors did not, standing alone, violate Section 2. As set out above, a monopolist has no duty to deal with its competitors, and a refusal to do so is generally lawful even if it is motivated, as Verizon's was in Trinko, by a desire "to limit entry" by new firms or impede the growth of existing ones. See540 U.S. at 408, 124 S.Ct. 872. It follows that a firm's merely announcing its choice not to deal with competitors, whatever the motivation for doing so, cannot violate Section 2. Plaintiffs' core argument for why the policies themselves are unlawful — that their promulgation was intended to, and did, "deter[ ] apps with established user networks from ... developing social features that would have threatened Facebook," States Opp. at 35 — misses the boat. The central teaching of the cases discussed above is that Facebook had no antitrust duty to avoid creating that deterrent. See,

e.g., Olympia Equipment Leasing, 797 F.2d at 375 ("Today it is clear that a firm with lawful monopoly power has no general duty to help its competitors ... by ... pulling its competitive punches.").

Facebook's general policy of withholding API access from competitors, moreover, was plainly lawful to the extent it covered rivals with which it had no previous, voluntary course of dealing. (Other rivals are addressed in Section B.1.b.ii., *infra*.) Such prior history of dealing, after all, is a necessary element of an Aspen Skiing claim. That is yet another reason why the mere act of announcing or maintaining a general no-dealing-with-competitors policy cannot, in and of itself, violate Section 2; rather, the analysis must focus on particular acts. See Areeda & Hovenkamp, ¶ 773e, at 273 (explaining that Aspen Skiing violations are "visible and idiosyncratic event[s]"). Consider an example from Plaintiffs' Complaint: citing its policies, in early 2013 Facebook blocked the API access of Vine, a new app it viewed as a competitor, mere hours after its launch. See Redacted Compl., ¶¶ 213–14. That decision was plainly lawful, per Trinko, because it was prospective: Facebook had not previously allowed Vine to access its APIs. Although the company was enforcing its "replicating core functionality" policy against Vine, that fact makes no difference to the Aspen Skiing analysis; rather, whether the specific refusal to deal with Vine contravened Section 2 depends on the details of the refusal itself.

To be clear, it is possible that were a monopolist to embark on a concerted scheme of serial refusals to deal with rivals, that scheme or "course of conduct" could amount to a separate and independent violation of the Sherman Act. See United States v. Microsoft Corp., 253 F.3d 34, 78 (noting course-of-conduct theory without passing on its validity); *infra* at 62–63 (further discussing theory). Even if such a claim were cognizable, however, simply maintaining a policy of refusing to deal with rivals would not be enough. Rather, to be actionable, an unlawful refusal-to-deal scheme would have to be made up of refusals that were themselves independent violations of the Aspen Skiing test. See Simon & Simon, PC v. Align Tech., Inc., No. 19-506, 2020 WL 1975139, at *7–8 (D. Del. Apr. 24, 2020) ("Plaintiff's characterization of [the defendant's] otherwise non-actionable refusals to deal as a 'scheme' do[es] not save its claims."); Eatoni Ergonomics, Inc. v. Rsch. In Motion Corp., 826 F. Supp. 2d 705, 709–10 (S.D.N.Y. 2011) ("[Plaintiff] does not, and cannot, cite any authority for the proposition that a series of unilateral acts that do not violate the antitrust laws may be aggregated into an unlawful 'course of conduct.' "), aff'd, 486 F. App'x 186 (2d Cir. 2012); Masimo Corp. v. Tyco Health Care Grp., L.P., No. 02-4770, 2004 WL 5907538, at *5–6 (C.D. Cal. June 10, 2004) (explaining that a course-of-conduct liability theory cannot "allow for clearly legal acts to be thrown into the mix to bolster a plaintiff's antitrust case"). Otherwise, as several scholars have persuasively explained, monopolists might face liability for refusals to deal that are categorically protected from scrutiny for the policy reasons explained above. See Crane, 76 Antitrust L.J. at 666–69; Douglas H. Ginsburg & Koren Wong-Ervin, Challenging Consummated Mergers Under Section 2 (George Mason Univ. L. & Econ. Paper No. 20-14, May 2020), https://bit.ly/3wPRpnx; see also *infra* at ——. The States, therefore, cannot get anywhere by reframing Facebook's adoption of a policy of refusing to deal with all competitors as the execution of an unlawful scheme of monopoly maintenance. Rather, such a scheme must involve specific instances in which that policy was enforced (i) against a rival with which the monopolist had a previous course of dealing; (ii) while the monopolist kept dealing with others in the market; (iii) at a short-term profit loss, with no conceivable rationale other than driving a competitor out of business in the long run.

### ii. Specific Refusals

**\*13** Plaintiffs rejoin that they have alleged a number of specific refusals to deal that in fact meet those requirements. See States Opp. at 38. All such pleaded instances, however, took place from 2013 to 2015, with the latest — revocation of Tsū's API access — happening in September 2015. See Redacted Compl., ¶¶ 222–24. Even assuming that those specific refusals to deal ran afoul of Aspen Skiing, the five-year delay that preceded the States' Complaint is fatal to their claim for equitable relief under Section 16 of the Clayton Act.

Section 16, as noted above, authorizes "injunctive relief" "against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity." 15 U.S.C. § 26. As it has been interpreted, that provision authorizes the usual equitable

practice under which courts may enter two different kinds of injunctions: (i) those that "attempt[ ] to foreclose a future harmful act," known as "preventive" injunctions; and (ii) those aimed at "prevent[ing] the future harmful effects of past acts," known as "reparative" injunctions. See Lampkin v. Dist. of Columbia, 886 F. Supp. 56, 62 (D.D.C. 1995) (citing Dan B. Dobbs, Law of Remedies 164 (2d ed. 1993)); see also California v. Am. Stores Co., 495 U.S. 271, 282, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990) (interpreting Section 16 to authorize divestiture, a reparative remedy, so long as the "harm to ... consumers persists" from, and therefore is still "threatened" by, the unlawful merger). The States here seek both kinds of relief as remedies for Facebook's alleged refusal-to-deal violations. On the preventive front, they request that "Facebook be enjoined and restrained from continuing to engage in any anticompetitive conduct and from adopting in the future any practice, plan, program, or device having a similar purpose or effect." Redacted Compl., ¶ 277(2). On the reparative front, they seek "such other and further equitable relief as this Court may deem appropriate to restore competitive conditions and lost competition" caused by Facebook's past Platform-related conduct. Id., ¶ 277(8).

Given that the only alleged conduct here that might have violated Section 2 took place from 2013 to 2015, however, the States cannot plausibly meet the requirements for either form of relief. See Gov't of Puerto Rico v. Carpenter Co., 442 F. Supp. 3d 464, 474 (D.P.R. 2020) (granting motion to dismiss where government plaintiff had "failed to plausibly establish that injunctive relief should be granted" under Section 16 because "it [was] apparent from the face of the Complaint that the last injurious act in the [alleged price-fixing] scheme befell almost ten years ago") (emphasis omitted).

Start with the preventive injunction, the key requirement for which is familiar: the States must "demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." Zenith Radio Corp. v. Hazeltine Rsch., Inc., 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); see also In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 14 (1st Cir. 2008) ("Section 16 ... dovetails with Article III's requirement that in order to obtain forward-looking relief, a plaintiff must face a threat of injury that is both real and immediate, not conjectural or hypothetical.") (cleaned up and citation omitted); City of Los Angeles v. Lyons, 461 U.S. 95, 103, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (explaining that this element of "whether the complaint states a sound basis for equitable relief" essentially overlaps with Article III standing inquiry).

**\*14** Facebook's ostensible scheme of revoking rivals' API access in a manner that violated Aspen Skiing is not ongoing or "contemporary," however, since the last revocation alleged occurred in 2015 and the policies themselves were suspended in 2018. See *supra* at ——. Nor is there any reason to think, given those facts, that such a scheme is "likely to ... recur." Zenith Radio, 395 U.S. at 130, 89 S.Ct. 1562; see Duty Free Americas, Inc. v. Estee Lauder Companies, Inc., 797 F.3d 1248, 1270–72 (11th Cir. 2015) (affirming dismissal of Section 16 claim for injunctive relief based on alleged antitrust violations that occurred four years before case was filed and were unlikely to affect plaintiff again). Plaintiffs suggest that Facebook's 2018 suspension of its API policies does not "establish that [it] stopped" targeting competitors for predatory API withdrawals. See States Opp. at 13. That gets it backwards: it is the States' burden to "substantiate the claim" for injunctive relief by "provid[ing] proof," or here well-pleaded allegations, "that the harm ... is likely to occur again." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). Yet based on the facts they have pleaded, and the judicially noticeable fact that Facebook discontinued the relevant Platform policies over two years ago, the States have alleged no "more than a mere possibility ... that the injury will occur" again. See 11A Charles Alan Wright & Arthur R. Miller, Fed. Prac. and Proc. § 2942 (3d ed.).

A reparative injunction is also clearly unavailable based on the facts alleged. To be sure, Plaintiffs have pleaded the existence of "an ongoing injury" — *i.e.*, "continuing, present adverse effects," In re Nifedipine Antitrust Litig., 335 F. Supp. 2d 6, 18 (D.D.C. 2004) (quoting O'Shea v. Littleton, 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)) — from the alleged 2013–15 scheme of unlawful revocations of API access to competitor apps. To wit, that scheme allegedly blunted the growth of existing competitors to Facebook Blue, deterred other potential competitors from entering Facebook's market, and even "discouraged outside investment" in new firms, see Redacted Compl., ¶¶ 187, 211, 246, and the resulting loss in competition allegedly caused a number of harms to the States' economic well-being that are still ongoing. Id., ¶¶ 248–54.

The problem is that there is nothing the Court could order Facebook to do that would remedy <u>that</u> specific injury. The key feature of a reparative injunction is that "it requires the defendant to restore the plaintiff to a preexisting condition to which [the] plaintiff was entitled."<u>Lampkin</u>, 886 F. Supp. at 62. A divestiture order can do that; it can "restore competitive conditions," Redacted Compl., ¶ 277(8), by unwinding a specific transaction that should never have occurred. But here, the Court cannot put the States back in their rightful position. It cannot turn back the clock to 2013, 2014, or 2015 and order Facebook to provide API access to Voxer, MessageMe, Path, or any other potential competitor (many of which are now defunct, per the Complaint), or somehow otherwise undo or ameliorate the destruction of competition that the States allege occurred. <u>Id.</u>, ¶¶ 216, 224, 229. Accordingly, "[a]n order enjoining [Facebook] ... would have no remedial effect whatsoever on the continuing ... [injury] [the States] expect to experience due to the past injury they allege." <u>In re G-Fees Antitrust Litig.</u>, 584 F. Supp. 2d 26, 35 (D.D.C. 2008) (dismissing antitrust "claim for injunctive relief ... for failure to state a claim"); <u>see also</u><u>In re Nifedipine</u>, 335 F. Supp. 2d at 19 & n.25 (noting that "the plaintiffs would also lack standing to seek an injunction" based on past conduct where the "relief they seek would not be reasonably likely to redress th[at] injury").

The foregoing analysis, it is worth emphasizing, simply reflects the hornbook principle that, "[a]s a general rule, past wrongs are not enough for the grant of an injunction." <u>Qualcomm</u>, 969 F.3d at 1005 (citation omitted) (holding that injunction would be inappropriate remedy for unlawful conduct that "substantially foreclosed competition in the relevant antitrust markets" but terminated "two years before the FTC filed its action"). The usual remedy in such cases is damages, <u>see</u><u>Lyons</u>, 461 U.S. at 109, 103 S.Ct. 1660, which Plaintiffs have not sought here and would likely be time barred in any event. <u>See</u>15 U.S.C. § 15c (authorizing State attorneys general to sue <i>parens patriae</i> for damages caused to their citizens by antitrust violations); <u>id.</u> § 15b (imposing a four-year statute of limitations on such actions). Indeed, as is discussed at length below, courts frequently apply the doctrine of laches to bar equitable relief where the comparable limitations period has run. <u>See</u><u>Carpenter</u>, 442 F. Supp. 3d at 474–75 (finding both that Puerto Rico had "failed to plausibly establish that injunctive relief should be granted" given the delay in suit and that, by the same token, "the laches doctrine applies"). Although the Court here does not apply laches to the States' challenge to Facebook's Platform-related conduct (nor does Facebook ask it to), the doctrine's likely applicability confirms the correctness of the Court's conclusion that equitable relief is unavailable as to events that occurred over five years ago.

**\*15** In sum, then, while it is possible that Facebook's alleged scheme of serially revoking API access from competitor apps could form the basis of a plausible refusal-to-deal claim under <u>Aspen Skiing</u>, the Court need not address that question. Even assuming the answer is yes, injunctive relief is not available now for such a claim as a matter of law.

### 2. *Conditional Dealing*

Plaintiffs get no further by maintaining that Facebook's policies also violated antitrust rules against what they call "conditional dealing." <u>See</u> States Opp. at 35. As an initial matter, the States are wrong to argue that a monopolist violates that so-called doctrine "when it requires third parties seeking to obtain its products or services to refrain from taking some action that would tend to foster competition on the merits."<u>Id.</u> They cite only <u>Lorain Journal Co. v. United States</u>, 342 U.S. 143, 149, 72 S.Ct. 181, 96 L.Ed. 162 (1951), for that proposition, and yet <u>Lorain</u> says nothing of the sort. That is unsurprising, as such a broadly formulated rule would cover refusals to deal with competitors, thus contradicting the cases discussed above — after all, such refusals can always be reframed as offers to deal only on the condition that the third party refrains from competing. <u>See, e.g.</u>, Herbert Hovenkamp, <u>FRAND and Antitrust</u>, 105 Cornell L. Rev. 1683, 1697 (2020) (defining "simple refusal[s] to deal" covered by <u>Trinko</u> rule to include "refusal[s] conditioned on a firm's status that cannot readily be changed," such as where a firm "agree[s] to sell to [non]competitors but not [ ]competitors").

To the extent any scholarly commentary uses the term "conditional dealing," rather, the phrase generally refers to actions such as "tying" or "exclusive dealing." <u>Id.</u> at 1697, 1708. The key fact distinguishing such conduct from a standard refusal to deal is that it is not "unilateral," but instead "involves some assay by the monopolist into the marketplace" that interferes with the relationship between rivals and third parties. <u>Novell</u>, 731 F.3d at 1072. Tying, for instance, occurs when a firm "require[s] third parties to purchase a bundle of goods rather than just the ones they really want," <u>id.</u>, thereby leveraging the monopolist's power

in the "tying" product market to harm its competitors (who lose access to customers) in the "tied" product market. See Microsoft, 253 F.3d at 84. "Exclusive dealing" is similar: it refers to a monopolist's conditioning the sale of a product on the buyer's agreement not to deal with its competitors. Id. at 69–70. Again, these "conditional dealing" schemes are thus categorically different from unilateral conduct that involves only the monopolist's competitors, such as its refusal to deal with them. The distinction is critical, as antitrust law is far more tolerant of unilateral behavior. See Novell, 731 F.3d at 1072–73 (citing cases) ("Put simply if perhaps a little too simply, today a monopolist is much more likely to be held liable for failing to leave its rivals alone than for failing to come to their aid."); Hovenkamp, 105 Cornell L. Rev. at 1697.

That brings us back to Lorain Journal, which, as it happens, involved a "very special form of exclusive dealing, namely, a refusal to sell to end-user customers who purchase[d] from the monopolist's competitor[ ]." Kenneth L. Glazer & Abbott B. Lipsky, Jr., Unilateral Refusals to Deal Under Section 2 of the Sherman Act, 63 Antitrust L.J. 749, 800 n.75 (1995). There, the Journal, a local newspaper, had a "commanding" position in the advertising market of the city of Lorain, Ohio. See 342 U.S. at 145, 72 S.Ct. 181. After a new radio station entered that market, the paper began to refuse to sell advertising space "in the Journal [to] any Lorain County advertiser who advertised or who [the paper] believed to be about to advertise" with the radio station. Id. at 148, 72 S.Ct. 181. The paper's bet was that many advertisers could not afford to lose out on the chance to advertise with it, and it was right; the scheme caused most firms to avoid advertising on the radio station, restoring the Journal to its local monopoly. Id. at 148–49, 72 S.Ct. 181. On those facts, the Court found a violation of Section 2 of the Sherman Act. Id. at 152–53, 72 S.Ct. 181. The key point for our purposes is that the Journal did not simply refuse to deal with the competitor radio station — e.g., it did not merely refuse to print advertisements for the station itself in its pages. The Journal instead refused to deal with any and all customers unless those customers agreed not to deal with the competitor station, thereby interfering with its rival's ability to compete on the merits.

**\*16**  For the Lorain Journal principle (or exclusive-dealing doctrine generally) to apply to this case, as Plaintiffs argue it does, they would thus have to allege that Facebook conditioned access to its Platform APIs on app developers agreeing not to deal with other social-networking services. And, indeed, the States' Opposition suggests that Facebook did just that. See States Opp. at 35 ("Facebook ... adopt[ed] policies prohibiting app developers from promoting competing social networks."); id. ("These policies deterred apps from ... working with other [social] networks ...."). If Facebook had in fact interfered in that way with the ability of competing social-networking services to make agreements with app developers, it could plausibly have violated Section 2; such conduct might well have had a "significant effect in preserving [Facebook's] monopoly" by keeping user engagement with competing social-networking services "below the critical level necessary for any rival to pose a real threat to [its] market share." United States v. Dentsply Int'l, Inc., 399 F.3d 181, 191 (3d Cir. 2005) (finding Section 2 liability based on exclusive dealing); see also Microsoft, 253 F.3d at 69–70 (same).

Plaintiffs, however, have not sufficiently pleaded the sort of conduct just described. As discussed above, see supra at 13–14, the only claim to this effect in their Complaint is their allegation that, "[i]n 2011, Facebook adopted a policy aimed at forbidding ... any apps that linked or integrated with competing social platforms ... from accessing its APIs." Redacted Compl., ¶ 199. The precise allegation here, however, appears to be that this 2011 policy was "aimed at" forbidding third-party apps from using Facebook's APIs if they "linked or integrated with" other social-networking services, not that the policy actually did condition API access on refraining from such dealings. The Complaint, moreover, pleads no facts as to how or whether that aim was achieved — in other words, there is no indication of what the policy actually said or did, or how it was implemented to have the effect of discouraging third-party apps from dealing with rivals. As the D.C. Circuit has cogently explained, whether a "monopolist's conduct ... is ... condemned as exclusionary" depends on "the effect of that conduct, not upon the intent behind it." Microsoft, 253 F.3d at 59.

The Court here is not relying on a technical pleading defect. On the contrary, even if the States had alleged that the 2011 policy in fact had this prohibition (and thus presumably caused the worrisome effect), the Court would disregard that allegation as inconsistent with the actual text of the 2011 policy. See supra at 13–14; Vanover, 77 F. Supp. 2d at 98 (court may consider material outside pleadings where it is "referred to in the complaint and is central to plaintiff's claim"). As the full text reveals, the policy stated only that "Apps on Facebook may not integrate, link to, promote, distribute, or redirect to any app on any other

competing social platform." Redacted FTC Compl., ¶ 139. By "Apps on Facebook," it is clear that the policy was referring to the "canvas apps" that Facebook allowed developers to create for use within the Facebook site itself — *e.g.*, the personality-test app — rather than freestanding apps such as the ESPN app, which a user would access and use separately. See *supra* at 11. The upshot is that while the 2011 policy prohibited apps built to be used on Facebook from providing a link to a different social-networking platform, like Circle or Path, it did not prevent freestanding apps from linking to or interoperating with competitor social-media services. It did not, for instance, provide that the ESPN app could only allow a user to sign in with Facebook credentials (as opposed to, say, Google credentials), or only add a Facebook "Like" button and not a "share" button from Path or Circle. Nor did it require the ESPN app to refrain from allowing users to search for their contacts on other apps, as they did for their Facebook friends using the Find Friends API.

**\*17**  Properly understood, then, the 2011 policy's conditions did not violate Section 2 of the Sherman Act. Nor do Plaintiffs so argue. The policy simply regulated the acceptable features of apps specifically built to be used on Facebook itself; it does not appear to have prevented an app developer from building a separate version of its app that could be accessed and used within the website of another PSN service. For instance, the developer who built a personality-test app for Facebook could build the same app for Google+ without running afoul of the policy; its terms merely prohibited the Facebook version of the app from linking or redirecting to the Google+ version. The 2011 policy was thus a far cry from a policy that told app developers that they could only access Facebook's platform if they promised to only build their app for Facebook. By rough analogy, it is as if the Lorain Journal, rather than refusing to carry advertisements from any business that also advertised with the competing radio station, instead merely required that advertisements appearing in its paper had to avoid mentioning the radio station. Such a focused prohibition on the use of a monopolist's own facilities obviously could not have "significantly limited" the "opportunities for [competitors] to enter into or remain in [the] market" for personal-social-networking services, as is required for Section 2 liability. Microsoft, 253 F.3d at 69. As such, the States' "conditional dealing" theory of a Section 2 violation fails to state a claim as a matter of law.

* * *

For the foregoing reasons, the Court agrees with Facebook that none of Plaintiffs' Section 2 challenges to its Platform-related policies and conduct survives the instant Motion.

C. Acquisitions

Facebook next argues that the States' challenges to its acquisitions must similarly be dismissed under the doctrine of laches. Correct again. That equitable doctrine "bars a plaintiff from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 121, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). The States filed this action in December 2020, seeking injunctive relief under Section 16 of the Clayton Act from the allegedly harmful effects of Facebook's anticompetitive acquisitions. But their main targets, the Instagram and WhatsApp mergers, both of which they challenge under Section 7 of the Clayton Act and Section 2 of the Sherman Act, took place in 2012 and 2014, respectively. See Redacted Compl., ¶¶ 119, 166. Begging the reader's indulgence for another lengthy exposition, the Court will now explain why that delay dooms the States' challenges here.

1. *Legal Framework*

Although what constitutes an "unreasonable delay" in filing suit is generally a fact-intensive question, in the context of injunctive actions under Section 16, many courts have held that the Clayton Act's "four-year statute of limitation" on damages actions should be "used as a 'guideline' " for "computing the laches period." Oliver v. SD-3C LLC, 751 F.3d 1081, 1085 (9th Cir. 2014) (quoting Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp., 518 F.2d 913, 928 (9th Cir. 1975), disapproved of on other grounds by California v. Am. Stores Co., 495 U.S. 271, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990)); see also Carpenter, 442 F. Supp. 3d at 474; Duty Free Americas, Inc. v. Estee Lauder Companies, Inc., No. 12-60741, 2014 WL 1329359, at \*14 (S.D. Fla. Mar. 31, 2014); Areeda & Hovenkamp vol. II, ¶ 320g, at 373 & n.199 (citing more decisions holding "the four-year statutory limitation

period for damage actions ... determinative of the equity result as well"). As these courts explain, "The doctrine of laches is premised upon the same principles that underlie statutes of limitation: the desire to avoid unfairness that can result from the prosecution of stale claims." Midwestern Mach. Co. v. Nw. Airlines, Inc., 392 F.3d 265, 277 (8th Cir. 2004) (citation omitted); see also IT&T, 518 F.2d at 928; ("[W]e think that a basic linkage is present [between the Clayton Act's separate causes of action for damages and injunctions] because of the fact that the two categories of relief serve as tools of enforcement and remedy for the same set of substantive rights.").

The starting presumption, then, is that regardless of whether a Section 16 plaintiff seeks damages or an injunction, it must file its lawsuit within four years from "the accrual of the claim." Menominee Indian Tribe of Wisconsin v. United States, 614 F.3d 519, 531 (D.C. Cir. 2010) (cleaned up) (citing Gull Airborne, 694 F.2d at 843); accord Oliver, 751 F.3d at 1086 (looking to when "cause of action in antitrust accrues" because "in applying laches, we look to the same legal rules that animate the four-year statute of limitations under section 4B [of the Clayton Act]."). Generally, "[a] Section 7 action challenging the initial acquisition of another company's stocks or assets accrues at the time of the merger or acquisition," Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1050 (8th Cir. 2000), giving the plaintiff four years from that time to sue. See also Z Techs. Corp. v. Lubrizol Corp., 753 F.3d 594, 604 (6th Cir. 2014) (same); Areeda & Hovenkamp, ¶ 320c5, at 349–350 (agreeing with this rule on policy grounds). The Court largely focuses on Section 7 in this section and then examines the distinct Section 2 component of Plaintiffs' attacks on Facebook's acquisitions in section III.C.1.d, *infra*. Following the lead of the parties and the cases, it uses the terms "acquisition" and "merger" interchangeably for purposes of this analysis.

 **\*18**  This presumptive four-year laches period is particularly appropriate for challenges to acquisitions. The "traditional[ ]" remedy in such cases, which Plaintiffs seek here, see Redacted Compl. ¶ 277(8), is divestiture of the acquired assets and/ or stock. See Am. Stores, 495 U.S. at 281, 110 S.Ct. 1853 (quoting United States v. E.I. du Pont de Nemours & Co., 366 U.S. 316, 329–331, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961)). Such a remedy, if ordered well after the merger has closed, will usually prejudice the defendant by inflicting substantial "hardship and competitive disadvantage," especially where its "business operations [have been] combined" with those of the acquired company. Ginsburg v. InBev NV/SA, 623 F.3d 1229, 1235 (8th Cir. 2010) (holding divestiture remedy unavailable as a matter of law because of plaintiff's "inexcusable delay[ ]" in bringing suit); see also Midwestern Mach., 392 F.3d at 277 (applying laches based on "substantial[ ] prejudice[ ]" to firm's shareholders "who invested [having] no reason to believe that a merger occurring more than seven years earlier could be the basis for suit"). For that reason, "where the equity relief" sought in a merger challenge "is retroactive in character, such as divestiture of illegally acquired assets," Areeda and Hovenkamp argue that the four-year time limit "should be absolute." Areeda & Hovenkamp ¶ 320g, at 374. Indeed, as they note, courts frequently find a divestiture remedy clearly unfair and unwarranted after delays in filing much shorter than four years — sometimes only months or even days after the merger's announcement. Id. ¶ 320g, 373 & n.198; see, e.g., Ginsburg, 623 F.3d at 1235 (suit filed only two months after merger announcement and before closing); Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp., 116 F. Supp. 2d 1159, 1173 (C.D. Cal. 2000) (delay of six months after merger announcement); Taleff v. Sw. Airlines Co., 828 F. Supp. 2d 1118, 1124 (N.D. Cal. 2011) (suit filed one day after closing).

### 2. *Application*

Given these precedents, the Court concludes that Plaintiffs' challenges to Facebook's 2012 and 2014 acquisitions are barred by laches. Going by the four-year "guideline" alone, Oliver, 751 F.3d at 1085, which is generous compared to the decisions set out above, and which prominent authorities argue "should be absolute," Areeda & Hovenkamp ¶ 320g, at 374, the States missed their window to sue by years. In the case of the Instagram acquisition, "the comparable statute of limitations time period ha[d] run ... twice over" by the time they filed. Midwestern Mach., 392 F.3d at 277 (applying laches). The Court is aware of no case, and the States provide none, in which a plaintiff other than the United States (against which laches does not apply), whether a state or a private party, was awarded equitable relief after such long post-acquisition delays in filing suit. Having thus "slumbered on [their] rights, [Plaintiffs'] equitable claims are now barred." Id.

That result is confirmed by applying the standard laches elements. Cf.Steves & Sons, Inc. v. JELD-WEN, Inc., 988 F.3d 690, 716 (4th Cir. 2021) (suggesting that a "singular focus on the date that a merger is consummated" is not appropriate). In brief, "Plaintiffs' years-long delay in bringing th[is] action was inexcusable as each challenged act was highly publicized," and "Facebook [would be] prejudiced by the unreasonable delay." Reveal Chat Holdco, LLC v. Facebook, Inc., 471 F. Supp. 3d 981, 990 (N.D. Cal. 2020) (discussing, *inter alia*, Instagram and WhatsApp acquisitions).

First, the States' long delays were unreasonable and unjustified as a matter of law. Both acquisitions were, per Plaintiffs' allegations, publicly announced, and the States were thus aware or certainly should have been aware of them from those points onward. See Redacted Compl., ¶¶ 124, 166, 199. The Complaint itself makes clear that concerns as to the effects of both on competition were apparent at the time. Plaintiffs allege that Facebook was "the dominant player" in Personal Social Networking Services "[a]t least as early as 2011," before either acquisition. Id., ¶ 68. Their position in this case, furthermore, is that "when the acquiring firm is a dominant firm or monopolist, competitive harm" from the acquisition of even a "potential competit[or] can be predicted with considerably more confidence[,] .... indicat[ing] a harsh rule against such mergers." States Opp. at 16 (quoting Areeda & Hovenkamp vol. V, ¶ 1122, at 59); see also Areeda & Hovenkamp vol. IV, ¶ 912a, at 91–92 (arguing that acquisition of a "nascent rival" "bears a very strong presumption of illegality" because it "eliminates an important route by which competition could have increased in the immediate future").

 **\*19**  As to each acquisition, moreover, either judicially noticeable facts or the Complaint's allegations provide objective confirmation of contemporaneous antitrust concerns. After Facebook announced its plans to purchase Instagram in April 2012, see Redacted Compl., ¶ 124, the FTC conducted a highly publicized, four-month-long "investigation to determine whether the proposed acquisition ... [would] violate Section 7 of the Clayton Act." Letter from April J. Tabor, Acting Secretary, Federal Trade Commission, to Thomas O. Barnett, Covington & Burling LLP (Aug. 22, 2012), https://bit.ly/3xaY3*o*p. Although the agency ultimately allowed the merger to proceed with no action, the States' choice not to assert their own concerns at that time, let alone at any time in the next eight years, "bear[s] upon the issue of laches." Am. Stores, 495 U.S. at 297, 110 S.Ct. 1853 (Kennedy, J., concurring). As to WhatsApp, according to the Complaint itself, "some analysts recognized" "at the time" that "the only rationale for Facebook's $19 billion purchase price was the elimination of a potential competitor poised to mount a major challenge to Facebook's monopoly." Redacted Compl., ¶ 170. That perfectly summarizes Plaintiffs' exact theory of the case against the WhatsApp acquisition, seeid., ¶¶ 179–80, 270, yet, again, it took them six years to come to court. Plaintiffs' Opposition, furthermore, does not argue or even suggest that the States were somehow not "able to pursue [their] claim[s]" at that time. Cf.JELD-WEN, 988 F.3d at 718 (citations omitted).

Second, prejudice to Facebook, were equitable relief to be awarded now, is also apparent. As an initial matter, "[t]he bare fact of delay" beyond the analogous four-year statute of limitations "creates a rebuttable presumption of prejudice." IT&T, 518 F.2d at 926 (citing Gillons v. Shell Co. of Calif., 86 F.2d 600, 608 (9th Cir. 1936) ("When the suit is filed after the statutory period, injury [*i.e.*, prejudice] is presumed.")); Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1057 (5th Cir. 1982) (same; citing cases). The facts alleged in the Complaint, moreover, confirm the existence of economic prejudice here. According to the States, for the last five-plus years Facebook has made business decisions and allocated firm resources based on holding Instagram and WhatsApp, and it has also integrated their offerings to some extent into its core business. See Redacted Compl., ¶ 115 (quoting Zuckerberg email explaining plan to "integrate [Instagram's] products with ours"); id., ¶ 124 (Facebook "scale[d] back" or "cancel[ed]" a number of projects, including its "Mobile photos app," after buying Instagram); id., ¶ 127 (Facebook matched user accounts on Facebook Blue and Instagram to better target and serve ads); id., ¶¶ 176–78, 180 (Facebook has "take[n] active steps to utilize WhatsApp data in efforts to promote its core platform," including "combin[ing] user data across the services"). Although short of full business integration, Defendant's "expanded use of and investment in" the acquired assets "establishes economic prejudice resulting from [Plaintiffs'] [d]elay." Pro-Football, Inc. v. Harjo, 567 F. Supp. 2d 46, 59, 62 (D.D.C. 2008) (holding that laches barred cancellation action against trademark where "[e]conomic prejudice ar[ose] from investment in and development of the trademark") (citation omitted), aff'd in relevant part, 565 F.3d 880, 884 (D.C. Cir. 2009) (agreeing that sufficient "evidence of prejudice ... may arise from mere proof of continued investment in the late-attacked mark"); see alsoGarabet, 116 F. Supp. 2d at 1173 (finding "serious prejudice and hardship" would be caused by divestiture given investment "spent on integrating the [merged] companies" and restructuring defendants' workforces).

Equitable relief would similarly prejudice Facebook's shareholders, see Redacted Compl., ¶ 99 (noting Facebook's 2012 IPO), especially those who invested within the last several years, by which point the WhatsApp and Instagram acquisitions had become old news. See Midwestern Mach., 392 F.3d at 277; cf. Fed. Home Loan Bank Bd. v. Elliott, 386 F.2d 42, 54 (9th Cir. 1967) (applying laches in non-antitrust suit seeking post-merger divestiture because of prejudice to "the rights of the shareholders ... as of the day of the filing of the merger ... to enjoy the benefits of the merger" and "prejudice [to] the rights of ... shareholders who became such after the merger"). What is more, even if the existence of prejudice were debatable under the applicable precedents, "a lesser showing of prejudice is required" for laches in this case than in the above-cited cases, simply due to the sheer length of the delay. See Harjo, 565 F.3d at 884–85 (eight-year delay) (citing Gull Airborne Instruments, Inc. v. Weinberger, 694 F.2d 838, 843 (D.C. Cir. 1982)); cf. JELD-WEN, 988 F.3d at 729 (Rushing, J., concurring) ("The passage of time exacerbates th[e] complexities" that would be caused by divestiture "[a]fter a merger closes," "not only for the combined entity but also for nonparties who will be affected by a court order dividing the company."). Prejudice sufficient to trigger the rule of laches is manifest here.

### 3. *Counterarguments*

**\*20**  The States, unsurprisingly, object to the foregoing analysis on a number of grounds. The Court marches through each, but ultimately sticks to its guns.

#### a. Applicability of Laches

Plaintiffs first maintain that the usual laches framework does not properly govern in cases brought by states *suing parens patriae* and in the public interest. See States Opp. at 10–12. They cite no authority for that contention; they instead simply point out that most of the cases cited above were suits brought by private litigants — only Carpenter (which held that laches did apply) involved a government plaintiff, the territory of Puerto Rico. See 442 F. Supp. 3d at 464. The dearth of cases (other than Carpenter) applying laches to bar merger challenges by states, however, does not somehow establish that states are immune from the doctrine. It instead seems to reflect the fact that there are very few cases like the present one, in which state plaintiffs delayed years and years in seeking equitable relief from an allegedly unlawful acquisition.

At any rate, to the extent that the question of laches' applicability to Section 16 suits by state plaintiffs is open, Carpenter had the correct answer. The only other case that is close to being on point, California v. American Stores Co., 495 U.S. at 271, 110 S.Ct. 1853, also supports the applicability of laches to state merger challenges. There, California sued in its capacity as *parens patriae* under Section 16 to unwind the merger of two supermarket chains, claiming that it violated Section 7. Id. at 274–75, 110 S.Ct. 1853; see California v. American Stores Co., 872 F.2d 837, 839 (9th Cir. 1989). The case eventually reached the Supreme Court, which held (reversing the lower court) that divestiture was an available remedy in suits brought under Section 16. Am. Stores, 495 U.S. at 278, 110 S.Ct. 1853. Throughout its opinion, the Court repeatedly referred to the suit as a "private action under § 16 of the Clayton Act," id. (emphasis added); see also id. at 281, 284–85, 110 S.Ct. 1853, and emphasized that despite its holding, "equitable defenses such as laches ... may protect consummated transactions from belated attacks by private parties" under Section 16. Id. at 296, 110 S.Ct. 1853. Justice Kennedy wrote separately to emphasize his view that, given California's delay in suing while the FTC negotiated a pre-merger settlement with the defendant (the State waited to file until one day after the FTC approved the merger under the negotiated conditions), the lower courts should consider on remand whether "the bar of laches" in fact applied. Id. at 298, 110 S.Ct. 1853 (Kennedy, J., concurring). It is difficult to come away from these opinions with the impression that any Justice thought that *parens patriae* suits under Section 16 are immune from a laches defense. See New York. v. Kraft Gen. Foods, Inc., 862 F. Supp. 1030, 1033 (S.D.N.Y. 1993) (citing American Stores for the proposition that "the State of New York[,] [though] a governmental actor, ... is considered a private party when seeking an injunction pursuant to the Clayton Act"), aff'd sub nom. State of N.Y. v. Kraft Gen. Foods, 14 F.3d 590 (2d Cir. 1993).

That approach makes sense given the history and purpose of Section 16. For the first two decades of its existence, the Sherman Act was interpreted not to provide for suits by either states or private parties. See Paine Lumber Co. v. Neal, 244 U.S. 459, 471, 37 S.Ct. 718, 61 L.Ed. 1256 (1917) (citing Minnesota v. Northern Sec. Co., 194 U.S. 48, 24 S.Ct. 598, 48 L.Ed. 870 (1904), for proposition that "a private person cannot maintain a suit for an injunction under" the Sherman Act); Georgia v. Evans, 316 U.S. 159, 162, 62 S.Ct. 972, 86 L.Ed. 1346 (1942) ("[A]n amendment was necessary to permit suit for an injunction [for Sherman Act violations] by others than the United States."). Enacted in 1914, the Clayton Act "filled [that] gap ... by authorizing equitable relief in private actions" under Section 16. American Stores, 495 U.S. at 287, 110 S.Ct. 1853. Congress, however, specifically rejected an amendment that would have authorized "the attorney general of any State [to] bring suit in the name of the United States to enforce any of the antitrust laws." 51 Cong. Rec. S14519–27 (daily ed. Sept. 1, 1914); see Evans, 316 U.S. at 162 n.1, 62 S.Ct. 972 (noting this history).

 **\*21** In expanding the universe of antitrust enforcers beyond the United States itself, Congress thus drew no distinction between states and private litigants: both simply came within the statute's authorization of "[a]ny person" to "sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26; see Evans, 316 U.S. at 161, 62 S.Ct. 972 (holding that states qualify as "person[s]" under that provision); see also Georgia v. Penn. R. Co., 324 U.S. at 447, 65 S.Ct. 716. As such, the Congressional judgment was that states, like private parties, are entitled to relief under Section 16 "under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity," 15 U.S.C. § 26 — "conditions and principles" that have always included the bar of laches against plaintiffs whose unreasonable delay prejudices the defendant.

This Court, then, agrees entirely with the position previously articulated by the United States in follow-on litigation to the Microsoft case:

> Although the States have traditionally played a significant role in American antitrust activity, they do not stand on equal footing with the United States as enforcers of the federal antitrust laws. The States possess important authority to seek both monetary and injunctive relief. In pursuing injunctive relief, however, the States appear before the Court as private parties, not as sovereign law enforcers.... [T]he relief they may seek is [therefore] subject to the limits Congress and the courts have imposed.

Mem. Amicus Curiae of the United States at 4, New York v. Microsoft Corp., No. 98-1233 (D.D.C. Apr. 15, 2002), https:// bit.ly/3fJDIVw. Consistent with this view, the principle that laches does not ordinarily apply to "government suits to enforce sovereign rights," United States v. Admin. Enterprises, Inc., 46 F.3d 670, 673 (7th Cir. 1995) (citation omitted), allows the United States to seek an injunction for violation of its antitrust laws at any time, see 15 U.S.C. §§ 4, 15; see, e.g., duPont, 366 U.S. at 318, 81 S.Ct. 1243, but does not offer the states the same leeway. As American Stores explained, laches can bar a "belated attack" against a merger under Section 16 even if "it would not be too late for the [federal] Government to vindicate the public interest" "under § 15" of the Clayton Act. See 495 U.S. at 295–96, 110 S.Ct. 1853.

The fact that the States "bring this *parens patriae* suit in the public interest," States Opp. at 10, does not counsel a different result. The *parens patriae* doctrine supplies a theory of Article III injury — namely, that "the state itself" has a cognizable "interest in the continuing prosperity of [its] econom[y]." Kleppe, 533 F.2d at 673–74. But the fact that "severe and generalized" economic injury to a state's citizens also concretely injures the state for Article III purposes, id. at 675, says nothing about the nature of the states' roles in the antitrust enforcement regime Congress has established. As the Supreme Court has explained, that regime, "while allowing "[t]he private-injunction action ... [to] supplement[ ] [G]overnment enforcement," "primarily charge[s]" the United States "with the duty of protecting the public interest under these laws." United States v. Borden Co., 347 U.S. 514, 518, 74 S.Ct. 703, 98 L.Ed. 903 (1954) (emphasis added). Categorically excusing the states from laches would be inconsistent with that principle. The States' argument here also proves too much: if the fact that a suit would advance the public interest were enough to preclude a laches defense under Section 16, then laches would not apply even to suits by private entities. Congress,

after all, authorized such suits precisely because they also "further the overriding public policy in favor of competition." Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134, 139, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), overruled by Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); Am. Stores, 495 U.S. at 284, 110 S.Ct. 1853 ("Private enforcement of the Act was in no sense an afterthought; it was an integral part of the congressional plan for protecting competition.").

**\*22**  Although the doctrine of laches therefore applies to *parens patriae* suits such as this one, the Court does not mean to suggest that the presence of state plaintiffs has zero effect on the analysis. Laches is an equitable doctrine, and in the balancing of the equities, it is of course relevant that this suit is brought not by a competitor hoping to "seriously interfere with a rival's business operations," but rather by many of the states of the Union. IT&T, 518 F.2d at 926. Even giving the States' interests significantly more weight than a private actor's would receive, however, does not lead to a different result. Plaintiffs waited six and eight years, compared to the four-year guideline statute of limitations, to challenge two highly publicized acquisitions — one of an existing nascent competitor, one of a potential future competitor — by a firm that they allege was already a "dominant" monopolist. See Redacted Compl., ¶ 68. To hold that laches did not apply in those circumstances would essentially declare the States immune from the doctrine for all practical purposes. While many might welcome such a regime as a matter of policy, it is not the system we have.

b. Ongoing Violation

The States next posit that even if laches applies, their "Complaint is timely," despite the long delays between the mergers at issue and their filing, "because the[y] allege ongoing conduct" by Facebook. See States Opp. at 12–13. They appear to contend, albeit not with perfect clarity, both that (i) the Instagram and WhatsApp acquisitions themselves are "ongoing" because Facebook still holds the purchased assets; and that (ii) Facebook has recently taken other actions that open the acquisitions to renewed challenge.

As noted above, the general rule is that courts "measure[ ] the reasonableness of a private plaintiff's delay in suing for divestiture relative to the announcement of the transaction and its subsequent consummation." JELD-WEN, 988 F.3d at 729 (Rushing, J., concurring) (citing cases). There are a number of exceptions to that rule, but before turning to the one the States seem to raise here, it is important to note what they do not argue. Plaintiffs do not contend, in opposing Facebook's Motion to Dismiss on the ground of laches, that "they lacked notice of the threatened injury [to their citizens' economic well-being] on which [their] divestiture claim is based" at the time the acquisitions were announced or consummated. Cf.JELD-WEN, 988 F.3d at 717–18 (majority) (reasoning that "unreasonable delay does not include any period of time before [the plaintiff] .... learned that the merger" threatened plaintiff injury) (cleaned up). Put differently, they do not argue that it was "uncertain or speculative whether [Facebook's] antitrust violation[s] [would] injure[ ] [them] at the time of the violation," such that the laches period did not "begin[ ] until the date that [antitrust injury] first ... became ascertainable." Oliver, 751 F.3d at 1086 (cleaned up and citation omitted); cf.In re Evanston Nw. Healthcare, No. 07-4446, 2008 WL 2229488, at \*4 (N.D. Ill. May 29, 2008) (denying motion to dismiss where "the plaintiffs dispute[d] [the defendant's] assertion that they either knew or should have known of their potential injury at the time the merger was consummated"). Along the same lines, there is no argument that the acquisitions at issue did not violate Section 7 or Section 2 until sometime after the merger closed; on the contrary, Plaintiffs' explicit theory is that both mergers were unlawful from the outset. See States Opp. at 17 ("The States allege that Facebook was a monopolist at the time it acquired Instagram and WhatsApp and that both acquisitions substantially reduced competition and further entrenched the company's monopoly position."); id. at 23 ("The States have pleaded that the acquisitions were illegal both then and now."). Nor do the States maintain that they "had good reason for not" suing earlier, such that their lengthy delay, even if measured from the time of the mergers, "was [nonetheless] reasonable." Menominee Indian Tribe, 614 F.3d at 531–32; see Reply States at 12 (correctly noting "States' failure to explain, justify, or even address their multi-year delay in challeng[ing] the[ ] acquisitions" in their briefing).

**\*23**  Instead, the States cite language from the Supreme Court that, in their minds, authorizes them to bring a Section 7 claim "at any time that an acquisition may be said with reasonable probability to contain a threat that it may lead to a restraint of commerce or tend to create a monopoly of a line of commerce." United States v. E.I. du Pont de Nemours & Co., 353 U.S. 586, 597, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). The States contend that they may avail themselves of this rule and seek equitable relief now, no matter what has come before, because "time has made clear the [more recent] continuing anticompetitive effects of the Instagram and WhatsApp acquisitions." States Opp. at 13 (citing allegations in the Complaint about recent "proliferation of ... objectionable content on Facebook" and "degrad[ation] of [WhatsApp's] privacy features," Redacted Compl., ¶¶ 180, 254).

The States misapprehend du Pont's import here. In that case, the United States — against which, recall, laches does not apply — brought a Section 7 challenge, in 1949, to the defendant's 23% share of General Motors shares. See 353 U.S. at 587, 77 S.Ct. 872. The Court found it proven that du Pont had long used, and was continuing to use, that "stock interest" to "entrench itself as the primary supplier of General Motors' requirements for automotive finishes and fabrics." Id. at 606, 77 S.Ct. 872. That relationship was not initially an antitrust concern, as GM was a relatively small buyer in that market at the time of du Pont's stock purchase. Id. at 599, 77 S.Ct. 872. By the time of suit, however, General Motors sold roughly half of all cars in the United States, id. at 596, 77 S.Ct. 872, giving du Pont a "commanding position" in the automobile finishes and fabrics market by virtue of its stock interest in GM, rather than competitive merit. Id. at 605, 77 S.Ct. 872; see Midwestern Mach., 392 F.3d at 273 ("In du Pont, there was no violation until decades later when GM became a successful and dominant firm."). In those circumstances, the Court allowed the United States to sue for divestiture, holding that "the plain language of § 7 contemplates an action at any time the [purchased] stock is used to bring about ... the substantial lessening of competition," "which may be at or any time after the acquisition, depending upon the circumstances of the particular case." Du Pont, 353 U.S. at 597, 77 S.Ct. 872; see also United States v. ITT Cont'l Baking Co., 420 U.S. 223, 242, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975). ("[T]here can be a [Section 7] violation at some time later even if there was clearly no violation — no realistic threat of restraint of commerce or creation of a monopoly — at the time of the initial acts of acquisition."); Concord Boat, 207 F.3d at 1050 ("Clayton Act claims are not limited to challenging the initial acquisition of stocks or assets ... since holding as well as obtaining assets is potentially violative of section 7.").

Du Pont and ITT, however, neither hold nor imply that the limitations or laches period for challenging a merger is forever tolled. The cases merely clarify that a violation of Section 7 — *i.e.*, "a reasonable probability that the acquisition is likely to result in the condemned restraints," duPont, 353 U.S. at 607, 77 S.Ct. 872 — can arise (and persist) not only at the time of the merger, but also at any time afterward so long as the acquired assets are still held. That is a principle of substantive liability; it says nothing about when a plaintiff's cause of action accrues, or, by the same token, when it becomes time barred (or when delay becomes unreasonable). Areeda & Hovenkamp helpfully analogize to the doctrine of adverse possession: "The fact that each day of [a trespasser's] occupancy constitutes a trespass, and thus a violation, does not operate so as to toll the statute of limitations," which accrues when the injury is first actionable. See Areeda & Hovenkamp, ¶ 320c5, at 352. At some point, a trespasser's violation of the law, despite being ongoing, is immunized from suit. By the same token, even if Facebook's continued holding of Instagram and WhatsApp violates Section 7 in some sense at this very moment, that does not make a present challenge timely. Such a result would write the statute of limitations for Section 7 damages actions out of the Clayton Act and similarly eliminate the laches defense that Congress expected to govern Section 16's cause of action for injunctive relief. See Midwestern Mach., 392 F.3d at 273 ("[T]he statute of limitations must begin to run at some point in order for the time bar to have any effect and to give repose to merged firms."); id. at 277 (same for laches); Z Techs., 753 F.3d at 605 (recognizing practical need to avoid "effectively undermin[ing] merger-acquisition agreements and subject[ing] them to continual challenge"); Complete Ent. Res. LLC v. Live Nation Ent., Inc., No. 15-9814, 2016 WL 3457177, at \*1 (C.D. Cal. May 11, 2016) ("It cannot be the case that if a merger leads to monopoly power then anything anticompetitive that the newfound monopolist does ... allow[s] the merger to be challenged indefinitely."); Areeda & Hovenkamp, ¶ 320c5, at 352–57.

**\*24**  Some courts suggest that du Pont's logic may "allow[ ] the Clayton Act statute of limitations to be restarted 'if [acquired] assets are used in a different manner from the way that they were used when the initial acquisition occurred, and that new use injures the plaintiff." Complete Ent. Res., 2016 WL 3457177, at \*2 (quoting Midwestern Mach., 392 F.3d at 273). Presumably the same principle would apply to laches. Plaintiffs, to be clear, do not mention or invoke this "hold and use" doctrine by name,

but their argument as to why Facebook's recent conduct reopens the Instagram and WhatsApp acquisitions to challenge would seem to fit the bill. See States Opp. at 12–15. In any event, to the extent that the hold-and-use theory is even viable, seeComplete Ent. Res., 2016 WL 3457177, at *2 (noting "skeptic[ism] of the legitimacy" of the doctrine), it does not help the States here.

For one thing, the conduct to which the States point — that Facebook has recently rolled back WhatsApp privacy protections, allowed "misinformation and violent or otherwise objectionable content" to proliferate on its platforms, and removed popular Instagram features, see Redacted Compl., ¶¶ 125–26, 176–180, 254 — does not qualify as the sort of "different uses of [the acquired] assets" that satisfy the hold-and-use doctrine as it has been articulated. Midwestern Mach., 392 F.3d at 272. On Plaintiffs' theory of the case, these are essentially price increases (as users pay for Facebook by allowing it to harvest their data) or reductions in product quality. Post-acquisition increases in prices or decreases in output, though, "are mere inertial consequences that one naturally expects to flow from" an anticompetitive merger, Z Techs., 753 F.3d at 601–02 (citation omitted), and such consequences, the law is clear, "do not restart the statute of limitations" in a Section 7 action. Concord Boat, 207 F.3d at 1052 (quoting DXS, Inc. v. Siemens Med. Sys., Inc., 100 F.3d 462, 467–68 (6th Cir. 1996)). This approach "allows the statute of limitations to have effect and discourages private parties from sleeping on their rights." Midwestern Mach., 392 F.3d at 271 (citing Pace Indus. v. Three Phoenix Co., 813 F.2d 234, 236–37 (9th Cir. 1987)). If it were otherwise, again, "there would in effect be no statute of limitations" and no laches defense to a claim for equitable relief, "since a Section 7 challenge to the holding or use of assets could be brought at any time." Concord Boat, 207 F.3d at 1052.

"[W]here the complained of 'new use' " of an acquired asset, moreover, "was, in fact, suspected and complained about prior to [and at the time of] the merger," it is especially improper to measure delay from some later point in time. Complete Ent. Res., 2016 WL 3457177, at *2. That is the case here — according to the States' Complaint, both the FTC and European regulators were specifically concerned that Facebook would decrease WhatsApp users' privacy after the merger in the ways that Plaintiffs allege eventually occurred. See Redacted Compl., ¶¶ 176–77. There would thus be little sense in allowing the States to sue now because those earlier concerns, which they chose not to raise in a lawsuit, ended up being prescient.

### c. Prospective Relief

The States next argue that because they have alleged "ongoing harm flowing from" the damage to competition caused by the WhatsApp and Instagram acquisitions, that renders the relief they seek "prospective," and "laches generally does not apply to bar claims for prospective injunctive relief." States Opp. at 14 (quoting Gaudreau v. Am. Promotional Events, Inc., 511 F. Supp. 2d 152, 159 (D.D.C. 2007)). As to the remedy of divestiture, that argument makes little sense; indeed, it would mean that all of the cases applying laches in merger challenges were wrongly decided. SeeReveal Chat, 471 F. Supp. 3d at 990–91 (applying laches to plaintiffs' Section 7 claims against Facebook's Instagram and WhatsApp acquisitions, and rejecting argument that doctrine did not apply because plaintiffs alleged "ongoing conduct and harm," including recent actions further integrating the acquired companies). Although divestiture is a form of equitable relief, it is not generally thought of as "prospective" but rather "retroactive in character," as it is aimed at "unwind[ing] a transaction." In re: Am. Express Anti-Steering Rules Antitrust Litig., No. 08-2315, 2016 WL 748089, at *15 (E.D.N.Y. Jan. 7, 2016) (quoting Areeda & Hovenkamp, ¶ 320, at 374). The fact that the challenged acquisitions allegedly continue to cause "ongoing harm" does not affect that characterization; on the contrary, where a plaintiff's complaint is that it is experiencing "continuing, present adverse effects" of past action, a reparative or backward-looking decree such as a divestiture order is the appropriate remedy. SeeIn re New Motor Vehicles, 522 F.3d at 14 (quoting O'Shea v. Littleton, 414 U.S. 488, 496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)); see alsosupra at 31 (discussing reparative and preventive injunctions).

**\*25** The States also point out that their Complaint seeks other truly prospective relief, see States Opp. at 14 — i.e., that "Facebook be enjoined and restrained from continuing to engage in any anticompetitive conduct," "from making further acquisitions valued at or in excess of $10 million without advance notification to Plaintiff States," and "from making further acquisitions" without providing their Hart-Scott-Rodino Act pre-merger clearance filings to Plaintiff States in addition to the FTC. See Redacted Compl., ¶¶ 277(2)–(4). None of that sort of relief, however, would "restore [the] competition" allegedly lost

as a result of Facebook's Instagram and WhatsApp purchases, as is required of a remedy for a <u>Section 7</u> violation. <u>See</u> <u>duPont</u>, 366 U.S. at 326, 81 S.Ct. 1243 ("[C]ourts are ... required ... to decree relief effective to redress the violations ...."). Instead, these preventive measures would be aimed at forestalling future anticompetitive acquisitions. If such relief were to be granted here, it could only be for the States' separate claim of monopoly maintenance under Section 2 of the Sherman Act (to which this Opinion now turns), which focuses not only on the Instagram and WhatsApp acquisitions themselves but also on additional conduct.

### d. Course of Conduct

For sake of clarity, the analysis to this point has focused on Plaintiffs' Section 7 challenges to Facebook's acquisitions, as the Clayton Act is the usual mechanism by which mergers are challenged. In addition to invoking that Section, though, Plaintiffs also allege one count of monopoly maintenance under Section 2 of the Sherman Act. Such a maintenance offense has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful ... maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." <u>Microsoft</u>, 253 F.3d at 50 (citation omitted). As to the second prong (which is all the Court addresses in this Opinion), the States argue that Facebook's " 'buy or bury' strategy — whether viewed in the aggregate or by components — constitutes" such willful maintenance. <u>See</u> States Opp. at 32; <u>see also</u> <u>id.</u> at 33 (challenging "two-pronged" scheme "[w]hether viewed separately or together"). Plaintiffs' theories of why Facebook's acquisitions are also subject to a Section 2 challenge, in addition to Section 7 attack, can thus be separated into three basic buckets, which are described from narrowest to broadest. First, both the Instagram and WhatsApp acquisitions <u>independently</u> violated Section 2, just as they did Section 7. <u>Id.</u> at 33–34. Second, Facebook pursued a "broader acquisition strategy that served to entrench [its] monopoly" and that, in and of itself, violated Section 2. <u>Id.</u> at 42–44; <u>see also</u> <u>id.</u> at 32–33 ("Instagram and WhatsApp are the most prominent, but not the only, examples of th[is] prong of [its unlawful] course of conduct."). Third, Facebook's overall course of conduct, in the form of its "buy or bury" scheme evaluated "as a whole," separately and independently violated Section 2. <u>Id.</u> at 32–33.

Upon closer examination, each bucket has a fatal leak; that is, each theory of a Section 2 violation runs into timeliness issues related to those that plagued Plaintiffs' Section 7 counts. As to the first bucket — *i.e.*, the challenges to the Instagram and WhatsApp acquisitions standing alone — the straightforward answer is that the label does not change the result: the same laches analysis applies regardless of whether a particular merger is assailed on Section 2 or Section 7 grounds. As the Sixth Circuit has persuasively explained, in the context of a damages action:

> There is no reason to treat the same conduct differently in sister statutes [*i.e.*, Section 2 and Section 7] that are designed to promote the same legislative objective. Moreover, the same statute — 15 U.S.C. § 15b — provides the statute of limitations for each. There is nothing in 15 U.S.C. § 15b that suggests it should be applied one way for merger-acquisition claims under the Sherman Act but differently for merger-acquisition claims under the Clayton Act.

<u>Z Techs.</u>, 753 F.3d at 603. Equivalent logic applies to the States' claims for injunctive relief here, as Section 16 (rather than 15b) provides the cause of action for, and imposes the same equitable limitations on, both Section 2 and Section 7 claims.

**\*26**  As to the second bucket, characterizing Plaintiffs' Section 2 claim as a challenge to Facebook's larger scheme of serial anticompetitive acquisitions does not help them. The latest-in-time acquisition their Complaint mentions and characterizes as anticompetitive is the purchase of Eyegroove, "an app that allowed users to create and share music videos with augmented reality effects," which "Facebook decided to acquire ... in 2016 upon learning that Twitter and Snapchat were interested." Redacted Compl., ¶ 184. The Complaint does not specify when in 2016 Facebook purchased that firm, but even assuming that it was in late December, four years still elapsed between the Eyegroove acquisition and the filing of this lawsuit. In general, and as set out above, "[t]he four-year limitation ... for private antitrust actions ... is long enough to enable potential plaintiffs to observe

the actual effects of a possible antitrust violation and to calculate its potential effects." Concord Boat, 207 F.3d at 1052 (quoting IT&T, 518 F.2d at 929). And courts consistently reject claims for retrospective equitable relief after far, far shorter delays. The Court can therefore see no reason in law or practice why the Eyegroove tail should wag the Instagram and WhatsApp dogs — why one small acquisition in 2016 (which merited one sentence in Plaintiffs' Complaint) should, four-plus years later, reopen the window to challenge a series of allegedly much more consequential acquisitions that all took place from 2012 to 2014. At the risk of repetition, there would be little left to the "especially important" principle that antitrust challenges to mergers "be timely made," for the benefit of both the public and the merged firms, see Areeda & Hovenkamp, ¶ 320, at 326, if such a maneuver were countenanced.

To the extent, moreover, that the States seek prospective injunctive relief based on Facebook's alleged scheme of anticompetitive acquisitions, they allege no present or recent unlawful conduct to enjoin, nor do they plausibly plead an impending threat of future anticompetitive acquisitions. See States Opp. at 43 (last listed "example[ ] that reflect[s] Facebook's evolving pattern of buying companies for anticompetitive reasons" is Eyegroove in 2016); *supra* at 32–33 (applying same principle in context of States' challenges to Platform policies). That is fatal to the States' requests for injunctive relief that would only prevent future injury — *e.g.*, an order compelling Facebook to notify Plaintiffs and provide them Hart-Scott-Rodino filings for any future acquisition over $10 million.

In the final bucket, Plaintiffs argue that their Section 2 claim broadly asserts an overall course of monopoly-maintaining conduct that includes both Facebook's acquisitions and its API-related actions, the latter of which ceased only in 2018 with the suspension of the Platform policies. See States Opp. at 13. This "buy or bury scheme," Plaintiffs argue, is in itself timely challenged under Section 2 here because, at worst, it terminated only two years prior to their filing this suit, within the presumptive laches period. Id.

As explained above, however, the last instance of Platform conduct that may be actionable under current refusal-to-deal doctrine occurred in late 2015; merely having the policy on the books of forbidding API access to competitors was, in itself, perfectly lawful behavior. To the extent Facebook's alleged "buy or bury" scheme is actionable, then, it can only be based on conduct that is alleged to have last occurred in 2015 (in the case of the Platform-related actions) and 2016 (in the case of Facebook's acquisitions, the last one of which was Eyegroove). As explained already, a challenge to either of those two prongs of conduct does not state a claim for reparative (backward-looking) relief, nor is there a plausibly pleaded risk that such scheme will imminently recur, as is necessary for preventive (forward-looking) injunctive relief. Combining the two prongs into one overall scheme changes nothing.

It is true, as the States point out, that some "[c]ourts do not require that every single action in an anticompetitive scheme be, on its own, anticompetitive" before that scheme may be separately assailed as a violation of Section 2. See States Opp. at 33 (quoting In re Intuniv Antitrust Litig., 496 F. Supp. 3d 639, 680 (D. Mass. 2020)). Under that theory of Section 2 liability, often referred to as a "course of conduct" or "monopoly broth" theory, "a plaintiff can allege a series of actions that when taken together make out antitrust liability even though some of the individual actions, when viewed independently, are not all actionable." Intuniv, 496 F. Supp. 3d at 680. Facebook's "buy or bury" scheme, Plaintiffs might argue, can thus be challenged as a separate violation of Section 2 even if it is made up of some lawful conduct. If that is so, even if Facebook's merely having its API policies on the books did not violate Section 2, as the Court concluded above, such conduct could still be part of an unlawful scheme of monopoly maintenance that was ongoing until 2018, making the States' challenge timelier.

  **\*27**  In Microsoft, the D.C. Circuit pointedly declined to address whether a defendant can violate Section 2 through a course of conduct involving lawful behavior. See 253 F.3d at 78. Even assuming the answer is yes, however, this Court believes that the doctrine does not help Plaintiffs in these circumstances. Specifically, it does not allow unilateral refusals to deal that are lawful (such as Facebook's mere adoption of a policy of not offering API access to competitors) to be considered as part of a "monopoly broth" or "course of conduct" that violates Section 2.

Here is why: the decisions that do allow for "course of conduct" Section 2 liability, which is itself controversial, usually explain that the doctrine is necessary in cases involving individual acts that are lawful in themselves only because, when evaluated in a vacuum, those acts lack the requisite substantial effect on competition. In such situations, these decisions explain, it is proper to "consider the[ ] overall combined effect" of all the acts alleged, even if some would be lawful if assessed separately, because competition can die from a thousand paper cuts just as easily as from one large blow. City of Anaheim v. S. California Edison Co., 955 F.2d 1373, 1376 (9th Cir. 1992); seeMicrosoft, 253 F.3d at 78 (explaining theory as proposing that "a monopolist's unilateral campaign of acts intended to exclude a rival that in the aggregate has the requisite impact warrants liability even if the acts viewed individually would be lawful for want of a significant effect upon competition") (cleaned up); Abbott Labs. v. Teva Pharm. USA, Inc., 432 F. Supp. 2d 408, 428 (D. Del. 2006) ("Plaintiffs are entitled to claim that individual acts are antitrust violations, as well as claiming that those acts as a group have an anticompetitive effect even if the acts taken separately do not."); LePage's Inc. v. 3M, 324 F.3d 141, 162 (3d Cir. 2003) (explaining that "[t]he effect of [the defendant's] conduct in strengthening its monopoly position by destroying competition ... is most apparent when [its] activities are considered as a whole."). On this view, it would be appropriate and indeed necessary to aggregate the effects of various, say, exclusive-dealing or bundling arrangements that on their own did not foreclose enough of the market to affect competition but, when evaluated together, did have that forbidden effect. See, e.g., LePage's, 324 F.3d at 162; Tele Atlas N.V. v. NAVTEQ Corp., 2008 WL 4911230, at *3–4 (N.D. Cal. Nov. 13, 2008) (allowing jury to consider tying alongside exclusive dealing even though court had already held that tying conduct was not unlawful because defendant lacked market power in the tying market).

Unilateral refusals to deal (at least those that do not meet the Aspen Skiing elements) do not fit this paradigm. As discussed above, they are not held to be lawful because of an insignificant effect on competition. Quite the contrary: a monopolist's refusal to deal with its competitors can harm competition, especially if the monopolist has substantial control over a facility or input that is valuable to its rivals. Such refusals are instead tolerated by antitrust law despite those negative effects, on the theory that the effects of the law's intervention to compel dealing would be even worse. Seesupra at 24–25; see also Thibault Schrepel, The "Enhanced No Economic Sense" Test: Experimenting with Predatory Innovation, 7 NYU J. Intell. Prop. & Ent. L. 30, 41 (2018). They are thus not the sort of lawful conduct that the monopoly-broth theory is designed to account for and, to the extent that theory is viable, should be excluded from its reach. SeeCrane, 76 Antitrust L.J. at 669 (arguing for this approach); Ginsburg & Wong-Ervin, supra, at 8–9 (same); Schrepel, 7 NYU J. Intell. Prop. & Ent. L. at 40–41 (noting "real danger" in applying monopoly-broth theory to unilateral refusals to deal); cf.Free FreeHand Corp. v. Adobe Sys. Inc., 852 F. Supp. 2d 1171, 1184 (N.D. Cal. 2012) (declining to consider as part of monopoly-broth theory defendant's choice not to "license its technology" to competitors because it "ha[d] no duty to" do so). Any other result would recreate the negative policy consequences that the no-duty-to-deal rule is meant to avoid. It would be far too easy for plaintiffs to advance their otherwise nonviable claims against unilateral refusals to deal — which, as Trinko makes clear, are lawful even if the monopolist intends to, and does, hinder its competitors in so refusing — by simply repackaging such refusals as part of a larger scheme by the defendant that was intended to, and did in fact, harm competition. That result is avoided by holding that lawful unilateral refusals to deal cannot be combined with other conduct, lawful or unlawful, into an overall scheme of monopoly acquisition or maintenance that can be separately challenged. If a unilateral refusal (or refusals) is to be part of such larger scheme, it must in itself be unlawful.

**\*28** The upshot is that Facebook's retention of its API policies cannot, as a matter of law, constitute part of any actionable scheme of monopoly maintenance under Section 2 of the Sherman Act. As a result, that the company retained those policies into 2018 does not furnish a basis for the States to challenge its much earlier actions.

### e. Procedural Posture

Down to their last card, Plaintiffs maintain that dismissing a claim based on laches at the Rule 12(b)(6) stage is generally improper because laches is an affirmative defense, as to which the defendant, here Facebook, bears the burden of proof. See States Opp. at 9–10, 15. The very case they cite for the proposition that "[l]aches is a fact-intensive defense poorly suited to a motion to dismiss," however, goes on to explain that dismissal is nonetheless proper if "(1) an unreasonable delay appears on the face of the pleading; [and] (2) no sufficient excuse for delay appears or is pleaded." Kemp v. Eiland, 139 F. Supp. 3d

329, 350 (D.D.C. 2015) (quoting Arclar Co. v. Gates, 17 F. Supp. 2d 818, 823 (S.D. Ill. 1998)); see also Zuckerman v. Metro. Museum of Art, 928 F.3d 186, 190 (2d Cir. 2019) (affirming lower court's non-laches-based dismissal on laches grounds where "delay [was] unreasonable" "and the prejudice to the [defendant] [was] evident on the face of [the] complaint"); Reveal Chat, 471 F. Supp. 3d at 990–91 (dismissing similar Section 2 and 7 claims against Facebook based on laches). As explained at length above, both unreasonable delay and prejudice are manifest on the face of the States' Complaint here.

The Court is aware that the D.C. Circuit has echoed the warning that a "complaint seldom will disclose undisputed facts clearly establishing the [laches] defense." Menominee Indian Tribe, 614 F.3d at 532 (quoting Wright & Miller § 1277). "Seldom," though, does not mean "never." Just as "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed," so too must it retain the power to avoid "sending the parties into discovery when there is no reasonable likelihood," based on "the events related in the complaint," that Plaintiffs will ultimately be entitled to the injunctive relief they seek. Bell Atlantic Corp v. Twombly, 550 U.S. 544, 558, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted). Had the States responded to the substantial timeliness arguments that Facebook put forward in its Motion to Dismiss — which rest entirely, and properly, on facts that are either pleaded or properly judicially noticed — by raising (or even hinting at) a factual dispute as to when their claims first accrued, or a reasonable justification for their long delays in filing, the outcome here might well be different. They did not do so. The only argument Plaintiffs make as to why the laches elements are not met here is their half-hearted contention that Facebook was not prejudiced but rather "benefitted from the States not filing sooner," since it has been and remains a very profitable company. See States Opp. at 15 (emphasis added). That is small beer indeed.

* * *

Ultimately, this antitrust action is premised on public, high-profile conduct nearly all of which occurred over six years ago — before the launch of the Apple Watch or Alexa or Periscope, when Kevin Durant still played for the Oklahoma City Thunder, and when Ebola was the virus dominating headlines. The Complaint's allegations themselves make clear that the States could easily have brought suit then, just as they make clear that any equitable relief this Court could or would order now would greatly prejudice both Facebook and third parties. The system of antitrust enforcement that Congress has established does not exempt Plaintiffs here from "the consequences of [their] choice" to do nothing over the last half decade. See Am. Stores, 495 U.S. at 298, 110 S.Ct. 1853 (Kennedy, J., concurring). The Court accordingly finds that, as a matter of law, their challenges to Facebook's acquisitions — whether they are targeted independently or as part of a larger scheme of anticompetitive behavior — are barred by the doctrine of laches or otherwise furnish no basis for the injunctive relief sought.

**IV. Conclusion**

 **\*29**  For the foregoing reasons, the Court will grant Facebook's Motion to Dismiss this case in its entirety. A separate Order so stating will issue this day.

**All Citations**

--- F.Supp.3d ----, 2021 WL 2643724

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.