# EXHIBIT G

# REDACTED

Page 1

1  UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF CALIFORNIA
2  SAN FRANCISCO DIVISION
3  -------------------------------------X
   IN RE GOOGLE PLAY STORE
4  ANTITRUST LITIGATION
5  Case No.  3:21-md-02981-JD
6
   THIS DOCUMENT RELATES TO:
7  Epic Games Inc. v. Google LLC, et al.,
   Case No. 3:20-cv-05671-JD
8
   In Re Google Play Consumer
9  Antitrust Litigation
   Case No. 3:20-cv-05671-JD
10
   In Re Google Play Developer
11 Antitrust Litigation,
   Case No: 3:20-cv-05792-JD
12
   State of Utah, et al., v.
13 Google LLC, et al.,
   Case No: 3:21-cv-05227-JD
14 -------------------------------------X
15
16            VIDEOTAPE DEPOSITION
17               HAL SINGER, PH.D.
18            Thursday, May 12, 2022
19                9:07 a.m. (EST)
20
21
22
23
24 Reported by:
25 Ryan K. Black, RPR, CLR, Notary Public

Page 2

1

2

3

4                  Thursday, May 12, 2022

5

6          Video Deposition of HAL SINGER, PH.D.,

7    taken at the Law Offices of Munger, Tolles &

8    Olson, LLP, 601 Massachusetts Avenue NW

9    Washington, DC, beginning at 9:07 a.m.,

10   before Ryan K. Black, a Registered

11   Professional Reporter, Certified Livenote

12   Reporter and Notary Public and for the

13   District of Columbia.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   A P P E A R A N C E S:
 2     CRAVATH, SWAINE & MOORE, LLP
       BY:  ERIC J. ZEPP, ESQ. - Via Zoom
 3     825 8th Ave
       New York, New York  10019
 4     212.474.1000
       ezepp@cravath.com
 5     Representing - Epic Games, Inc. In Re:
                      Epic Games, Inc. V. Google
 6                    LLC, et al.
 7
       BARTLIT BECK LLP
 8     BY:  KARMA M. GIULIANELLI, ESQ.
       1801 Wewatta Street
 9     Suite 1200
       Denver, Colorado  80202
10     303.592.3100
       karma.giulianelli@bartlitbeck.com
11     Representing - Consumer Class Plaintiffs
12
       HAUSFELD LLP
13     BY:  AMY ERNST, ESQ. - Via Zoom
       325 Chestnut Street
14     Unit 900
       Philadelphia, Pennsylvania  19106
15     215.985.3270
       aernst@hausfeld.com
16     Representing - Plaintiff Developers
17
       MUNGER, TOLLES & OLSON LLP
18     BY:  JUSTIN R. RAPHAEL, ESQ.
       560 Mission Street
19     27th Floor
       San Francisco, California  94105
20     415.512.4000
       justin.raphael@mto.com
21     Representing - Defendants
22
23   ALSO PRESENT:
24     Emmanuel Pezoa - Legal Videographer
       Yajing Jiang, Ph.D - Charles River Associates
25     Kevin Caves, Ph.D - Econ One
```

1                        I N D E X

2       TESTIMONY OF:  HAL SINGER, PH.D              PAGE

3       By Mr. Raphael.............................6, 391

4       By Mr. Giulianelli.........................389

5                      E X H I B I T S

6       EXHIBIT            DESCRIPTION              PAGE

7       Exhibit 333    Hal Singer Ph.D's Opening Expert

8                      Report..........................27

9       Exhibit 334    Hal Singer Ph.D's Reply Report...27

10      Exhibit 335    an article titled Digital Economics

11                     by Avi Goldfarb and

12                     Catherine Tucker................96

13      Exhibit 336    a document titled Economics Letters

14                     - Using Cost Pass-through To

15                     Calibrate Demand, by Miller, Remer

16                     and Sheu.......................117

17      Exhibit 337    an article titled The Antitrust

18                     Logit Model For Predicting

19                     Unilateral Competitive Effects,

20                     by Gregory J. Werden and

21                     Luke M. Froeb..................156

22      Exhibit 338    a document titled Expert Report of

23                     Michelle M. Burtis, Ph.D.......364

24

25

```
                                        Page 5
 1              THE VIDEOGRAPHER:  Good morning.  We are
 2    on the record at 9:07 a.m. on May 12, 2022.  This
 3    is the video-recorded deposition of Hal Singer
 4    taken in the matter of In re:  Google Play Store
 5    Antitrust Litigation, filed in the United States
 6    District Court, Northern District of California,
 7    San Francisco Division, Case No.
 8    3:21-MD-02981-JD.
 9              My name is Emmanuel Pezoa, from the firm
10    Veritext Legal Solutions.  The court reporter is
11    Ryan Black, from the firm Veritext Legal
12    Solutions.
13              Will the court re -- court reporter
14    please swear in the witness?
15                       *     *     *
16    Whereupon --
17                 HAL JASON SINGER, PH.D.,
18    called to testify, having been first duly sworn
19    or affirmed, was examined and testified as
20    follows:
21                       *     *     *
22              THE REPORTER:  And, Counsel, if you want
23    to state your appearances for the record, that
24    would be great.
25              MR. RAPHAEL:  Sure.
```

Page 6

```
 1              Justin Raphael, Munger Tolles & Olson,
 2    for the defendants.
 3              MS. GIULIANELLI:  Karma Giulianelli,
 4    from Bartlit Beck, for the consumer class.
 5              MS. JIANG:  Yajing Jiang from Charles
 6    River Associates.
 7              MR. RAPHAEL:  Is there anyone on the
 8    line who wants to introduce themselves?
 9              MS. ERNST:  This is Amy Ernst.  I'm here
10    with Hausfeld for the plaintiff developers.
11              THE VIDEOGRAPHER:  Thank you.  You may
12    proceed.
13              MR. ZEPP:  Eric Zepp here, from Cravath
14    Swaine & Moore, on behalf of Epic Games.
15              MR. CAVES:  I'm Kevin Caves, with Econ
16    One on behalf of the Commercial developers.
17                         EXAMINATION
18    BY MR. RAPHAEL:
19         Q.   All right.  Dr. Singer, will you just
20    state your name for the record?
21         A.   Hal Jason Singer.
22         Q.   And, Dr. Singer, you've been deposed
23    many times; is that right?
24         A.   Yes.
25         Q.   How many times would you say you've been
```

                                          Page 53

1    developers are passing through savings in order

2    to induce customers to switch to the -- and

3    download the app from the developer's website.

4              So it's not just theory.  I mean,

5    obviously, theory is on my side; but I think we

6    have -- we have good evidence to bear as well.

7         Q.   But you would agree that standard

8    economic theory tells us that developers would

9    have incentives to respond to lower service fees

10   by reducing their prices?

11        A.   Correct.

12        Q.   Okay.  And standard economics also

13   tells us that competition drives firms to make

14   competitive investments in product quality,

15   right?

16        A.   Yes.  I believe that, as I said, that

17   in -- in a but-for world with lower take rates

18   and this new-found cash flow that the developers

19   would enjoy, not all of it is going to go into

20   the pockets of the owners.  But -- but some of

21   that will be reinvested and -- and -- and in

22   services and features that -- that make the app a

23   better experience for the user.

24        Q.   Right.  So standard economics would give

25   developers an incentive to respond to lower

Page 54

1    service fees by reducing prices and improving

2    quality?

3         A.   Correct.

4         Q.   Now, in your reports, do you have any

5    model that will tell the Court or the jury which

6    developer will follow the incentives to improve

7    quality and which developer will follow the

8    incentives to reduce price?

9         A.   Well, I think all developers will reduce

10   price.  My opinion on quality is that it would

11   happen at a -- at a general level, but that is

12   not my proof of impact.  My proof of impact turns

13   on the price response.

14        Q.   Have you done any analysis to determine

15   whether any developer would improve the -- the

16   quality of their app in a world with reduced

17   service fees?

18        A.   I don't think I've done analysis.

19   I'm -- I'm aware of some testimony, and we'd have

20   to go into my footnotes of developers testifying

21   that they would do something to that effect.  But

22   I -- that's more me just citing a developer than

23   -- you know, than doing -- I took your question

24   to mean original analysis, like trying to model

25   the quality dimension.  I don't do that.

Page 90

1    predicts.
2         A.    Correct.
3         Q.    Okay.  And you're aware, aren't you,
4    that developers choose the category for their app
5    when they list it in Google Play?
6         A.    Yes.
7         Q.    Now, in your reports, have you
8    calculated or estimated the marginal cost of
9    supplying an additional app subscription or
10   in-app purchaser for any developer?
11        A.    I haven't estimated the marginal cost,
12   but I have cited record evidence and economic
13   literature establishing that they do, in fact,
14   incur marginal costs.  And I -- I also have the
15   opinion that processing payments are marginal
16   cost, and I also have the opinion that the take
17   rate is a marginal cost.  So I --
18        Q.    Okay.
19        A.    -- leave it at that.
20        Q.    Okay.  So in your reports, though, you
21   haven't calculated or estimated the marginal cost
22   of supplying an additional app subscription or
23   in-app purchase for any developer.
24        A.    No.  And the models don't call for that.
25   The -- at least in the short run, all the models

Page 91

1    require is that they face a positive marginal
2    cost, and I'm confident they do.
3        Q.   All right.  So the pass-through formula
4    you've used in your reports doesn't actually
5    depend on what the marginal cost of the developer
6    is.
7             MS. GIULIANELLI:  Objection.
8             THE WITNESS:  That's fair.
9             Do you want to -- I think we're an hour
10   and a half in?
11            MS. GIULIANELLI:  You want to --
12            MR. RAPHAEL:  Happy to take a break.
13            MS. GIULIANELLI:  -- a break?
14            THE WITNESS:  Okay.  Yes.
15            THE VIDEOGRAPHER:  Please stand by.
16            We're now off the record.  The time is
17   10:40 a.m.
18            (Recess taken.)
19            THE VIDEOGRAPHER:  We're now on the
20   record.  The time is 10:50 a.m.
21   BY MR. RAPHAEL:
22       Q.   Dr. Singer, have you put forth any
23   method in your reports to determine what each
24   developer's marginal costs are, other than
25   service fees?

1        A.   Well, other than the service fees
2    and the processing fees, I haven't estimated
3    precisely the marginal costs.  But I have studied
4    the issue of whether they do incur other marginal
5    costs, and I've come to the conclusion that they
6    do; and I cite record evidence in economics
7    articles.
8        Q.   And so economics articles would be a
9    good source to determine what the marginal costs
10   for the developers are other than the service
11   fees and transaction fees?
12       A.   For identifying the categories of
13   marginal costs but not to -- not to estimate
14   precisely what -- what it is in, say, percentage
15   terms.
16       Q.    Okay.  Now, your opinion is that
17   acquiring an app -- strike that.
18            Your opinion is that downloading an
19   app and making in-app purchases are separate
20   transactions involving separate products.
21       A.    I wouldn't quite put it that way.  I
22   would say that the -- the services that are being
23   offered in the in-app for -- in support of in-app
24   transactions are different.  It's a different
25   suite of services than the services being offered

Page 95

```
 1   consumer is complete?
 2       A.   Certainly not the sales costs.
 3   Certainly not the processing fee.  Certainly not
 4   the take rate.
 5       Q.   How about the other costs that you've
 6   listed here in your report?
 7       A.   It's possible that some of those other
 8   marginal costs identified by Ghose and Han would
 9   occur subsequent to -- to a particular
10   transaction, --
11       Q.   Okay.
12       A.   -- but could still be considered as
13   variable costs in the sense that they rise
14   with -- with output.
15       Q.   Okay.  Could the marginal cost to a
16   developer of supplying an additional in-app
17   purchase vary from developer to developer?
18       A.   Sure.
19       Q.   And could some developers have zero
20   marginal costs for an in-app purchase?
21       A.   No.
22       Q.   Could you go to Page 153 of your report?
23       A.   You must mean my initial report
24   because --
25       Q.   Correct.
```

```
 1       A.   -- the reply is not -- okay.
 2            Page 153?
 3       Q.   Yes, sir.
 4       A.   Okay.
 5       Q.   Do you see there second from the top
 6   there's an article by Avi Goldfarb and Catherine
 7   Tucker called "Digital Economics"?
 8       A.   Yes.
 9       Q.   So that's an article that you've relied
10   on in your report?
11       A.   Yes.
12       Q.   Are you familiar with that article?
13       A.   In part, yes.
14       Q.   Okay.  Do you know if that article says
15   anything about what marginal costs might be for a
16   digital good?
17       A.   No.  But if it were just a digital good,
18   I think that might be too broad of a category.
19   We're talking about in-app transactions here.
20            MR. RAPHAEL:  I'm going to mark this as
21   Exhibit 335.
22            (Exhibit No. 335, an article titled
23   Digital Economics by Avi Goldfarb and Catherine
24   Tucker, was introduced electronically.)
25            THE REPORTER:  Here you go, sir.
```

```
 1            THE WITNESS:  Thanks.
 2    BY MR. RAPHAEL:
 3        Q.   Do you see Exhibit 335, Dr. Singer?
 4        A.   I do.
 5        Q.   And what is it?
 6        A.   It -- it appears to be the article that
 7    I cited.
 8        Q.   That's the "Digital Economics" article
 9    by Tucker and Goldfarb?
10        A.   Yes.
11        Q.   And -- and could you go to Page 12 of
12    the article?
13        A.   If you'd let me just -- one second.  I'd
14    -- I'd like to just read the abstract quickly.
15        Q.   Would you go to Page 12, please?
16        A.   Hold on one second.
17             Okay.  Page 12.
18             Okay.
19        Q.   Do you see at -- further down, say,
20    two-thirds of the way down in the left column,
21    there's a header that says, "The replication cost
22    of digital goods is zero"?
23        A.   Yes.
24        Q.   So this article that you relied on in
25    your report says that "The replication costs of
```

```
 1   digital goods is zero," correct?
 2        A.    Correct.
 3        Q.    Now, are you familiar with V-Bucks?
 4        A.    Oh.  Can I put this to the side?
 5        Q.    For now, yes.
 6        A.    Yeah.
 7              And I would just note for the record
 8   that replication costs and marginal costs are not
 9   the same.
10        Q.    Well, how are they different?
11        A.    Oh.  What -- what Goldfarb is not taking
12   into consideration here is that to sell the extra
13   unit you have to pay a processing fee.  That's a
14   marginal cost.
15              So it's true that to create the next
16   sword -- the 150th sword doesn't cost any more to
17   replicate that sword, but that doesn't mean there
18   aren't any marginal costs incurred in the
19   transaction.
20        Q.    Understood.
21              All right.  Could some developers have
22   negative marginal costs for in-app purchases?
23        A.    It's hard to -- to fathom that.
24        Q.    What if a developer generates
25   advertising revenue as the result of an in-app
```

1    being reflected in the prices of apps in the

2    transaction data.

3         Q.   Right.  And your opinion is that

4    Google's service fees, to the extent that they

5    are supercompetitive, is equivalent to an

6    increase in the developer's marginal cost.

7         A.   It can be understood that way, yes.

8         Q.   Right.  And in your report, you've

9    modeled the proper economic way to calculate how

10   a profit-maximizing developer would set prices

11   based on marginal costs.

12        A.   I have.  And --

13        Q.   Right.

14        A.   -- and, as you know, it depends on

15   the -- the nature of the demand and the demand

16   specification that you assume, right?  Each

17   demand specification you assume is going to apply

18   at different pass-through rates.

19        Q.   Right.  So could you go to Page 104 of

20   your report, your opening report, please?

21        A.   Sure.

22        Q.   And you'll see this is a continuation of

23   the Paragraph 225 from the previous page.

24             And you've got a formula there that has

25   "P minus C star divided by P equals one divided

Page 106

1   by E sub D."

2          Do you see that?

3      A.   Yes.  That's the classic Lerner markup.

4      Q.   Right.  So that's -- that's the proper

5   economic model for how a profit maximizing

6   developer would set prices based on marginal

7   costs, right?

8      A.   That model describes the markup over

9   marginal cost as the function of the elasticity

10  of demand faced by the developer.

11     Q.   Right.  And -- and this model on Page

12  104 of your opening report, that -- that's --

13     A.   So --

14     Q.   -- the correct economic mod -- economic

15  way to model how the change in marginal costs

16  will affect the price that the developer charges.

17     A.   It's the -- it's the way to think

18  about it at -- at a very, very high level of

19  abstraction.  But, as you know, to actually

20  estimate the pass-through rate here, I have to

21  make an assumption about the demands curve and --

22  and -- and the precise nature of demand that a --

23  the developer faces, right?

24          Once you --

25     Q.   Understood.

1      A.   -- make a -- once you make that

2    decision, you get these pass-through rules,

3    right?  And the pass-through rules -- whether you

4    go linear or logit or -- or constant elasticity

5    -- are going to express pass-through as a

6    function of things that do not include the

7    marginal cost.

8      Q.   Understood.  But this formula on Page

9    104 of your report is the correct economic way to

10   model the relationship between the developer's

11   price and the marginal cost in general?

12     A.   Well, I just want to put that caveat in

13   there.  It's the -- it's the -- definitely the

14   way to think about it and why it's in my

15   preamble, right?

16          But when I go to model the precise

17   amount of pass-through, I have to make an

18   assumption about what kind of demand the

19   developer faces, right?  And that -- that puts

20   me to a -- takes me to a pass-through rule that

21   isn't necessarily going to be denominated in

22   terms of costs.

23     Q.   Understood.  So -- but -- but this mod

24   -- this economic model you've described in Page

25   104 of your report, that's generally accepted in

Page 108

1    economics.

2         A.    Yes.

3         Q.    Now, if you just look at the cost term

4    there, C star, and the -- the C star in that

5    formula that you have on Page 104 of your report

6    is equal to C divided by one minus T, right?

7         A.    Correct.

8         Q.    And -- and in that -- in that cost term

9    I just described, T is the service fee rate?

10        A.    Correct.

11        Q.    And C is the developer's per-unit

12   marginal cost other than the service fee?

13        A.    Correct.  Processing and the like, yes.

14   Any other --

15        Q.    Okay.

16        A.    Any other types of marginal costs.

17        Q.    Okay.  And so one input into the

18   generally accepted economic model of how the

19   profit-maximizing developer would set pri --

20   prices is the marginal costs other than the

21   service fee.

22        A.    For short-run profit maximization, the

23   answer is, yes, that this model, at this high

24   level of ab -- of abstraction, is a function of

25   the marginal cost.

1        Q.    Right.   And in terms of how the price is

2    a function of mar -- of --of -- of marginal cost,

3    the -- the -- the formula you've got here on Page

4    104, in that formula, the effect of a change in

5    the service fee -- let me -- let me put it

6    differently.

7            The formula you've got on Page 104, the

8    effect on prices will be -- as a result of a

9    change in the service fee will be proportional to

10   the marginal costs other than the service fee.

11       A.    In -- for short-run profit maximization,

12   yes.   For -- for long-run profit maximization,

13   this is not -- this is not the -- the way that

14   you'd get to the effect on price.

15       Q.    Okay.   Now, -- so let me just ask,

16   looking at this cost term here, C -- C star, if C

17   in that formula, which is the marginal cost other

18   than the service fee, if that's zero, then the

19   service fee rate will not have any effect on the

20   ultimate price charged according to this model,

21   correct?

22       A.    Let me just say this:   It -- it's --

23   it's never zero in the real world.   But -- but if

24   you want me to ask -- answer the hypothetical,

25   counterfactually, if we had -- if we had a zero

1   marginal cost, then by this model, and this model

2   alone, then in the short run, prices would not

3   adjust to the take rate.

4           As I explain in my report, there's all

5   sorts of reasons why we would still, even in that

6   extreme and counterfactual assumption, would

7   expect prices to change with the change in the

8   take rate, including from steering, including

9   from having to cover all costs in the long

10  run, --

11      Q.   Okay.

12      A.   -- including from sticky prices.

13      Q.   Okay.  Now, let me just ask again,

14  hypothetically, if that term C, which are the

15  marginal costs other than the service fee rate

16  in your formula on Page 104, if that term is

17  negative, then a reduction in the service fee

18  rate will actually lead to an increase in the

19  price that the developer would charge.

20      A.   I haven't done that one yet, but I

21  think you've got the -- the sign correct.  If you

22  multiply, in that example, 1.43 by a negative

23  cost, I think that there -- there would be a

24  negative relationship in the short run for this

25  equation.

```
 1   period.
 2   BY MR. RAPHAEL:
 3       Q.   But the pass-through formula you have
 4   would predict changes in the pass-through rate
 5   from week to week or month to month if the share
 6   changes.  Fair?
 7       A.   If one were so inclined to measure it on
 8   -- on a monthly or nanosecond basis, yes, you
 9   could get very strange results.
10       Q.   Okay.  Could the formula you've got
11   here, the "M minus Q sub J divided by M," could
12   that be used to calculate pass-through rates in
13   any case where you know the unit market share of
14   an intermediary alleged to have passed on an
15   overcharge?
16       A.   I -- I -- I'd be reluctant to say that
17   the logit model could be applied to any case.
18   I'd want to confirm, first, as I did here, that
19   the logit model does a good job explaining the
20   relationship between prices and shares, as it
21   does here.
22            So I think you need some empirical
23   foundation before applying the logit model.
24   I think that would be a good -- good practice.
25       Q.   Okay.  Have you used the formula that
```

1   you used to calculate pass-through in this case

2   to calculate pass-through in any other case?

3        A.   I do not believe I have.  In other

4   cases, what I'm typically doing is regressing

5   retail price changes on wholesale price changes.

6        Q.   Okay.

7        A.   And that -- that's just not available

8   here.

9        Q.   All right.  To your knowledge, has

10  any economist used the formula you've used to

11  calculate pass-through in this case to calculate

12  pass-through in some other case?

13       A.   I -- I don't -- I don't know enough -- I

14  can't follow how pass-through is calculated in

15  every antitrust case.  I can tell you that the

16  logit assumption is one of the most common

17  assumptions that's used in antitrust cases there

18  is.

19       Q.   But --

20       A.   All right?

21       Q.   But you're not aware of this formula

22  being used to calculate pass-through in another

23  case.

24       A.   Oh.  Pass-through?  Well, the formula

25  is used to calculate price effects from, say,

1    has imposed throughout the class period.

2            This is why their examples are so

3    tortured.  They're looking at these slight little

4    variations that either barely applied to an app

5    or where prices couldn't change because of Google

6    restriction.  So I -- I did everything that I

7    could possible.  I'm telling you that the most

8    comprehensive thing that -- that relates would be

9    the relationship between ad valorem sales taxes

10   at -- at the state level and prices, which do

11   -- are -- there's a tight relationship between

12   those two, right?

13       Q.   Right.  But the analysis of ad valorem

14   sales taxes doesn't use actual data regarding

15   developers' service fees and prices in the actual

16   world, correct?

17       A.   That is correct.

18       Q.   Okay.  And so you haven't done any

19   analysis -- using actual data on prices and

20   service fees for the entire set of developers

21   that's at issue in this case, you haven't done

22   any comprehensive analysis regarding the

23   relationship between those things, correct?

24       A.   I told you I could not do it given the

25   nature of the lack of variation --

```
                                          Page 142

 1        Q.   And because --

 2        A.   -- in Google's --

 3        Q.   -- you couldn't --

 4        A.   Almost every transaction.

 5             MS. GIULIANELLI:  Hey, hey.  Let --

 6   let --

 7             THE WITNESS:   ████████████████████

 8   ███████████████████████████████████████████

 9   ████████████████████████████████████████████

10   ██████████████████████████████   And if Google

11   doesn't do it because of its restraints

12   preventing competition, I can't -- I can't run a

13   test of what you're asking for.

14   BY MR. RAPHAEL:

15        Q.   Right.  And because you feel like you

16   couldn't do it, you didn't do it?

17        A.   Correct.

18        Q.   Okay.  Now, the Miller -- let's go back

19   to the exhibit, I think it was 336, which was the

20   Miller article?

21        A.   Yes.

22        Q.   Now, if you'll to go to the top of Page

23   452, we were talking earlier about Expression 2

24   which refers to the per-unit tax.  Do you recall

25   that?
```

1   in the Staples and Office Depot case, that paper
2   clips and a ruler aren't necessarily substitutes;
3   but if the people generally tend to buy those
4   things from the same place, they can belong in
5   the same product market.
6       Q.   So -- but -- but it's not your opinion
7   that all apps in each Google Play app category
8   are substitutes.
9       A.   I just gave an example of Excel and Word
10  as being more -- more of complements, right?  But
11  -- but when you think about the -- the cat -- the
12  productivity suite that Google is offering, that
13  -- that's clearly a substitute to what -- what
14  Microsoft is offering in its productivity suite.
15      Q.   Right.  So some of the apps in each
16  Google Play category could be complements,
17  correct?
18      A.   They could be.
19      Q.   And some could be substitutes.
20      A.   They could be, yes.
21      Q.   Right.  And you haven't put forth a
22  model in your report to determine which apps in
23  each category are complements and which are
24  substitutes?
25      A.   No.  And it's not necessary to get the

```
                                        Page 164
 1      Q.   Let me -- let me ask a different
 2   question.  You haven't calculated what those
 3   switching costs are.
 4      A.   I haven't calculated it, no.
 5      Q.   All right.  So you ran a regression in
 6   your opening report, correct?
 7      A.   Well, I ran so many, I'm not sure which
 8   one you're speaking of.
 9      Q.   So let me -- fair point.
10           You ran a set of regressions in your
11   opening report.
12      A.   Yes.
13      Q.   Okay.  Now, those regressions are
14   testing the elasticity of demand for apps based
15   on a change in the price of the app, right?
16      A.   As instrumented via change in the tax
17   rate, correct.
18      Q.   Okay.  Now, the regression you ran in
19   preparing your opening report isn't measuring how
20   a service fee change affects the price of an app
21   or an in-app purchase, right?
22      A.   Correct.  We've been through this
23   before.  ██████████████████████████████████
24   ██████████████████████████████████
25   █████████████, I -- I could have employed a
```

1   different model, but I couldn't given the
2   restraint.
3        Q.   Right.  So just -- I -- I understand.
4   I just want to make sure we're clear about what
5   your regression does and -- and it doesn't do.
6            The regressions that you ran in your
7   opening report isn't measuring the effect of the
8   service fee on the price of the app or the in-app
9   purchases, right?
10       A.   Correct.  It's doing something close so
11  that I can make a prediction about how a change
12  in the service fee would change the prices.
13       Q.   And you haven't run any regression that
14  measures how a change in the service fee affects
15  the price of an app or in-app purchases?
16       A.   I've -- I haven't -- well, I've tested
17  and -- and analyzed the regressions that were run
18  by Dr. Williams and Burtis that -- that purport
19  to do that or that attempt to do that, but those
20  experiments are so fatally flawed and botched
21  that there is no learning to be done.  There's --
22  there's no -- there's no economic knowledge that
23  can be gleaned from those botched experiments.
24       Q.   Right.  Now, the prices that developers
25  charge in the but-for world might depend on

Page 167

1    would have been set are the prices that would

2    have been set most likely for the long haul.

3         Q.   Okay.  And the prices that developers

4    charge in the but-for world could depend on what

5    their competitors charge.

6         A.   Yes.

7         Q.   Can you think of any factors that could

8    cause one developer to pass on a reduced service

9    fee in the form of a lower price and -- and would

10   make another developer not do so?

11        A.   Well, under the logit model, the

12   pass-through rate will be different depending

13   upon the share of the developer and the app

14   category.  So anything that contributed to the

15   app developer having different share would

16   allow -- would be the basis for a different

17   pass-through rate.

18        Q.   Can you think of any other factors

19   that would affect whether one developer would

20   pass through a reduced service fee and another

21   developer wouldn't?

22        A.   Oh.  "Wouldn't?"  I mean, no.  Wouldn't,

23   it's hard for me to conceive of, because almost

24   any -- any demand structure that I have would

25   have used, whether linear, logit or constant

Page 181

1    that uses a dollar amount of sales tax?

2         A.   Well, in the field -- it's one of the

3    fields in the transaction data that says "taxes",

4    and it -- it is -- it is stated in dollars, I

5    believe, not as percentage.  So we get to see

6    what the relationship is between those changes,

7    right, as -- as predictive -- how predictive they

8    are to changes in prices.  The fact that they may

9    be denominated in dollars doesn't mean they don't

10   come from ad valorem.  I'm pretty confident that

11   they are always -- or that generally -- just to

12   be safe, they're generally set as a percentage of

13   revenues.

14        Q.   Understood.  But as you input them into

15   your model regarding the relationship between the

16   sales taxes and the prices, they were in dollar

17   terms and not percentage terms?

18        A.   I believe that's the case.  I can -- I

19   can check that out for you in a break, but I

20   believe that the way that it's entered into the

21   database is as dollars.

22        Q.   Got it.

23             Now, going back to your formula for

24   pass-through, which, again, is essentially a

25   hundred minus the quantity share of the apps

Page 182

1    transactions in its category, right?
2         A.   That's for the app developer, but I
3    don't present it that way in the report.  I
4    present it, as you know, at the category level.
5         Q.   Understood.
6         A.   Okay.
7         Q.   But that's the general math of the
8    formula?
9         A.   That's the math.
10        Q.   Right.  Fair to say that that math will
11   always produce a pass-through rate, unless the
12   app developer or -- has a hundred percent of a
13   Google Play category?
14        A.   I think it's fair that -- that you'll
15   get a positive pass-through rate.  You won't
16   necessarily get a big one, but you'll get a
17   positive pass-through rate with the exception
18   of the guy who dominates the field.  And, you
19   know, again, this is -- hopefully this is
20   intuitive to the non-economist in that -- in that
21   your share is capturing your dominance in this
22   arena of competition.  And so what the logit
23   model is telling us is that the more dominant you
24   are, the less -- the smaller percentage of the
25   pass -- of a cost saving you share with your --

Page 183

1    with your client.

2        Q.   Right.  But just so we're clear, unless

3    the app has a hundred percent quantity share in

4    the category, your formula will predict a

5    positive pass-through rate?

6        A.   For a given app developer, that -- that

7    is correct, yes.

8        Q.   Okay.  Now, you talked earlier about

9    the pass-through formula you have, potentially

10   predicting different rates from month to month or

11   week to week.  We talked about that a little bit.

12       A.   Yeah.  If you were to measure it on a

13   monthly basis, there would be some variation that

14   you wouldn't get if you were to measure it across

15   the -- the class period.  That is correct.

16       Q.   Right.  And your opinion is that it's

17   not appropriate to measure it on that short of a

18   time scale, correct?

19       A.   Correct.

20       Q.   Right.  And what's the economic basis

21   for why it's inappropriate to measure it on that

22   week to week or month to month or those sorts of

23   time frames?

24       A.   I don't think that an app developer

25   is going to revisit its pricing on a -- on a

1    apply to a model of logit demand if the -- if the
2    model in Paragraph 104 is a generic model?
3        A.   Well, because the logit pass-through
4    rule states pass-through as a function of
5    industry concentration and not of cost, and so
6    when you asked me why doesn't -- you're asking me
7    basically why isn't the pass-through rate under
8    logit changing with the change in costs.  It
9    doesn't.  It's just a property of the logit
10   demand.  It doesn't make the math on 104 wrong.
11   It doesn't make the logit wrong.  It just -- it's
12   no longer a function of cost.
13       Q.   So the property of the logit demand
14   model that you used for your pass-through is that
15   the price is a function of the concentration and
16   not of the cost?
17       A.   The pass-through is a function of the
18   concentration, not of the cost, correct.
19       Q.   All right.  What is focal point pricing?
20       A.   Focal point pricing is the notion that a
21   consumer might focus on the -- on the first digit
22   before the decimal, as opposed to the last two.
23   So it explains why a lot of firms end -- end
24   their prices in 99 cents, or other -- or other
25   combinations.  Just a greater focus on the first

Page 198

```
 1    -- on the stuff before the decimal place than --
 2    than after the decimal place.
 3        Q.   Okay.  And do you -- focal point pricing
 4    is a well-established concept in economics?
 5        A.   Sure.
 6        Q.   And in the real world, many developers
 7    price transactions only at certain focal points?
 8            MS. GIULIANELLI:  Objection.
 9            THE WITNESS:  We -- we've -- I've given
10    you all the stats that I think you could ever
11    want to see and more, but, you know, we know that
12    a lot do but a lot don't.  You know, ████████████
13    ███████████████████████████████████████████████
14    ████████████████████████
15    BY MR. RAPHAEL:
16        Q.   So fair to say, though, that in the real
17    world some developers price in way that seems
18    like they're focal point pricing and some
19    developers don't?
20        A.   Given -- given the constraints that
21    Google imposed on some developers, yes, they
22    -- you know, they did price at 99 cents.
23        Q.   Well, what analysis have you done, sir,
24    in your reports to determine what effect Google
25    -- any constraints that Google imposed on
```

```
                                              Page 202
 1    BY MR. RAPHAEL:
 2        Q.   I guess what I'm asking is, is it your
 3    opinion that focal point pricing doesn't explain
 4    any developers' pricing in the actual world?
 5        A.   No, I think that's too harsh.  I think
 6    that focal point pricing is an important
 7    consideration here.
 8        Q.   Okay.  Now, and -- and the price floor
 9    you talked about of setting prices at 99 cents,
10    that wouldn't affect developers who set their
11    prices quite a bit above 99 cents?
12        A.   That's fair.  I think that, when we
13    looked at the data, it's about -- ███████████████
14    ████████████████████████████████████████ so I
15    agree with you that -- that those would be the
16    ones who were constrained from -- from moving
17    downward.
18        Q.   Okay.  So the other ████████████ of
19    developers wouldn't be affected by what you're
20    calling the price floor that Google had in place?
21        A.   Correct.
22        Q.   Okay.
23        A.   With one caveat in the sense that there
24    could be spillover effects from a floor being set
25    at 99 on what the next step up would be, but I
```

1  out, for the purposes of impact, is to say that

2  if all app developers within a category achieved

3  a certain cost reduction by virtue of enhanced

4  competition and, thereby, lower take rate, how

5  much of that would be shared with consumers in

6  the aggregate across the category.  And, you

7  know, what I'm hearing is, oh, my God, have you

8  ruled out 99-cent things or things that end in 9?

9  No, we haven't -- we haven't ruled that out.  But

10  we're talking about the share of the costs that

11  are being saved in the aggregate across a

12  category.  We can allow for 79-cent pricing, we

13  can allow for 99-cent pricing, 29-cent pricing in

14  the but-for world.  We're not putting any

15  restrictions on -- on what the price of a

16  particular app in a particular plan at a

17  particular point in time are.

18  BY MR. RAPHAEL:

19      Q.   Right.  So I just want to make sure I

20  get an answer to my question.  So your model for

21  a pass-through isn't trying to take account in

22  any specific way for the phenomenon of focal

23  point pricing?

24      A.   I -- I don't -- I don't think that the

25  mod -- that particular logit estimate of the 89

1    percent is accounting or needs to take account.

2    I think I need to account for it in my overall

3    opinions about what the but-for world would look

4    like.  But the logit model is just telling us

5    what the implied pass-through rate is given a

6    reduction in costs, given the concentration

7    -- the typical concentration we see within

8    categories in -- you know, in the app industry.

9         Q.   Okay.  Your regressions regarding the

10   logit demand, did they have any fixed effect or

11   other mechanism to control for focal point

12   pricing?

13        A.   Well, they did use fixed effects.  I

14   don't know if you meant to say that, but they

15   don't have a separate control variable for focal

16   point.  But it is true, now that you brought this

17   up, we do have app fixed effects, right?  So to

18   the extent that an app stayed constant at a given

19   price over time or always ended at 99 -- let me

20   just say for the record what fixed effects is.

21   Quite literally, it's controlling for any of

22   these attributes of the app that are constant

23   over time.  And so if that tendency to want to

24   end in 99 or 79 or 69 is constant, then, yes, my

25   regressions control for it.

Page 224

1  monopoly power.

2      Q.    Okay.  Now, service fees on platforms

3  other than Google Play are marginal costs for

4  developers as well, right?

5      A.    The service fee or the take rate charged

6  by Google to the developer can be understood as a

7  marginal cost.

8      Q.    And when service fees are charged to

9  developers on other platforms that may compete

10  with Google Play, those are also properly

11  understood as marginal costs for the developers?

12      A.    Correct.

13      Q.    Okay.  So if we saw service fees on

14  other platforms that are lower than Google Play's

15  service fees, those would be lower marginal costs

16  to those developers.  Fair?

17      A.    Fair.

18      Q.    Okay.  Now, would you predict, then,

19  that -- well, strike that.

20          In fact, it's true that many developers

21  do not charge different prices on platforms that

22  compete with Google Play that offer lower service

23  fees.

24      A.    There are examples of that, sure.

25      Q.    And do you know how many developers

1    record.   The time is 2:08 p.m.

2             (Recess taken.)

3             THE VIDEOGRAPHER:  We're now on the

4    record.   The time is 2:10 p.m.

5    BY MR. RAPHAEL:

6        Q.   Now that you've got your microphone

7    fixed, it's true, according to your report, that

8    some other app stores charge lower service fees

9    for some transactions than Google charges on

10   Google Play?

11       A.   Yes.  These -- these diminished

12   competitors, in part by virtue of the challenged

13   conduct, are charging lower, as economic theory

14   would predict they would charge lower.  How else

15   would they get someone to switch?

16       Q.   Right.  And is it the case that all

17   developers charge lower prices on other app

18   stores that have lower service fees?

19             MS. GIULIANELLI:  Objection.

20             THE WITNESS:  Not all, no.

21   BY MR. RAPHAEL:

22       Q.   So some developers charge the same price

23   on other app stores than Google Play where there

24   are lower service fees?

25       A.   I would -- I would assume that's a safe

1    -- yeah, that is a safe assumption that you could

2    find examples of app prices being the same across

3    stores under today's, you know, diminished

4    competition where these rivals aren't really

5    offering meaningful substitution opportunities.

6        Q.   Have you done any analysis in your

7    reports to determine whether the majority of

8    developers on the Google Play store and another

9    app store charged the same or different prices

10   across stores?

11       A.   No, I haven't.

12       Q.   Okay.  Now, in your report, I think you

13   note that different PC gaming platforms charge

14   different service fees?

15       A.   Sure.

16       Q.   Right?  So Microsoft now charges a 12

17   percent service fee on -- on PC gaming?

18       A.   Yes.

19       Q.   Okay.  And Steam charges more than 12

20   percent for its PC gaming platform?

21       A.   I think I give the percentages in my

22   report, but I -- I don't recall them being far

23   off from each other.  I think it's a more

24   competitive marketplace.

25       Q.   Right.  Well, let's go to -- let's

Page 239

1    developers.
2         Q.   Right.  But other than what's in Table
3    9, have you done any empirical analysis of the
4    effect on developers' ability or inability to
5    steer on whether they lowered their prices in
6    response to lowered service fees?
7         A.   Other than 9, I -- I don't -- I haven't
8    done one, but what you're asking is a bit of a
9    trick question, which is, in the presence of
10   steering, we -- in the presence of an
11   anti-steering restraint, it is very hard to go
12   out and measure what the effect of steering would
13   be on -- on pass-through or app pricing.
14        Q.   Okay.  Now, your opinion is that
15   directing customers from inside the app
16   downloaded from the Play Store to options outside
17   of the Play Store is the most efficient channel
18   for steering?
19        A.   Correct.
20        Q.   Okay.  Now, what -- what empirical
21   analysis have you done to support that opinion?
22        A.   Yeah.  This has been asked and answered,
23   but I'll -- we'll go back through it again, if
24   you want.
25             And let me have the question back again,

                                        Page 240

1   please.
2       Q.   Have you done any empirical analysis to
3   support your opinion that directing customers
4   from inside the app downloaded from the Play
5   Store to options outside of the Play Store is
6   the most efficient channel for steering?
7       A.   So I think -- I think it's the same
8   answer that I gave you this morning, that I
9   haven't done original empiricism, but I -- I'm
10   aware that Google has not prevented steering on
11   billboards, television advertisements and
12   Internet advertisements, but they have prevented
13   steering from within the app itself once it's
14   downloaded on the Play Store.  And that tells me
15   that, to Google, it's the most important channel.
16   Why would Google block it otherwise, right?  So I
17   feel like it's a very natural inference for an
18   economist to make that this is the most -- this
19   is the most efficient.
20            If you -- put it this way:  For you to
21   go any other path would incur new costs that you
22   wouldn't otherwise incur by steering within
23   the app store, right?  To get someone else's
24   attention on a billboard, you've gotta pay money.
25   You don't need to do that when it's inside of

```
 1   your own app.
 2        Q.   Do you agree that payment systems
 3   that require exiting the app to complete the
 4   transaction aren't reasonable substitutes for
 5   Google Play billing?
 6             MS. GIULIANELLI:  Objection.
 7             THE WITNESS:  I didn't understand it,
 8   so --
 9   BY MR. RAPHAEL:
10        Q.   Are payment systems that would require
11   exiting the app to complete a transaction
12   reasonable substitutes for developers or
13   consumers to using Google Play billing?
14             MS. GIULIANELLI:  Same objection.
15             THE WITNESS:  I don't know if I have an
16   opinion here, and I'm just not aware of any
17   payment processor who requires the customer
18   to leave the app in order to consummate the
19   purchase?  I just -- I'm just not aware -- I'm
20   just not aware that that would even -- that is
21   even a thing.  I wasn't aware of that.
22   BY MR. RAPHAEL:
23        Q.   Okay.  Is there a term in your
24   pass-through rate formula for the extent to which
25   developers can steer?
```

Page 242

1        A.    No.

2        Q.    Why not?

3        A.    Well, as you know, I ultimately

4    chose the logit model, and the logit model's

5    pass-through formula simplifies to a function of

6    market share, which is not a term for steering.

7        Q.    All right.  So the -- the logit

8    pass-through formula that you used to calculate

9    the pass-through rates doesn't depend on

10   steering?

11       A.    I would say that steering ensures the

12   pass-through is going to be positive.  Logit

13   allows us to estimate precisely what it's going

14   to be.

15       Q.    Okay.  So fair to say, then, that the --

16   the logit model pass-through formula that you've

17   used in your report depends on steering?

18       A.    No, I don't think it depends on steering

19   because we can come up with -- we can come up

20   with explanations for how pass-through would

21   occur in the presence of the anti-steering

22   restraint.

23       Q.    So you -- there's reasons why

24   steering would occur despite the anti-steering

25   restrictions?

1     A.   No, there's reasons why pass-through

2   would occur.

3     Q.   Oh, excuse me.  Okay.  So there are

4   reasons why -- why you would expect pass-through

5   regardless of the anti-steering restrictions?

6     A.   Correct.  I think that while it's true

7   that the anti-steering restrictions make for a

8   very potent impediment to steering and

9   pass-through, there are other ways in which

10  pass-through would occur, even without steering.

11  If I could, you know, ███████████████████

12  ████████████████, and so I've kind of mimicked

13  the assumption of where the developer could

14  choose its payment processor, right?  And you can

15  imagine a world where developers look around at a

16  whole bunch of payment processors in kind of an

17  open and unfettered market and go with the

18  payment processor offering a competitive rate, or

19  one of the lowest rates, and then competition

20  among developers in the same category would put

21  downward pressure on the prices that they charge

22  to their customers.

23        So there are -- there are mechanisms

24  that get you to pass-through and lower prices

25  outside of steering.  But I'll always hold, until

Page 244

```
 1   I'm blue in the face, that steering is like a
 2   supercharger.  It would -- it would -- it would
 3   boost all of these properties.
 4       Q.   Have you done any analysis to determine
 5   by how much it would supercharge all these
 6   properties?
 7       A.   No.  But -- no.  But what I'm assuming,
 8   I mean, at least in my -- when I wrote this
 9   report, I'm assuming that the challenged conduct
10   is gone, and part of the challenged conduct is
11   the anti-steering restrictions.  And so I'm
12   confident that there would be pass-through; that
13   it would be positive.  Now the question is,
14   what's the tool in economics that I can use to
15   reliably estimate the extent of the pass-through,
16   and that was the logit model.
17       Q.   Right.  Now, Google doesn't restrict any
18   marketing or advertising of other platforms
19   -- strike that.
20            Google doesn't restrict developers from
21   marketing or advertising transactions on other
22   platforms outside of the app that's been
23   downloaded from Google Play.
24       A.   That's correct.  There -- there's
25   -- Google understands that there would be a
```

1      Q.   Well, I'm just saying -- I guess
2  what I'm asking is -- maybe I'll ask it this
3  way:  Have -- have you done any analysis that
4  compares the profitability of steering for
5  developers via in app communications versus
6  steering using outside of the app communications?
7      A.   I haven't, but I know this:  That to go
8  outside would require a newfound advertising cost
9  that would not otherwise be incurred if you could
10 do it in-app.  And that would necessarily lower
11 the profitability of that -- of that steering
12 relative to steering within the app.
13     Q.   Have you done any empirical analysis in
14 your report of whether it would be profitable for
15 any particular developer to reduce prices by a
16 full focal point?
17     A.   I don't know what that means.
18     Q.   Well, --
19     A.   What's a full focal point?
20     Q.   Well, you told me what -- what's your
21 definition of a focal point?
22     A.   Well, we talked about how it's focusing
23 the attention on the left side of the decimal
24 place so you can kind of go high on the right and
25 it's not really going to scare off the customers.

Page 288

1   the play points program?

2       A.   The reason why that's the case is that

3   at ████████████████████████████████████████████

4   ████████████████████████████████████████

5   ████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ████████████████████████████████████████████████

9   ████████████████████████████████████████████

10  ██████████

11      Q.   My question was in the actual world,

12  it's correct that only some consumers signed up

13  for the play points program?

14      A.   In its -- in its existing state of

15  chintziness, yes, ███████████████████████████████

16  ██████████████████████████████████████████████

17      Q.   And, in fact, in the actual world, only

18  some of the people who did sign up for the play

19  points program actually used the play points they

20  earned?

21      A.   I asked the question why bother.  ██████

22  ██████████████████████████████████████

23      Q.   Okay.  But my question was, in the

24  actual world, only some of the people who signed

25  up for the play points program actually used the

```
                                      Page 289

 1    play points that they earned?
 2         A.   I can accept that -- that when the
 3    -- when the subsidy was at ███████████████
 4    ███████████████████████████████████, ████
 5    ███████████████████████████████████████████
 6    ████████████
 7         Q.   So the answer to my question is yes?
 8         A.   I can -- I can accept.  I haven't
 9    studied what percentage redeemed, but ██████
10    ████████████████████████████████████████████
11    ███████████████████████████████
12    ███████████████████████████████
13    ████████████████████████████████
14    ████████████████████████████████████
15    ██████████████████████████████████
16    ████████████████████████████
17         ██       ████████████████████████████
18    ██████████████████████  My question is it's
19    just a fact that only some of the people that
20    signed up for the play points program used their
21    play points, right?
22         A.   I can accept that fact.  I haven't
23    studied what percentage have.
24         Q.   Okay.  So in your reports, you haven't
25    identified any model to determine which
```

1    -- the -- the flip, you know, where it occurs,

2    but I can -- I can conceive that ███████████████

3    ████████████████████████████████████████████████

4    ████████████

5        Q.   Okay.  Now, in your reports have you

6    identified any model to determine which users

7    would have signed up for play points in the

8    but-for world?

9        A.   No.  I don't need to because what the

10   model is giving me is what Google would pay in

11   the aggregate across all consumers in terms of

12   subsidy.  So that ███████████ that comes out of the

13   play points model, and doing by memory, is what

14   happens in the aggregate.  So, it's conceivable

15   that -- that some consumers aren't contributing

16   to that -- to that ████████████ or some people are

17   doing it disproportionately, but that is going to

18   be the average subsidy that comes about via the

19   -- that if the locus of competition were to occur

20   on the points side of the market.

21       Q.   So the answer to my question is, no, you

22   -- in your reports you haven't put forth any

23   model to determine which users would have signed

24   up for play points in the but-for world?

25       A.   I don't think I need to, just to be

Page 296

1   clear --

2        Q.   I'm not asking you whether you need to.

3        A.   Okay.

4        Q.   So I'm going to ask my question again.

5        A.   Okay.

6        Q.   In your reports, did you put forth any

7   model to determine in the but-for world which

8   users would have signed up for the play points

9   program?

10       A.   That's not what the model is calling

11  for.  I'll be clear, the model wants to know

12  -- the model is solving for the size of the

13  subsidy across all consumers, right, and if the

14  model is telling us ███████████, the way to

15  interpret that -- that -- that parameter is that,

16  on average, the subsidy offered to consumers in

17  the but-for world, if the locus of competition

18  were exclusively on the play points side, right,

19  would be ███████████.

20       Q.   Right.  And so the model that you put

21  forward in your report regarding play points

22  isn't telling us anything about what individual

23  consumers would do with respect to signing up for

24  the play points program or using their play

25  points, correct?

1     A.   I think the model is.  I think that at 8
2   percent, the economic intuition -- well, this is
3   the intuition that I'm drawing from the model --
4   is that when the benefit gets so large, that is
5   going to spur participation and usage in the
6   system.
7     Q.   Great.
8          Your -- your testimony here today, sir,
9   is that you have a model in your reports that can
10  tell the Court and the jury in this case which of
11  the members of the putative class would have
12  signed up for play points and who would have used
13  them?
14          MS. GIULIANELLI:  Objection to the form.
15          THE WITNESS:  I didn't say that.  I said
16  that if the but-for subsidy were to rise to 8
17  percent, then it would be embraced -- the play
18  points system would be embraced across the class
19  just as the way that the points system in the
20  AMEX marketplace is embraced across American
21  Express users.
22  BY MR. RAPHAEL:
23    Q.   Okay.  So I want to -- I want to be
24  clear.  You have -- your testimony is that in the
25  but-for world, every member of the putative class

                                                        Page 298

1    would sign up for the play points program and use

2    their play points?

3              MS. GIULIANELLI:  Objection.

4              THE WITNESS:  I cannot -- this is the

5    first time I've been asked that question.  I'm

6    just hearing it afresh, right?  I cannot fathom

7    why a user would say, no, take back -- I was

8    going to spend a hundred dollars and I realize

9    you're trying to give me ██, but, no, I don't

10   want the ██, I want to spend the full hundred

11   myself.  It would be crazy -- it would be crazy

12   to -- to do that.

13   BY MR. RAPHAEL:

14       Q.   Sir, in the actual world, some consumers

15   don't sign up for play points or don't use the

16   play points that they earn, correct?

17       A.   We've established, I hope, that ███████

18   ████████████████████████████████████████████████

19   ███████████████████████████████████████████

20   ██████████████████████████████████████████

21   ██████████████████████████████████

22       Q.   Right.  And so your testimony is that if

23   Google changed the play points rate that you've

24   put in your report, that every member of the

25   putative class would have signed up for the play

1    points program and used play points?

2              MS. GIULIANELLI:  Objection.

3              THE WITNESS:  I think -- I think it's a

4    fair assumption.  Like, the model certainly is

5    not calling on this, but I think it's a fair

6    assumption that once it goes up to ███████ that

7    -- that everyone who is making purchases would

8    -- would either redeem it or at least enroll so

9    as to be able -- to be capable of taking the

10   subsidy at -- at those terms.

11   BY MR. RAPHAEL:

12       Q.   That's an assumption, though, that

13   you're making.  It's not what the model tells

14   you?

15       A.   Well, the model spits out, just to be

16   clear, what the average subsidy is across all

17   users.

18       Q.   Now, you -- would you agree with me that

19   the counterfactual experiment lies at the heart

20   of antitrust analysis?

21       A.   Sure.  I mean, it's an important thing.

22   It's -- I don't know if it's at the heart, but

23   you need -- you need to have a counterfactual.

24   You need to model the counterfactual.

25       Q.   Could you describe for me the

```
                                        Page 300
 1   methodology you used to construct
 2   counterfactuals?
 3        A.    In general?
 4        Q.    Yes.
 5        A.    We try to preserve all the attributes of
 6   the actual world, Google choosing a singular
 7   headline rate that applies to everyone.  And we
 8   -- and we deviate only in the restraints that are
 9   being challenged.  So we try to model a world in
10   which everything is identical.  We call it the
11   ceteris paribus assumption.  But we try to model,
12   holding everything else constant, what would
13   competition have looked like in the absence of
14   this set of restraints.
15        Q.    Understood.  Now, in the actual world
16   Google is a profit-maximizing firm?
17        A.    In the actual and in the but-for, I'll
18   give you that.  It's always profit maximizing.
19        Q.    That's what I would think.
20        A.    I mean, you take that away from me -- I
21   mean, you take that away from an economist, we
22   don't say a lot.  We're very quiet at cocktail
23   parties if you take that away.
24        Q.    So that's where I was going to go.  I
25   just want to make sure I understand in the -- in
```

1    the correctly constructed but-for world, an

2    economist should assume that Google is a

3    profit-maximizing firm.

4         A.    Absolutely.

5         Q.    Now, your opinion is that Google would

6    earn lower profits if it eliminated the

7    challenged conduct?

8         A.    Lower profits but still enormous sums,

9    yes.

10        Q.    But lower?

11        A.    Lower, yes.

12        Q.    Right.  So if Google's a

13   profit-maximizing firm and it lost profits in the

14   but-for world without the challenged conduct,

15   would you expect Google to take steps to try to

16   earn those profits through some other means?

17        A.    Not if they're anticompetitive.  I mean,

18   if a court has told that you that, you know, the

19   tie-in was illegal, you can't reconstruct the tie

20   through some other means to try to bring back

21   those -- those anticompetitive profits.

22        Q.    Well, let me ask a clearer question:  If

23   Google's a profit-maximizing firm, in a world

24   without the challenged conduct where you say

25   Google would earn lower profits, would you expect

```
                                              Page 302
 1    Google to try to take any lawful or competitive
 2    means to earn back those profits?
 3         A.   Well, with the caveat, it's not just
 4    anything lawful, it's gotta be something that is
 5    profit maximizing.  Like, for example, Dr. Burtis
 6    likes to talk about, you know, ████████████████
 7    ███████████████████████████████████████████████
 8    ███████████████████████████████████████████████
 9    ███████████████████████████████    The idea
10    would -- it would just violate the entire
11    business model.  So it has to be -- I'm with you
12    that it has to be profit maximizing.
13         Q.   Right.  Right.  But in a but-for world
14    where Google had lower profits, as a
15    profit-maximizing firm, they would try to do
16    anything else to earn back those profits if it
17    was profit-maximizing?
18         A.   Well, a few -- a few other criteria.
19    It's gotta be profit maximizing, and it's gotta
20    be legal and procompetitive.  You can't replicate
21    the tie-in through some other means.
22         Q.   Is there anything anticompetitive about
23    ████████████████████████████████████████████████
24    ███████████████████████████
25         A.   The -- the mere ███████████████████████
```

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3      A.   Well, I -- I want to push back on that,

4  respectfully, just a bit, if I could, all right,

5  because you're disavowing all the advertising

6  revenue, you're disavowing what it made in the --

7  in the market for app distribution, you're

8  disavowing what it's making on all the other ▮

9  percent of the transactions that it is

10  consummating the in-app transactions on.  So I

11  just want the record to -- to be crystal clear

12  that it's not like Google is just left on the

13  street, you know, begging for -- for cash out

14  there, right?

15      Q.   So, let's talk about a particular

16  transaction in the but-for world where the app

17  has been downloaded for free.

18      A.   Okay.

19      Q.   So in that scenario, Google would not

20  have earned any service fee from the transaction

21  in the app distribution market.

22      A.   Right.

23      Q.   And then there's a transaction in the

24  in-app aftermarket where Google doesn't serve as

25  the payment processor.  Do you -- do you have

Page 310

1    that?

2         A.    Yeah.

3         Q.    Okay.   In -- in that transaction in the

4    but-for world, setting aside advertising that

5    Google might have -- might have earned through

6    some other way, Google's not earning any service

7    fee at all on that transaction?

8         A.    That's fair.

9         Q.    Okay.   Now, I think your opinion in your

10   report is that in the but-for world, Google would

11   earn a service fee rate of ████ percent on in-app

12   transactions for which it served as the payment

13   processor?

14        A.    And not just the payment processor, on

15   all the -- the whole suite of aftermarket

16   services.

17        Q.    Okay.   Well, does Google provide any

18   aftermarket services on the transactions for

19   which it doesn't serve as payment processor?

20             MS. GIULIANELLI:   Objection to form.

21             THE WITNESS:   Well, we -- we've never

22   seen that world, right?   So you're asking me if

23   -- am I assuming that they're not?   Because in

24   the real world they're tying -- they're forcing

25   themselves to be in every transaction.