# EXHIBIT 1

## EXHIBIT 1

The following are the positions of Dr. Singer and Dr. Burtis on the agreed upon issues of disagreement for the concurrent expert witness proceeding to be held on July 19, 2022:

**1. Dr. Singer's Estimates of Google's But-For Service Fee Rates**

<u>Dr. Singer's Position</u>

The Rochet-Tirole ("R-T") model, first developed by Nobel laureate Jean Tirole, is the foundational model for pricing studies in two-sided platform markets such as the Android App Distribution Market. It is generally accepted and widely used by economists. Using real-world data from this case, Dr. Singer properly applied the R-T model to study the effect of increased competition in the but-for world in the Android App Distribution Market. Dr. Singer used the standard and generally accepted Dominant Firm/Competitive Fringe ("DF/CF") model to study the effect of increased competition in the but-for world in the In-App Aftermarket. Dr. Singer's application of the R-T and DF/CF models to the data and facts of this case was an appropriate and sufficient method of establishing classwide injury and damages in the two separate relevant markets. Google does not dispute the reliability of these models. Google disputes the validity of just two inputs to the models (the pass-through rate and Google's but-for market share), both of which will be discussed during the proceeding. Google challenges Dr. Singer's marketwide implementation of the R-T and DC/CF models, ignoring that the Play Store has a highly uniform and formulaic marketwide take rate structure, with a "headline" marketwide take rate of 30 percent. The inputs to the R-T and DF/CF models are therefore appropriately modeled as marketwide statistics. The R-T and DC/CF models each produce but-for headline take rates (below 30 percent), and Dr. Singer has demonstrated how to calculate the extent to which discrete categories of developers would receive discounts to the but-for headline rate.

<u>Dr. Burtis's Position</u>

Dr. Singer's but-for service fee rate models cannot be used to analyze common impact. First, the models are unreliable because one of the inputs is a pass-through rate calculated using Dr. Singer's unreliable and theoretical pass-through formula.  Dr. Singer's models depend critically on his pass-through rate.  As explained below, Dr. Singer's service fee rate models are unreliable because the pass-through formula they depend upon ignores (1) real-world data showing that pass-through is minimal, (2) standard economics regarding how changes in fees that are a percentage of prices affect developers' profit-maximizing price, and (3) focal point pricing.  Second, setting aside pass-through, Dr. Singer's models for calculating but-for service fee rates cannot reliably analyze the issue of common impact because the models rely on broad averages for all of the inputs. Third, the service fee rate models assume a single service fee rate reduction in the but-for world when, in fact, Google has lowered its service fee rate at times to certain developers. Economic evidence demonstrates that not all service fee rates would fall or fall in a uniform amount in Plaintiffs' but-for world, and Dr. Singer presents no economic basis or

evidence to justify his assumption that service fee rates for all paid apps, all subscriptions, and all IAP would be lower. Dr. Singer's models simply assume, but do not test, that an increase in competition would have the same effect on all apps and developers. By design, each of his calculations can return only a single but-for service fee rate for each model – he allows for no other possibility.

## 2. Pass-Through Analyses

### a. Reliability of Dr. Singer's Pass-Through Formula

Dr. Singer's Position

According to elementary economics, firms pass higher marginal costs to their customers in the form of higher prices ("pass-through"). Standard economics shows that the fraction of cost increases that are passed through to consumers (the "pass-through rate") depends on the shape of the demand curve. To determine the shape of the demand curve, Dr. Singer applied standard, rigorous, and undisputed econometric and statistical methods to the Play Store's voluminous transaction data, encompassing millions of prices and hundreds of thousands of apps, grouped into 35 categories created and used by Google in the ordinary course of its business. This detailed analysis showed there is a negative and highly statistically significant relationship between an app's share in a given Play Store category and the app's price, and the logit model explains the vast majority (over 85 percent) of the variation in an app's share within a category. In other words, the analysis confirms that the standard logit demand model explains the real-world demand and pricing variations observed in Play Store data extremely well, and that the Play Store's 35 categories reflect economically reasonable groupings of consumer tastes for different varieties of apps. This does not imply that all apps within a category are interchangeable. Economic literature confirms that the logit model allows for extensive product differentiation. *See* Simon Anderson & Andre de Palma, *The Logit as a Model of Product Differentiation* 44 Oxford Economic Papers 51-67 (1992)) at 53 ("there are many characteristics of products which consumers value differently, such as color, aesthetic appeal, brand image, etc.").

Because the logit model applies to this case, Dr. Singer used the standard formula for the logit pass-through rate derived in a peer-reviewed article, Nathan Miller, Marc Remer, & Gloria Sheu, "Using cost pass-through to calibrate demand," 118 Economics Letters 451-454 (2013) ("Miller *et al*."). Miller *et al*. demonstrated mathematically that, for a logit demand curve, the pass-through rate is one minus the app's category share.

Google claims incorrectly that a distinct equation, presented in Dr. Singer's report to show at a high level how an increase in the *ad valorem* take rate resembles an increase in marginal cost, somehow contradicts Miller *et. al*. This is incorrect; Dr. Singer never offered this high-level equation as a pass-through model. To calculate the applicable pass-through rate, one needs to perform extensive data analysis, just as Dr. Singer has done.

Dr. Singer's application of the standard logit demand model to the data and facts of this case is appropriate and sufficient to establish pass-through (on an app-by-app basis, if necessary).

Dr. Burtis's Position

Dr. Singer claims to have applied "econometric and statistical models" in evaluating pass-through, but he does not rely on the results of any of those "models" to estimate pass-through for any app, any developer, or any transaction. Instead, Dr. Singer calculates a pass-through rate based solely on a simplistic and unreliable formula: one minus the developer's share of sales of the app category equals the pass-through rate for an app. For example, if a developer's app accounts for 1% of sales in the Games category, Dr. Singer would conclude that the pass-through rate for that game was 99% (*i.e.*, (1- 0.01 = 0.99) or 99%). This method guarantees universal pass-through because it predicts pass-through for a developer without a 100% share of its app category, which none has.

Dr. Singer's formula is also not reliable because it treats Google's service fees for Play, which are calculated as a percentage of the sales price, as a per-unit cost instead of an *ad valorem* (or "percentage of the price") cost. The source for Dr. Singer's formula explicitly states that the formula used by Dr. Singer assumes a per-unit cost. *See* Nathan Miller, Marc Remer, & Gloria Sheu, *Using Cost Pass-Through to Calibrate Demand*, 118 ECON. LTRS. 451, 452 (2013) ("Now suppose that a *per-unit tax* is levied on each product in the model—the tax perturbs marginal costs and allows for the derivation of cost pass-through.") (emphasis added). According to the standard economic model set forth in Dr. Singer's own report, changes in costs (here Google's service fee) that are calculated as a percentage of prices will affect prices proportional to marginal costs. But, Dr. Singer's pass-through formula does not account for this mathematical relationship or for developers' marginal costs. Instead, Dr. Singer's formula calculates pass-through only as a function of the category that a developer chooses to market its app, even though (as Dr. Singer concedes) the apps in each category are not substitutes and thus their prices do not necessarily have any relationship with each other.

**b. Marginal Costs And Pass-Through**

Dr. Burtis's Position

As noted, the standard economic model of profit maximization predicts that changes in service fees will affect developers' prices proportional to other marginal costs. Because a proportion of zero is zero, if an app has zero (or close to zero) marginal cost, a reduction in the service fee rate will be less likely to lead to a change in the retail price of the app. Dr. Singer agrees that if a developer's marginal cost is zero, Google's service fee will not be passed on in the form of higher prices for consumers. Economic literature—including literature relied upon by Dr. Singer—notes that the marginal cost to produce many digital goods,

such as the additional cost to produce one more digital "sword" or "gem" in a game, is zero.  *See, e.g.*, Jean-Charles Rochet & Jean Tirole, *Platform Competition in Two-Sided Markets*, 1 J. EUR. ECON. ASS'N 990, 1012 (2003) (assuming that video game developers have "no marginal cost"); Avi Goldfarb & Catherine Tucker, *Digital Economics*, 57 J. ECON. LIT. 3, 12 (2019) ("The replication cost of digital goods is zero").  Dr. Singer nevertheless asserts that marginal costs are never zero, but cannot point to any literature that supports that position.

<u>Dr. Singer's Position</u>

Dr. Singer appropriately and sufficiently accounted for marginal cost in his pass-through analysis, applying the standard logit model described above. That model measures how prices change with a *change* in marginal costs. Since it is the change in costs that impacts the *change* in price, the level of the costs do not need to be separately calculated for each individual developer. As Miller *et al*. demonstrate mathematically, the level of marginal cost drops out of the standard logit pass-through rate, which applies to any perturbation of marginal cost.

Dr. Burtis does not dispute the derivation of pass-through calculations from Miller *et al*., but does assert that class members may not have been injured if they purchased exclusively from developers with zero marginal costs, a recognition that the *ad valorem* take rate can affect app pricing so long as the developer's marginal costs are not zero. Dr. Singer has reasonably concluded that apps and in-app products do not have zero marginal costs. Google focuses on the negligible cost of *making* the next sword, but even the swordmaking developer incurs marginal costs when *selling* the sword inside the app. More generally, the economic literature recognizes the "ongoing marginal costs for app developers arise from various maintenance tasks after app development." *See* Anindya Ghose & Sang Pil Han, *Estimating Demand for Mobile Applications in the New Economy*, 60(6) MANAGEMENT SCIENCE 1470, 1474 (2014). Dr. Burtis admits that "apps that require processing of consumer information (e.g., usernames and communications across consumers) such as multi-player game apps and apps that require relatively high costs for customer support may have positive marginal costs." Burtis Report p. 52 ¶ 146. There is no need to individually measure marginal cost for each developer in the Play Store.

**c.  Focal Point Pricing**

<u>Dr. Burtis's Position</u>

Well over 90% of prices of items sold through Google Play end in "99" (e.g., $0.99, $1.99).  This indicates that most developers engage in what economists call focal point pricing:  setting prices ending in "99," which can be attractive to consumers.  Developers who use focal point pricing may not find it profitable to lower their price to the next focal point ending in "99" even if they have positive marginal cost and they paid reduced service fees.  Thus, focal point pricing is a

reason why developers might not pass-through reduced service fees. Dr. Singer's pass-through model does not account for this dynamic. Dr. Singer observes that some developers may find it profitable to reduce prices to a price that is higher than the next lowest focal point (e.g., $1.49). Even if that were true, it does not address whether developers who would not find it profitable to do so would lower prices if they paid reduced service fees.

<u>Dr. Singer's Position</u>

Dr. Singer appropriately and sufficiently accounted for focal-point pricing. Dr. Singer's model generates a percentage overcharge of the total spend within an app category, based on the category-specific pass-through rate and take rate in the but-for world. There is no reason why the aggregate consumer savings could not accommodate a subset of prices that ended in nine. But in any event, economics and record evidence does not indicate that most developers would necessarily charge prices that end in $.99 in the but-for world. First, record evidence shows that developers are willing to charge prices that do *not* end in "99" when passing on the marginal cost savings from lower take rates to their customers when they transact on a website instead of the Play Store. Second, record evidence also suggests that Google changed its policy of forcing developers to charge at least 99 cents to accommodate developer demand for lower price points. Google's minimum price reduction from .99 to .05 worldwide shows that $0.99 focal point pricing is not necessary. In addition, because of Google's earlier $0.99 minimum requirement, for a large number of developers, the observed prices in the actual world could be the result of Google's pricing restraints. Third, more than 20 percent of the top paid apps in the Play Store have initial download prices that do not end in "99." Google's transaction data records over 130 million such U.S. transactions.

Even if one assumes that developers would prefer to maintain "supermarket-style" pricing in the but-for world, they could do so simply by ending their prices in "9," instead of "99" (e.g., $2.49), or in or in "5" (e.g. $4.95) as many do today. Dr. Singer's models can easily accommodate this contingency.

#### d. **Developers' Prices After Google Reduced Service Fees**

<u>Dr. Burtis's Position</u>

Real-world data contradict Dr. Singer's claim that all developers would lower prices if Google reduced their service fees ("pass-through"). Google reduced its service fee several times during the class period. Following those reductions, only a small percentage (far less than 10%) of paid apps, subscriptions, or in-app purchases ("IAPs") (together, "SKUs") that were subject to lower service fees fell in price. Developers did not change prices for the overwhelming number of over 450,000 SKUs subject to a lower service fee. Dr. Singer's pass-through methodology thus produces results that are verifiably wrong. Dr. Singer's claim that Google's conduct—specifically its alleged anti-steering policies—accounts

for this lack of pass-through does not make economic sense and is contradicted by the data.  Dr. Singer's pass-through model is not based on steering, his pass-through formula does not include any variable to account for steering, and Dr. Singer admits that pass-through would occur even in the presence of anti-steering policies.

Dr. Singer's Position

Dr. Burtis's attempted pass-through study does not and cannot measure the long-run effects of substantially and permanently lower take rates for all developers in a more competitive but-for world. Dr. Burtis's pass-through analysis does not employ any standard econometric methods, statistical tests, or control variables. A properly conducted "before-after" study should include a clean "after" period in which the conduct in question is absent. Dr. Burtis lacks a clean "after" period. For example, Dr. Burtis has no way of controlling for factors, such as price stickiness, that will influence pricing in both time periods. Nor can she control for developers' inability to steer. The time horizon in Dr. Burtis's pass-through analysis is also far too short. Except for a handful of cherry-picked examples, Dr. Burtis limits her comparisons to either one month or six months before and after a take rate change. This error is compounded by the fact that a decrease in the take rate does not immediately flow through to a developer's financials. For example, if a developer's take rate fell from 30 percent to 15 percent in a given month, the developer's average take rate over the prior year would be approximately 29 percent. With respect to developers selling subscription apps, Dr. Burtis commits multiple additional errors. Dr. Burtis relies on artificially defined "products" representing less than five percent of the revenue for the apps she purports to analyze. Dr. Burtis also ignores the elementary economics of subscription pricing, which incentivizes "front-end" discounts to new customers. Moreover, the Play Store's developer pricing interface made it difficult or impossible for most developers to pass on any reduction of the take rate after the initial sign up period, without also discounting new customers.  Dr. Burtis' opinions based on her flawed study, therefore, do not undermine the results of Dr. Singer's economic modeling.

3. **Dr. Singer's Play Points Model**

Dr. Singer's Position

Economists use the R-T model as a standard method to determine how competition affects consumer subsidies in two-sided platform markets. Using real-world data from this case, Dr. Singer properly applied the R-T model to study the effect of increased competition in the but-for world on consumer subsidies paid by Google to consumers ("Play Points"). Because Play Points are paid by Google to consumers, classwide injury and damages can be modeled without pass-through from a developer. When faced with limited competition in the actual world, Google deployed Play Points to combat the threat of potential platform entry, first in Japan when it faced competition from Amazon, and then in South Korea in response to competition from ONE Store. The Play Points

program is available to all customers, with no minimum level of expenditure. Nevertheless, Dr. Burtis claims that some class members are uninjured because they would not have signed up for or redeemed Play Points in a more competitive but-for world. Dr. Burtis ignores that the Play Points subsidy is low in the actual world; in the but-for world, the Play Points subsidy would be about 39 times greater, dramatically increasing consumer incentives to participate. Google itself has found substantial increases in Play Points participation levels in the limited instances in which Google has increased the Play Points subsidy. Dr. Burtis also ignores that Play Points do not have to be redeemed to have value, just as cash has value before it is spent. Dr. Singer's application of the standard R-T model to the data and facts of this case is appropriate and sufficient to establish antitrust injury and damages classwide via an increase in consumer subsidies.

<u>Dr. Burtis's Position</u>

Dr. Singer claims that in a but-for world where Google would have faced more competition, Google might have expanded its Google Play Points loyalty program for consumers, instead of reducing service fees for developers. However, Dr. Singer fails to consider and account for the fact that in the actual world, only a small fraction of U.S. consumers participated in and have redeemed Play Points. Thus, to support his opinion that all consumers would have benefitted from enhanced Play Points, Dr. Singer must show that most consumers who did not enroll in or use Play Points would have made a different decision in a but-for world. Dr. Singer claims that the value of Play Points would be sufficient to motivate all consumers to enroll in and use Play Points, but he has not conducted any analysis to support that opinion. For example, the Play Points that Dr. Singer posits Google would have offered in a but-for world would have been less than a dollar for a significant proportion of consumers. Dr. Singer has not conducted any analysis showing that this small amount would have motivated consumers to make a different decision regarding Play Points than they did in the real world.

## 4. Alternative Monetization Strategies Considered By Google

<u>Dr. Burtis's Position</u>

Dr. Singer ignores that, in a but-for world, Google would have an economic incentive to change its monetization strategy, which may result in outcomes that make some consumers worse off than they were in the actual world. One part of Plaintiffs' theory is that, if Google did not engage in the challenged conduct, developers could sell IAPs using their own billing system without paying Google any service fees. Giving developers the option not to pay Google would put nearly all of Google Play's service fee revenue "at risk." Faced with that risk, Google would have an incentive to find another mechanism to generate revenue for Google Play. Indeed, Google has considered alternative monetization strategies. Certain of those strategies could result in developers charging for free apps and certain strategies could result in developers paying higher service fees than the fees paid in the actual world. Dr. Singer has not accounted for the possibility that, for some consumers, the increase in price for free apps could be more than any reduction in the price of IAPs or that, based on Dr. Singer's own theory,

developers would raise prices due to higher service fees.  Dr. Singer claims that Google would not adopt these alternative monetization strategies because at the but-for service fee rates he calculates, Google would still earn profits by employing its current business model even though it would not earn service fees on many in-app purchases.  But this ignores Dr. Singer's own opinion that Google would seek to maximize its profits in a world without the challenged conduct.  It also ignores market realities that in Plaintiffs' but-for world where developers could avoid paying the service fee by using their own billing system, giving developers the option not to pay Google would still put a significant portion of Google's revenue "at risk" even if Google charged the service fees Dr. Singer predicts it would have.

<u>Dr. Singer's Position</u>

Like other two-sided platforms, the Play Store faces clear economic incentives to maximize participation by both sides of the market (consumers and developers). A large consumer base is critical to unlocking the indirect network effects that have made the Play Store so profitable. Google's documents and financial data indicate it would be economically irrational for Google to impose alternative monetization strategies (such as a fee for consumers to access free apps) that would undermine these indirect network effects. Doing so could jeopardize billions of dollars in annual revenue generated by the Play Store, including the Play Store's highly lucrative advertising business, which is only monetized by offering large volumes of consumers to advertisers and developers. When the Play Store has cut its take rates in the past, it never once sought to offset the lost revenue by imposing alternative monetization strategies. Google has never actually adopted any of the alternative monetization strategies about which Dr. Burtis speculates, despite the market power it enjoys in the actual world. Increased competition in the but-for world makes it even less likely that Google could or would profitably impose these alternative monetization strategies.