Karma M. Giulianelli (SBN 184175)
**BARTLIT BECK LLP**
1801 Wewatta St., Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140
karma.giulianelli@bartlitbeck.com

Hae Sung Nam (*pro hac vice*)
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7715
hnam@kaplanfox.com

*Interim Co-Lead Counsel for the Proposed Classes*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY CONSUMER ANTITRUST LITIGATION**<br><br>RELATED ACTIONS:<br><br>*Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD<br><br>*In re Google Play Developer Antitrust Litigation*, Case No. 3:20-cv-05792-JD<br><br>*State of Utah, et al., v. Google LLC, et al.*, Case No. 3:21-cv-05227-JD<br><br>*Match Group, LLC, et al. v. Google LLC, et al.*, Case No. 3:22-cv-02746-JD | No. 3:20-CV-05761-JD<br><br>**CONSUMER PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: August 4, 2022<br>Hearing Time: 10:00 a.m.<br>Courtroom: Courtroom 11, 19th Floor<br>Judge: The Honorable James Donato |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................2

I.   Common Questions Predominate, Satisfying Rule 23(b)(3) ............................................2

    A.   Dr. Singer's Model Shows All Developers Would Be Subject to
        Lower Take Rates Absent Google's Monopolization.................................................2

    B.   Consumer Plaintiffs Will Prove Pass-Through with Classwide
        Evidence.................................................................................................................4

        1.   Dr. Singer's Model Is Sound Classwide Proof of Pass-
             Through......................................................................................................... 4

        2.   App-By-App Analysis Is Not Required to Demonstrate
             Pass-Through................................................................................................ 5

        3.   Dr. Burtis's Misguided Claim that There are Uninjured
             Class Members Does Not Undermine Class Certification........................... 9

    C.   Dr. Singer's Play Points Model Provides Further, Independent
        Common Proof of Antitrust Impact .........................................................................9

    D.   Class Members Will Not Be Worse Off In the But-For World .................................10

    E.   Dr. Singer Provides a Common Method of Calculating Damages ........................11

II.   An Injunctive Relief Class Is Justified Under Rule 23(b)(2)...........................................12

III.   All Four of the Rule 23(a) Factors Are Met ...................................................................13

CONCLUSION......................................................................................................................15

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
  247 F.R.D. 156 (C.D. Cal. 2007) ..................................................................... 11

4

*B.K. by next friend Tinsley v. Snyder*,
  922 F.3d 957 (9th Cir. 2019) .......................................................................... 12

5

6

*Berni & Barilla S.p.A.*,
  964 F.3d 141 (2d Cir. 2020) .......................................................................... 13

7

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ....................................................................................... 14

8

*Buchanan v. Tata Consultancy Servs., Ltd.*,
  No. 15-CV-01696-YGR, 2017 WL 6611653 (N.D. Cal. Dec. 27, 2017) .................. 13

9

10

*Cummings v. Connell*,
  316 F.3d 886 (9th Cir. 2003) .......................................................................... 15

11

*In re Apple iPhone Antitrust Litig.*,
  No. 11-cv-6714-YGR, 2022 WL 1284104 (N.D. Cal. Mar. 29, 2022) ..................... 8

12

*In re Digital Music Antitrust Litig.*,
  321 F.R.D. 64 (S.D.N.Y. 2017) ......................................................................... 6

13

14

*In re Electronic Books Antitrust Litig.*,
  Case No. 11-md-02293 (DLC) (S.D.N.Y.) ........................................................ 14

15

*In re Flash Memory Antitrust Litig.*,
  No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ......................... 3

16

*In re FPI/Agretech Sec. Litig.*,
  105 F.3d 469 (9th Cir. 1997) .......................................................................... 14

17

18

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR, 2018 WL 1156797 (N.D. Cal. Mar. 5, 2018) ..................... 8

19

*In re Live Concert Antitrust Litig.*,
  247 F.R.D. 98 (C.D. Cal. 2007) ....................................................................... 11

20

21

*In re Online DVD Rental Antitrust Litig.*,
  No. M 09-2029 PJH, 2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) ...................... 15

22

*In re Optical Disk Drive Antitrust Litig.*,
  303 F.R.D. 311 (N.D. Cal. 2014) ................................................................... 5, 8

23

*In re Optical Disk Drive Antitrust Litig.*,
  No. 3:10-md-2143 RS, 2016 WL 467444 (N.D. Cal., Feb. 8, 2016) ...................... 10

24

25

*In re Packaged Seafood Prod. Antitrust Litig.*,
  332 F.R.D. 308 (S.D. Cal. 2019), *aff'd on reh'g en banc sub nom. Olean*,
  31 F.4th 651 ................................................................................................... 8

26

*In re Pre-Filled Propane Tank Antitrust Litig.*,
  No. 14-02567-MD-W-GAF, 2021 WL 5632089 (W.D. Mo. Nov. 9, 2021) ............... 6

27

*In re Suboxone Antitrust Litig.*,
  421 F. Supp. 3d 12 (E.D. Pa. 2019) ................................................................. 13

28

*Kamakahi v. Am. Society for Reproductive Med.*,
  305 F.R.D. 164 (N.D. Cal. 2015) .......................................................................... 11

*MacRae v. HCR Manor Care Services, LLC*,
  Case No. SA CV 14-00715-DOC (RNBx), 2018 WL 8064088 (C.D. Cal. Dec. 10,
  2018) ....................................................................................................................... 13

*Mueller v. Puritan's Pride, Inc.*,
  No. 3:16-cv-06717-JD, 2021 WL 5494254 (N.D. Cal. Nov. 23, 2021) ................... 12

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods, LLC*,
  31 F.4th 651 (2022) (en banc) ........................................................................ passim

*Paul, Johnson, Alston & Hunt v. Graulty*,
  886 F.2d 268 (9th Cir. 1989) ................................................................................. 14

*Sandoval v. M1 Auto Collisions Ctrs.*,
  309 F.R.D. 549 (N.D. Cal. 2015) ........................................................................... 15

*Walters v. Reno*,
  145 F.3d 1032 (9th Cir. 1998) ............................................................................... 12

**Statutes**

15 U.S.C. § 15c(b)(2) ................................................................................................. 15

**Other Authority**

*Newberg on Class Actions* § 3:75 .............................................................................. 15

**INTRODUCTION**

In its opposition, Google derides consumers for spending the "bulk of their motion … attacking Google's business practices." Dkt. 300 ("Opp.") at 1. But Google's monopolistic conduct demonstrates the enormous amount of common evidence of wrongdoing that would predominate over any individualized issues at trial. The conduct at issue includes predation, an array of exclusionary contracts, and numerous bribes and threats aimed at potential competitors. A trial on Google's anticompetitive schemes will require the presentation of voluminous common evidence, which will plainly predominate over any individualized issues.

Committing the very transgression Google falsely accuses consumers of, Google's opposition focuses on arguments about the merits of the case, including its criticisms of Dr. Singer's substantive analysis, that are inappropriate at the class certification stage. Those arguments also fail on the merits for the same reason they fail in the *Daubert* context.

The main thrust of Google's opposition—that pass-through is "not susceptible to generalized class-wide proof"—is foreclosed by the Ninth Circuit's recent decision in *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods, LLC*, 31 F.4th 651 (2022) (en banc). Google argues that ███████████████████ (based on its own economist's analysis), and therefore must be proven with individualized evidence. Opp. at 15. Google's economist is free to take this position—one that Plaintiffs will prove is fundamentally flawed—but it cannot outweigh Dr. Singer's reliable methodology assessing classwide damages. Instead, Google merely argues that "plaintiffs' evidence relating to the common question … [is] unpersuasive and unlikely to succeed." *Olean*, 31 F.4th at 667. Plaintiffs can prove their case with common evidence, and certification is warranted. It will be up to the jury to decide whether the evidence is persuasive. *Id.*

Google is also wrong that its monopolization has benefitted some consumers. Google argues that competition would harm consumers by forcing it to ████████████ or to reduce security. Speculation that Google might begin ██████████████████ for the first time in its history—causing some class members to pay *more* under competitive conditions—is no reason to deny class certification. There is no reason or economic rationale to suggest competition would lead Google to make its product worse, and acceptance of its argument would allow any

monopolist to escape liability through unilateral speculation about what it would be willing to do if it lost monopoly power. In any event, this, too, is a question for the merits.

## ARGUMENT

**I.      Common Questions Predominate, Satisfying Rule 23(b)(3)**

Ignoring the overwhelming predominance of undisputedly common issues in this monop-olization case, Google focuses just on antitrust injury, claiming that "Plaintiffs have no common proof" of pass-through, that Google would "lower service fees at all," or that consumers "would have been injured under their Play Points theory." Opp. at 8. But Google's argument ignores Dr. Singer's expert analysis demonstrating common impact through well-accepted economic models and is a rehash of its *Daubert* motion, which fails for multiple reasons. *See* Dkt. 298 ("*Daubert* Opp."). Dr. Singer's modeling reliably demonstrates common impact. *Id.*

**A.      Dr. Singer's Model Shows All Developers Would Be Subject to Lower Take Rates Absent Google's Monopolization**

As explained in Plaintiffs' opening brief, Dr. Singer's models of the App Distribution Mar-ket and In-App Aftermarket demonstrate that Google's 30% headline take rate is supra-competi-tive, and that Google would be forced to lower prices in the but-for world. Dkt. 280 ("Mot.") at 10-11. Aside from questioning an input, Google does not challenge the reliability of that model in its *Daubert* briefing. Dkt. 282 ("*Daubert* Br.") at 13-14. Instead, Google appears to argue that "not all developers would be subject to lower service fees in the but-for world" because it would keep its 30% take rate in the face of competition, competing with other stores **only** through a "targeted approach" of offering discounts to some developers. Opp. at 16-17. Most importantly, whether Google's contention has merit can be resolved on a classwide basis and, therefore, cannot defeat class certification. Second, Google's argument has no support in economics, the law, or the facts.

***First***, it is false that Google and its competitors have employed a "targeted approach" to pricing. *Id.* at 17. Google has used its uniform 30% take rate for the vast majority of developers, with negotiated programs formulaically reducing its rate from the headline rate representing ██ ████████ of U.S. developers. Ex. 3[1] (Singer Reply) ¶ 8. Likewise, Google's recent

---

[1] Exhibit citations in this reply refer to the consecutively-numbered exhibits of the Giulianelli Declaration filed in support of class certification, Dkt. 280-1, and the Giulianelli Declaration filed in support of this reply.

pricing reductions from 30% to 15% for the first $1 million in developer revenue per year and for subscription products apply uniformly to *all* developers. Ex. 68 (https://android-developers.googleblog.com/2021/03/boosting-dev-success.html); Ex. 69 (https://android-developers.googleblog.com/2021/10/evolving-business-model.html). Even for the ███████████████ — which are anticompetitive and would be absent in the but-for world—Google's headline take rate was "████████." Ex. 40 (GOOG-PLAY-004588725); Ex. 2 (Singer Rpt.) ¶¶ 110-14.[2] A key Google executive confirmed that Google ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████" Ex. 70 (Rosenberg Dep.) 123:22-124:23. A uniform approach is Google's norm, and ██████████████ are the exception. Likewise, contrary to Google's suggestion, entrants have already attempted to compete with cheaper take rates for *all* developers. International stores offer 20% (One Store) and 25% (Aptoide). Ex. 2 (Singer Rpt.) ¶¶ 196-98. ████████████████████████████████████████████████████████ ████████████████████████. *Id.* ¶¶ 104-09.

   ***Second***, Google ignores that a competitive but-for world would foster more general competition than the current world constrained by Google's monopoly power. Google's anticompetitive conduct affects "all market participants, creating an inference of class-wide impact" that cannot be undone due to "different bargaining power." *Olean*, 31 F.4th at 671, 677; *see also* Mot. at 21-22 (citing further cases). In an open market, it is unrealistic to expect that Google would individually negotiate with tens of thousands of developers. Ex. 3 (Singer Reply) ¶ 10. Without Google's contractual and technical restrictions, *all* apps would have the ability to freely steer to cheaper alternatives. And Google recognized that ████████████████████████, the result would ██████████████████████ and Google would ██████████ ████████████████████████████████████ Ex. 71 (GOOG-PLAY-000542516.R) at -532. In other words, Google's current ability to price discriminate by ████████████████ ██████████ reflects its market power. Ex. 2 (Singer Rpt.) ¶ 148. In short, Google would be

---

[2] This case is nothing like *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010), where three direct purchasers who controlled 82% of the market made "*individualized* negotiations and contracts with Defendants." *Id.* at *9.

forced to compete on price for **all** developers if it could not rely on its anticompetitive conduct to stymy competitors.

***Third***, that some developers may negotiate **even lower** prices in the but-for world does not defeat common impact. Dr. Singer's model accounts for those deals by extending the discount achieved in the actual world, albeit from the lower but-for headline rate. Ex. 3 (Singer Reply) ¶¶ 7-12. And Dr. Singer reliably shows that Google's take rate would be lower for **all** apps in the but-for world. For example, as noted above, Google has a policy favoring uniformity and it uses form Developer Distribution Agreements for all developers. Ex. 2 (Singer Rpt.) ¶ 119 & n.276.

### B.   Consumer Plaintiffs Will Prove Pass-Through with Classwide Evidence

#### 1.   Dr. Singer's Model Is Sound Classwide Proof of Pass-Through

Dr. Singer provides reliable proof of pass-through, "a class-wide question[,] in one stroke." *Olean*, 31 F.4th at 666. Google attacks this pass-through model, claiming that it relies on theoretical assumptions, that it fails to employ regressions, and that it cannot identify uninjured class members. These arguments ignore the rigorous work Dr. Singer performed to validate his work.

Google claims that Dr. Singer did not run any regressions to calculate pass-through, and instead relied on "a *theory* of universal pass-through." Opp. at 14-15.[3] But Dr. Singer did not simply rely on a theory. He ran regressions on real-world market shares and prices using each of Google's 35 app categories as a separate demand system to determine the demand curve faced by *each* developer and to test the fit of the logit model to the data. Ex. 2 (Singer Rpt.) ¶¶ 235-38 & Table 7. Google has not challenged those regressions. Only after the logit model proved to fit the data, Dr. Singer calculated pass-through for *each* app using the standard logit pass-through formula, derived mathematically in peer-reviewed literature, based on each app's share of the category in which it competed. *Id.* ¶ 239. The result is a model that calculates pass-through on an app-by-app level using established economic methods. *Id.* ¶¶ 235-39; Ex. 72 (Singer Dep.) 130:12-25.

---

[3] Google notes that Dr. Singer did not use his usual approach of "regressing retail price changes on wholesale price changes," Opp. at 14, but omits that the same deposition answer confirms that "that's just not available here." Ex. 72 (Singer Dep.) 134:24-135:8. Google's supra-competitive prices infect the entire period for which data is available, and no wholesale pricing exists given the two-sided platform structure of the market. *See id.* 138:16-142:13. Dr. Singer therefore turned to the well-accepted economic models in his report. Ex. 2 (Singer Rpt.) ¶168.

Nor did Dr. Singer simply assume universal pass-through—the model calculates a pass-through rate only if the logit demand explains the variation in the market share data within a category, which Dr. Singer validated. Unlike in *In re Optical Disk Drive Antitrust Litigation*, 303 F.R.D. 311 (N.D. Cal. 2014), Dr. Singer ran regressions to confirm the applicability of the model; he did not merely "assume[] the very proposition" he was trying to prove. *Id.* at 321.

Contrary to Google's suggestions, Dr. Singer also used real-world data. ***First***, Dr. Singer confirmed the applicability of the logit model using Google's voluminous transaction data. Dr. Singer ran regressions to confirm that real world price changes explained changes in market shares for the applications. Those regressions allowed Dr. Singer to confirm that the demand for the applications within the various Google "app categories" is interdependent—that is, an app's share within a given category declines with increases in the price of that app. Ex. 2 (Singer Rpt.) ¶¶ 235-38. ***Second***, Dr. Singer's analysis of developers' reaction to taxes in the real world confirmed cost pass-through. *Id.* ¶ 244. ***Third***, Dr. Singer examined (and rejected) the data underlying the flawed analysis of Dr. Burtis. *Id.* ¶¶ 242-44; Ex. 3 (Singer Reply) ¶¶ 112-15.

In short, none of Google's criticisms of Dr. Singer's pass-through model undermine its rigor or preclude its use as classwide proof of antitrust impact.

## 2. App-By-App Analysis Is Not Required to Demonstrate Pass-Through

Dr. Singer's reliable proof of impact—which as explained above, considers the pass-through rate of each app individually through the application of a well-accepted economic model—means that no further individualized app-by-app analysis is required to prove Plaintiffs' claims. Google's argument to the contrary relies on the flawed analysis of its economist, Dr. Burtis. She concluded that when Google applied a limited "service fee" (or take rate) reduction under the market conditions that exist today, pass-through was "rare." Opp. at 9. Google thus argues that "pass-through must be ***proven*** for each app." *Id.* (emphasis in original). But the *Olean* court rejected arguments like these: "[A] district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue." 31 F.4th at 667. Google's expert unsurprisingly disagrees on the merits, but that is no barrier to class certification. Opp. at 9.

1    In any event, Google's merits arguments are wrong. Google's claim that Dr. Singer has

2   "no answer to real-world evidence showing that prices did not change with service fees," Opp. at

3   16, ignores the many fatal flaws in Dr. Burtis's and the developers' expert analyses. The one-

4   month and six-month time horizons used by Dr. Burtis are insufficient to show the long-run effects

5   of lower prices in the but-for world. Ex. 3 (Singer Reply) ¶¶ 103. Google's anticompetitive conduct

6   infected the initial pricing of applications, which economic evidence suggests would linger due to

7   sticky prices. *Id.* ¶¶ 114-15. Both experts analyzed pass-through after a 2018 price reduction for

8   second-year subscriptions, but ignored that ███████████████████████████████

9   ███████████████████████████████████████████████████████

10  ███████. *Id.* ¶ 122 & n.248 (citing Ex. 73 (Scalise Dep.) at 269:9-21). Dr. Burtis's model suffers

11  from numerous other flaws, including failing to use appropriate controls and using artificially

12  small product-groups. Ex. 3 (Singer Reply) ¶¶ 102-33.

13   Google cannot paper over those flaws by claiming only its expert uses "actual data." As

14  discussed, Dr. Singer employed regression analysis using real-world pricing data to confirm the

15  applicability of his economic modeling of pass-through.[4] Google's mere assertion that pass-

16  through is "████████" is not supported by the factual record. For that reason, the cases Google

17  cites do not undermine the pertinency of Dr. Singer's model. *In re Pre-Filled Propane Tank Anti-*

18  *trust Litig.*, No. 14-02567-MD-W-GAF, 2021 WL 5632089, at *12 (W.D. Mo. Nov. 9, 2021) (ex-

19  cluding pass-through analysis limited to 3 retailers and less than 10% of total sales); *In re Digital*

20  *Music Antitrust Litig.*, 321 F.R.D. 64, 94 (S.D.N.Y. 2017) (excluding expert opinion for ignoring

21  20% of the market and for fatal flaw that "renders his inference from the regression invalid").

22   The remainder of the individualized factors Google says require further app-by-app analy-

23  sis are simply recast versions of its *Daubert* arguments. For the same reason those arguments fail

24  at *Daubert*, they fail to raise individualized issues that defeat class certification.

25   **Marginal Costs.** Dr. Singer's model does not ignore marginal costs. The peer-reviewed

26  literature on which Dr. Singer relied for his standard pass-through formula demonstrated that the

---

[4] Dr. Singer did not analyze pass-through of Google's take rate changes against real world data because, as he testified, those changes were too ██████ to allow robust testing. Ex. 72 (Singer Dep.) 138:16-141:12. Dr. Burtis's analysis of the same data is flawed for that reason.

formula is derived mathematically from a profit-maximation model in which marginal cost is a key component. Ex. 3 (Singer Reply) ¶ 71. Based on that derivation, Dr. Singer calculates pass-through based on the *change* in each developer's marginal costs from a reduced take rate. *Id.* ¶ 72. To argue otherwise, Google relies on the same misconstrued deposition testimony and faulty economics it did in its *Daubert* motion. *See Daubert* Opp. at 7-8.[5] Dr. Burtis opines that pass-through is "less likely" when a developer's marginal costs are zero. Ex. 5 (Burtis Rpt.) ¶¶ 142-43; Ex. 3 (Singer Reply) ¶¶ 21-24. Google has pointed to zero evidence that any app developers' marginal costs are actually zero. The best it can do is to note that "replication costs" are sometimes zero, Opp. at 10-11, but as the full deposition answer Google only partially cited notes, replication costs are merely one type of marginal costs. Ex. 72 (Singer Dep.) 97:19-98:19 (noting it "doesn't cost any more to replicate that sword, but that doesn't mean there aren't any marginal costs incurred in the transaction."). As Dr. Singer demonstrated, developers face numerous other marginal costs like Google's take rate, taxes, customer service, and server hosting. Ex. 3 (Singer Reply) ¶¶ 21-25. Given this unrebutted evidence, analysis of *levels* of developers' marginal costs is unnecessary.

**Focal Point Pricing.** Nor will proof of pass-through require app-by-app inquiry of focal point pricing as Google contends. Google misleadingly suggests that Dr. Singer conceded that focal point pricing is an "important consideration" in the but-for world solely by quoting a response to a question asking whether focal point pricing "explain[s] any developers' pricing in the *actual world*." Ex. 72 (Singer Dep.) 202:2-7 (emphasis added). As Dr. Singer explained, developers' behavior in the face of Google's restraints are not necessarily predictive of the but-for world. *Id.* at 197:19-207:6; Ex. 3 (Singer Reply) ¶¶ 26-31. Nonetheless, Google's transaction data records ███████████ transactions at prices that do not end in "99." Ex. 3 (Singer Reply) ¶¶ 26-31. As of February 2022, Google reduced the minimum app price from $0.99 to $.05 worldwide. *Id.* ¶ 29 & n.58. Even in the actual world, developers depart from focal point pricing, and Google itself has eased restrictions which effectively required focal point pricing at the $0.99 price point. And Dr. Singer's model does in fact allow for developers to retain focal-point pricing with price

---

[5] Google's reference to a "standard economic model" that Dr. Singer purportedly chose not to use, is an economic model that *cannot* calculate pass-through because it does not provide a method for determining a developer's demand curve. Ex. 72 (Singer Dep.) 106:4-107:22; *Daubert* Opp. at 7.

CONSUMER PLAINTIFFS' REPLY IN SUPPORT OF CLASS CERTIFICATION NO. 3:20-CV-05761-JD

points ending in 9. Ex. 3 (Singer Reply) ¶ 31. Dr. Singer's consideration of these factors is sufficient for his model to support certification. *See In re Packaged Seafood Prod. Antitrust Litig.*, 332 F.R.D. 308, 343 (S.D. Cal. 2019) (finding that "[t]he Court is not persuaded" by defendants' argument that expert "ignored loss-leader and focal point pricing" because the expert "in fact discusses both in his report"), *aff'd on reh'g en banc sub nom. Olean*, 31 F.4th 651.[6] Dr. Singer's model reliably considered the role focal point pricing would play in the but-for world.

**Competitive Conditions.** Google ignores that Dr. Singer's logit model measures, and controls for, the competitive conditions faced by developers in each of Google's 35 app categories. Dr. Singer determined that the logit model he employed explained real-world variation in prices and shares within an app category. Ex. 2 (Singer Rpt.) ¶ 238; Ex. 3 (Singer Reply) ¶ 70. In other words, the logit model verifiably described the competitive conditions faced by developers.[7] It yields the economically intuitive result that a highly concentrated app category where there is less competition will have a low pass-through rate, and an unconcentrated app category where there is more competition will have a high pass-through rate. *Id.* ¶ 73. Dr. Singer's modeling already accounts for competitive conditions, and no further individualized analysis is required.

**"Other Idiosyncratic Factors."** Google's argument that Dr. Singer failed to consider "other idiosyncratic factors" is another *Daubert* argument that mischaracterizes Dr. Singer's work. Dr. Singer's models are agnostic to how developers choose to use the portion of savings not passed through to consumers. Ex. 2 (Singer Rpt.) ¶ 266. Speculation that some developers may spend the remainder of their savings on marketing, improvements to their apps, or in ██████████ neither undermines his pass-through calculation nor requires individualized analysis. *Daubert*

---

[6] Google's cases all involved significantly different evidence of, and theories supporting, focal point pricing. *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2018 WL 1156797, at *3 (N.D. Cal. Mar. 5, 2018) (finding that theory of pass-through based on lower quality to compensate for battery costs in laptops was unsupported by record); *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. at 324-25 (finding that pass-through of cost that is "relatively small portion of the cost" of products priced at $100 increments defeated class certification); *In re Apple iPhone Antitrust Litig.*, No. 11-cv-6714-YGR, 2022 WL 1284104, at *8 (N.D. Cal. Mar. 29, 2022) (finding expert should have considered focal point pricing where record included "overwhelming evidence" of focal point pricing in but-for world, including expert's own admission).

[7] While Google is correct that Dr. Singer did not model "which apps in each category are complements and which are substitutes," Opp. at 12-13, he explained in the same answer that "it's not necessary to get the implied pass-through rate." Ex. 72 (Singer Dep.) 159:21-160:1; *see* Dkt. 298 (*Daubert* Opp.) at 13 (further discussing suitability of categories for logit model).

---

CONSUMER PLAINTIFFS' REPLY IN SUPPORT OF CLASS CERTIFICATION NO. 3:20-CV-05761-JD

Opp. at 9. In short, Google's "other idiosyncratic factors" are irrelevant to the determination of whether Plaintiffs have provided a reliable methodology for calculating antitrust injury.

### 3. Dr. Burtis's Misguided Claim that There are Uninjured Class Members Does Not Undermine Class Certification

Google's argument that class members who purchased from only one app may not be injured if that app's developer did not pass through Google's supracompetitive costs is just a restatement of Dr. Burtis's error-riddled analysis that pass-through is "a rare exception." Opp. at 1. Dr. Singer's analysis proves otherwise that virtually all class members *have* been harmed. *Supra* I.A.

Moreover, Google's argument is nearly identical to the argument the Ninth Circuit rejected in *Olean*, 31 F.4th at 669.[8] There, defendants' expert argued that 28% of the class was not overcharged. *Id.* at 680. The court found that this fact did not defeat class certification in part because the expert focused on "class members with no or limited transactions during the benchmark period," and "did not make a factual finding that 28 percent of the [class] … were uninjured." *Id.* The same is true here. Dr. Burtis identifies class members who made few purchases but does not identify which apps those individuals purchased or whether those apps would be priced the same in the but-for world. Dr. Burtis can argue at trial that some class members with limited purchases may not be injured, but without more, that cannot defeat class certification. *Id*. at 682. Dr. Singer's model is reliable evidence of antitrust impact that "each class member could have relied on … to establish liability if he or she had brought an individual action." *Id.* at 679-81.

### C. Dr. Singer's Play Points Model Provides Further, Independent Common Proof of Antitrust Impact

Dr. Singer's Play Points model independently demonstrates antitrust impact through the increased rewards consumers would receive in the but-for world. *See* Ex. 2 (Singer Rpt.) ¶¶ 245-56. Google says that Dr. Singer "assum[ed] away the need to determine the amount of Play Points each consumer would have earned," Opp. at 19, but Dr. Singer calculated that figure— ██ of transaction value. Ex. 2 (Singer Rpt.) ¶ 253. The remainder of Google's argument repeats its

---

[8] Google cites footnote 13 of *Olean* throughout its opposition, for the unremarkable proposition that individualized questions about uninjured class members can sometimes defeat class certification. Opp. at 7, 8, 9, 10, 16, 18. The *Olean* court merely recognized that, "on the particular facts of the cases before them," courts have found that the "need to identify uninjured class members" can predominate. *Olean*, 31 F.4th at 669 n.13. Google never engages with *Olean*'s actual holding.

*Daubert* contentions that Dr. Singer failed to model how many class members would sign up for and use Play Points in the but-for world. First, whether consumers spend the points or value them differently is irrelevant to class certification. *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2016 WL 467444, at *9 (N.D. Cal., Feb. 8, 2016) ("Defendants' focus on the subjective desires of individual consumers is misplaced, and is not supported by legal precedent requiring any such approach."). Unspent Play Points have intrinsic value, Ex. 3 (Singer Reply) ¶ 99, and the loss of consumer subsidies shows common impact. Second, Google's current opt-in model and relatively low participation rates do not mean Dr. Singer must model participation in the but-for world. Current participation rates are attributable to the limited Play Points program—subsidies average ███████████ because Google's anticompetitive conduct shields it from real competition, and therefore the need to attract consumers to its store. Ex. 72 (Singer Dep.) at 293:21-294:9, 297:8-21; Ex. 3 (Singer Reply) ¶ 98; *Daubert* Opp. at 3-4 (discussing same arguments).

### D.      Class Members Will Not Be Worse Off In the But-For World

Google speculates that some class members will be worse off in the but-for world, thereby defeating common impact, because Google would degrade its own services and features in the face of competition. Those self-serving merits arguments run contrary to basic economics, Google's own business model, and the facts in the record.

To begin, it defies belief that Google would respond to competition by charging ███████ ███████ or degrading security. *See* Mot. at 23-24. Basic economics teaches that "as competition increases, firms compete more vigorously for customers on all dimensions." *Id.* (quoting Ex. 3 (Singer Reply) ¶ 64.)

Moreover, Google's opposition severely overstates the extent to which the but-for world would deprive Google of revenue for its services. Opp. at 19. Dr. Singer models that Google would retain a 60% market share resulting in ██████ in profit in 2020 and ███████ in 2021 from its but-for take rates alone. Ex. 2 (Singer Rpt.) ¶¶ 219, 269. Google also ignores its substantial advertising revenue from ads placed in the Play Store, bringing Google Play's but-for profits up to ██████ in 2020 and ██████ in 2021. *Id.* ¶ 269. These substantial figures don't account for the other significant revenues Google earns from advertising on its own and others' apps and

products on Android. *Id.* ¶ 271. Google would risk these substantial revenues if it started providing a lower quality product or charging consumers for services that have always been free.

Separately, Google has consistently rejected the measures Dr. Burtis claims it would take. Mot. at 23-24. ████████████████████████████████████████████████████████████ ████████ would run counter to Google's core business strategies across all of its products. Google consistently offers free access to its products (including Search, Gmail, Maps, YouTube, and others). Google recognizes that ██████████████████████████████████████████" and "██████████████████████." *See* Ex. 70 (Rosenberg Dep.) 410:8-413:14. The economic evidence shows that Google would not depart from its core business model, but to the extent Google wants to argue otherwise, that is an issue for the merits. *See In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 143-44 (C.D. Cal. 2007) (rejecting, at class certification, arguments based on defendants' expert report, including claim that some class members would have been worse off in the but-for world, "because they relate to the merits").

Here, all consumers would be better off if there were competition.[9] The benefits to consumers that Google touts (security protections and ████████████████) are unrelated to its exclusionary conduct. Google simply argues that if its exclusionary conduct is barred, it will degrade its products rather than competing by improving its offerings. That is contrary to the facts and to well-established economic principles. Ex. 3 (Singer Reply) ¶ 2 n.3; *cf. Kamakahi v. Am. Society for Reproductive Med.*, 305 F.R.D. 164, 193 (N.D. Cal. 2015) (rejecting defendants' argument that substitution in the but-for world defeats class certification because the Ninth Circuit "does not favor denial of class certification on the basis of speculative conflicts" among the class).

## E.    Dr. Singer Provides a Common Method of Calculating Damages

For the same reasons that Dr. Singer's economic models provide common proof of antitrust impact, those models provide a classwide means of calculating damages. Google provides no independent argument for this point, simply restating the same mischaracterization of a "standard economic model" in Dr. Singer's report. *See* Opp. at 22 & n.16; *supra* n.7. Even if some

---

[9] Google relies upon *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156 (C.D. Cal. 2007), a case in which some class members received "discounts and deals on Tyco products" as a result of the exclusionary contracts "that would be *unavailable to them in the but-for world*." *Id.* at 168-70 (emphasis in original).

individualized damages determinations were required, "there is no per se rule that a district court is precluded from certifying a class if plaintiffs may have to prove individualized damages at trial," and Google has made no effort to make a showing why this case is different. *Olean*, 31 F.4th 651, 681-82.[10] Damages calculations are no barrier to class certification.[11]

## II.    An Injunctive Relief Class Is Justified Under Rule 23(b)(2)

Google argues that Rule 23(b)(2) has not been satisfied because: (1) Plaintiffs have not adequately described the injunction, (2) Plaintiffs have not shown that all class members are injured, and (3) an injunction would harm some class members. Each argument fails.

***First***, Rule 23(b)(2) will "ordinarily" be met "when plaintiffs have described the general contours of an injunction ... that can be given greater substance and specificity at an appropriate stage in the litigation." *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019). Moreover, Rule 23(b)(2) is met when "class members complain of a pattern or practice that is generally applicable to the class as a whole." *Mueller v. Puritan's Pride, Inc.*, No. 3:16-cv-06717-JD, 2021 WL 5494254, at *8 (N.D. Cal. Nov. 23, 2021) (*quoting Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)). Consumers have satisfied these standards. The Complaint alleges in detail the anticompetitive conduct that Plaintiffs seek to end. Dkt. 241 ¶¶ 4, 6-11, 14-22. Plaintiffs' expert reports also set forth at length conduct ripe for injunctive relief, including, but not limited to, removing technical barriers to other app stores; Ex. 2 (Singer Rpt.) ¶¶ 95-96; Ex. 4 (Schmidt Rpt.) ¶¶ 27-41; removing the tie requiring Google Play Billing for in-app transactions; Ex. 2 (Singer Rpt.) ¶¶ 27-29, 31; and permitting developers to steer consumers to other platforms; *id.* ¶¶ 169-75.

There is no merit to Google's related argument that monetary relief predominates over injunctive relief for the 23(b)(2) class. Monetary damages are sought only for a separate 23(b)(3)

---

[10] Here, as elsewhere, Google relies on a footnote in *Olean* while ignoring the holding. *See* Opp. at 22 (quoting *Olean*, 31 F.4th at 682 n.31). Google's brief separately quotes *Olean* for the proposition that "the complexity of damages calculations … defeat[s] predominance." Opp. at 21 (quoting *Olean* 31 F.4th at 681). The court actually said: "[T]he Tuna Suppliers have not argued that the complexity of damages calculations would defeat predominance here." 31 F.4th at 681. Plaintiffs respectfully submit that Google's quotation does not comport with paragraph 23 of this Court's Standing Order for Civil Cases.

[11] Google briefly argues that the proposed class's limitation to 17 states and territories would introduce individualized issues as to the residence of each class member, Opp. at 8, but its own data ██████████████████, allowing mechanical determinations of each class member's residence.

class. "District courts may certify both a 23(b)(2) class for the portion of the case concerning in-
junctive and declaratory relief and a 23(b)(3) class for the portion of the case requesting monetary
damages." *Buchanan v. Tata Consultancy Servs., Ltd.*, No. 15-CV-01696-YGR, 2017 WL
6611653, at *23 (N.D. Cal. Dec. 27, 2017); *see also MacRae v. HCR Manor Care Services, LLC*,
No. SA CV 14-00715-DOC (RNBx), 2018 WL 8064088, at *8 (C.D. Cal. Dec. 10, 2018).

*Second*, Google's argument that 23(b)(2) class members who made no purchase are un-
harmed is flawed. Google's anticompetitive conduct harms all users by reducing output and elim-
inating consumer choice. Google has foreclosed consumers' ability to download apps from
competitors, and its fees have restricted the growth and improvement of apps. *See* Ex. 2 (Singer
Rpt.) ¶¶ 54-166, 257-67. Each member of the proposed 23(b)(2) class is a current Android user, is
subject to ongoing antitrust violations, and would benefit from injunctive relief. Google's cases
concerning past users are inapposite. *See* Opp. at 25 (citing *Berni & Barilla S.p.A.*, 964 F.3d 141,
147 n.28 & 148 (2d Cir. 2020) (finding prospective relief would not redress class members with
only past harms); *In re Suboxone Antitrust Litig.*, 421 F. Supp. 3d 12, 70 (E.D. Pa. 2019) (same).

*Third*, Google's contention that users who download free apps would be harmed by in-
junctive relief is a merit-based issue and should not defeat class certification. As noted, *supra* Part
I.D, Google's parade of horribles that would accompany its loss of monopoly power is self-serving
speculation at best. To the extent class members have benefited from Google Play, those benefits
did not flow from the challenged anticompetitive conduct. The 23(b)(2) class should be certified.

## III.   All Four of the Rule 23(a) Factors Are Met

Consumers have established that each Rule 23(a) factor is met. There is no dispute that
numerosity, commonality, and typicality have been established. *See* Opp. at 4 (conceding there are
"█████████ putative class members"); Mot. at 4-13, 14-15 (identifying numerous common ques-
tions); Mot. at 15 (establishing typicality). Indeed, Google's opposition mentions these factors
only in its recitation of the legal standard. Opp. at 6.

Google generally does not dispute the adequacy of the class representatives and class coun-
sel either. Near the end of its brief, however, Google argues that the Joint Prosecution Agreement
signed by the Court-appointed Steering Committee and 39 State Attorneys General creates

conflicts of interest for class counsel. But this argument is meritless. The JPA does not create any conflicts of interest. It merely represents a recognition by the State AGs that class counsel performed considerable work for the benefit of consumers in *all states* prior to the State AGs bringing their claims,[12] and that the significant work class counsel continue to perform for the benefit of the proposed class likewise inures to the benefit of consumers in *all states*. *See* Ex. 1 (JPA).

The JPA recognizes that class counsel can request fees from a common fund for work they perform that benefits plaintiffs other than the proposed class. This is entirely consistent with longstanding jurisprudence on attorneys' fees for common funds. *See, e.g.*, *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"); *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir. 1989) ("[I]t is well settled that the lawyer who creates a common fund is allowed an *extra* reward, beyond that which he has arranged with his client...."). Regardless, the Court will determine any fee award. *In re FPI/Agretech Sec. Litig.*, 105 F.3d 469, 474 (9th Cir. 1997) (affirming fee award to law firm who tried case, rather than to counsel who had stopped work despite "Joint Prosecution Agreement" requiring fees to be split).

And there is nothing unusual or inappropriate in class counsel seeking fees for work that benefits a common fund performed in cooperation with state attorneys general. For example, in *In re Electronic Books Antitrust Litigation*, class counsel represented consumers in certain states in parallel with attorneys general representing consumers in other states under their *parens patriae* authority. Class counsel made a fee application over a common fund created for all consumers who benefited from the settlement and the application was approved. *See In re Electronic Books Antitrust Litig.*, Case No. 11-md-02293 (DLC) (S.D.N.Y.) at Dkt. 685 (order approving class counsel fee application in connection with settlement agreement including plaintiff states), & at Dkt. 667 (class counsel's fee declaration detailing coordinated work effort with counsel for plaintiff states). Close cooperation between class counsel and state attorneys general toward common objectives *benefits* consumers through more effective and efficient work. It should be encouraged,

---

[12] Class counsel filed their Complaint on behalf of consumers in all states 11 months before the State AGs brought overlapping *parens patriae* claims for consumers in 39 of the states.

not attacked. The JPA *avoids* a scenario in which class counsel and the States would be pursuing largely the same claims for the same relief on behalf of the same individuals.

Google also argues that class counsel have an interest in keeping the case alive as long as possible, because "counsel's ability to keep earning fees depends on the ***absence*** of a settlement." Opp. at 22-23. But class counsel are not being paid by the hour; their fees are entirely at risk. So their interests are aligned with class members as they have every incentive to recommend a timely, favorable settlement to the class representatives, and, ultimately, for court approval.

Google is mistaken in its assertion that four plaintiffs cannot serve as class representatives based on their residence.[13] These plaintiffs have, in essence, opted out of the States' action to serve as class representatives. *See* 15 U.S.C. § 15c(b)(2). Just as class representatives often represent residents of other states in federal antitrust actions, there is nothing unusual about this arrangement. Nonetheless, the interests of the proposed class do not differ from the claims of consumers in other states, and consumers nationwide have the same interests and the same incentives, regardless of who is representing them. Therefore, class counsel's representation of these clients creates no conflict even if some individual plaintiffs were not class members. "In general, class counsel may represent multiple sets of litigants—whether in the same action or in a related proceeding—so long as the litigants' interests are not inherently opposed." *Newberg on Class Actions* § 3:75; *see also Sandoval v. M1 Auto Collisions Ctrs.*, 309 F.R.D. 549, 570 (N.D. Cal. 2015) (denying motion to disqualify counsel for representing classes in separate proceedings).

At best, Google raises highly speculative arguments that the JPA "creates conflicts," but "[t]he mere potential for a conflict of interest in not sufficient to defeat class certification," and certification should not be denied "on the basis of speculative conflicts." *In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2010 WL 5396064, at *4 (N.D. Cal. Dec. 23, 2010) (*quoting Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003)). Class counsel are experienced and well-suited to represent the consumer class. Google's attack on their adequacy should be rejected.

## CONCLUSION

For the foregoing reasons, the Court should certify both classes under Rule 23.

---

[13] Two class representatives (Atkinson and Iwamoto) reside in class states. Dkt. 241 ¶¶ 27-28.

Respectfully submitted,

By: */s/ Karma M. Giulianelli*                                    By: */s/ Hae Sung Nam*

**BARTLIT BECK LLP**                                            **KAPLAN FOX & KILSHEIMER LLP**
Karma M. Giulianelli (SBN 184175)                              Hae Sung Nam (*pro hac vice*)
Glen E. Summers (SBN 176402)                                   Robert N. Kaplan (*pro hac vice*)
Jameson R. Jones (*pro hac vice*)                              Frederic S. Fox (*pro hac vice*)
1801 Wewatta St., Suite 1200                                   Donald R. Hall (*pro hac vice*)
Denver, CO 80202                                               Aaron L. Schwartz (*pro hac vice*)
Telephone: (303) 592-3100                                      850 Third Avenue
Facsimile: (303) 592-3140                                      New York, NY 10022
karma.giulianelli@bartlitbeck.com                              Tel.: (212) 687-1980
glen.summers@bartlitbeck.com                                   Fax: (212) 687-7715
jameson.jones@bartlitbeck.com                                  hnam@kaplanfox.com
                                                               rkaplan@kaplanfox.com
**BARTLIT BECK LLP**                                            ffox@kaplanfox.com
John Byars (*pro hac vice*)                                     dhall@kaplanfox.com
Lee Mason (*pro hac vice*)                                      aschwartz@kaplanfox.com
54 W. Hubbard St., Suite 300
Chicago, IL 60654                                              **KAPLAN FOX & KILSHEIMER LLP**
Telephone: (312) 494-4400                                      Laurence D. King (SBN 206423)
Facsimile: (312) 494-4440                                      Kathleen A. Herkenhoff (SBN 168562)
john.byars@bartlitbeck.com                                     1999 Harrison Street, Suite 1560
lee.mason@bartlitbeck.com                                      Oakland, CA 94612
                                                               Telephone: 415-772-4700
**COTCHETT, PITRE & MCCARTHY, LLP**                             Facsimile: 415-772-4707
Nanci E. Nishimura (SBN 152621)                                lking@kaplanfox.com
Adam J. Zapala (SBN 245748)                                    kherkenhoff@kaplanfox.com
Elizabeth T. Castillo (SBN 280502)
James G. Dallal (SBN 277826)                                   **PRITZKER LEVINE, LLP**
San Francisco Airport Office Center                            Elizabeth C. Pritzker (SBN 146267)
840 Malcolm Road, Suite 200                                    Bethany Caracuzzo (SBN 190687)
Burlingame, CA 94010                                           Caroline Corbitt (SBN 305492)
Telephone: (650) 697-6000                                      1900 Powell Street, Suite 450
Facsimile: (650) 697-0577                                      Emeryville, CA 94608
nnishimura@cpmlegal.com                                        Telephone: (415) 805-8532
azapala@cpmlegal.com                                           Facsimile: (415) 366-6110
ecastillo@cpmlegal.com                                         ecp@pritzkerlevine.com
jdallal@cpmlegal.com                                           bc@pritzkerlevine.com
                                                               ccc@pritzkerlevine.com

**KOREIN TILLERY, LLC**
George A. Zelcs (*pro hac vice*)
Randall Ewing, Jr. (*pro hac vice*)
David Walchak (SBN 323422)
205 North Michigan, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
dwalchak@koreintillery.com

Stephen M. Tillery (*pro hac vice*)
Michael E. Klenov (SBN 277028)
Carol O'Keefe (*pro hac vice*)
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525
stillery@koreintillery.com
mklenov@koreintillery.com
cokeefe@koreintillery.com

**MILBERG PHILLIPS GROSSMAN LLP**
Peggy J. Wedgworth (*pro hac vice*)
Robert A. Wallner (*pro hac vice*)
Elizabeth McKenna (*pro hac vice*)
Blake Yagman (*pro hac vice*)
Michael Acciavatti (*pro hac vice*)
One Penn Plaza, Suite 1920
New York, New York 10119
Telephone: 212-594-5300
Facsimile: 212-868-1229
pwedgworth@milberg.com
rwallner@milberg.com
emckenna@milberg.com
byagman@milberg.com
macciavatti@milberg.com

*Counsel for the Proposed Class*

1

## **CERTIFICATE OF SERVICE**

2 The undersigned certifies that a true and correct copy of the foregoing was served on July

3  14, 2022 upon all counsel of record via the Court's electronic notification system.

4

5 */s/ Karma M. Giulianelli*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28